UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CARCO GROUP, INC., and PONJEB V, L.L.C.,

|                        | Plaintiffs,        | Index No. 05 CV 6038 (ARL) |

    -against-

DREW MACONACHY,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## POST-TRIAL MEMORANDUM OF PLAINTIFFS
## CARCO GROUP, INC. AND PONJEB V, L.L.C.

FARRELL FRITZ, P.C.
*Attorneys for Plaintiffs*
1320 RexCorp Plaza
Uniondale, New York 11556-1320
(516) 227-0700
- and -
Edward F. Cunningham, Esq.
*Co-Counsel for Plaintiffs*
62 Cambridge Avenue
Garden City, New York 11530

*Of Counsel*:
    James M. Wicks
    Edward F. Cunningham
    Frank C. McRoberts

Interwoven\885548.1

## TABLE OF CONTENTS

                                                                                                   **Page**

TABLE OF AUTHORITIES ................................................................................................... iii

ARGUMENT

   Point I

      PLAINTIFFS' RESPONSES TO QUESTIONS OF THE COURT ....................5

      **Question #1**:  How did the termination of MMI West employees impact
                 MMI West's financial performance?............................................................5

      **Question #2**:  Why would Peter O'Neill fire Drew Maconachy if O'Neill was
                 "obsessed" with profitability and Maconachy was purportedly so
                 successful at increasing MMI West's profitability? ....................................6

      **Question #3**:  Did John Murphy have an interest in participating in the
                 falsification of the Weekly Time Analysis reports? ....................................7

      **Question #4**:  Should the Court infer from O'Neill's criticism of Michael Slattery in
                 2003 about MMI West's use of Brendan Kertin that O'Neill directed
                 Slattery to terminate Kertin?.....................................................................8

      **Question #5**:  Even assuming that Maconachy did not actively participate in the
                 falsification of the Weekly Time Analysis reports, was Maconachy
                 disloyal by failing to inquire whether the records were falsified and
                 by failing to notify O'Neill of the record falsification?............................9

      **Question #6**:  If O'Neill knew that Kertin was performing work for MMI would there
                 have been any reason to falsify the Weekly Time Analysis reports? ........10

      **Question #7**:  Can O'Neill be charged with actual knowledge that Kertin performed
                 work for MMI during the period of the record falsification based on
                 his receipt of sporadic documents containing references to Kertin? .........11

      **Question #8**:  When did O'Neill first inform Maconachy that he was prohibited from
                 using CARCO's competitors for background screening services?............11

      **Question #9**:  Why is it important to Plaintiffs that Maconachy used the name
                 "Murphy & Maconachy" without Plaintiffs' permission in a lawsuit
                 Maconachy commenced?...........................................................................13

      **Question #10**: Didn't MMI West's revenues increase significantly
                 after the acquisition?...............................................................................14

      **Question #11**: Was there a delay between the time that O'Neill directed Maconachy

i

not to use CARCO's competitors for background checks and the time
that CARCO was able to perform those services at the same level as
CARCO's competitors? .............................................................................15

**Question #12**: Was O'Neill's objection to Maconachy's employment of
Kertin based on the fact that Kertin was Maconachy's
brother-in-law?.........................................................................................16

**Question #13**: How and by whom were the Weekly Time Analysis reports generated
and circulated to O'Neill prior to implementation of the plan to
remove Kertin's name from the report?....................................................17

**Question #14**: Is O'Neill's awareness that Kertin may have been working for MMI
during the period of falsification of the Weekly Time Analysis reports
relevant to whether Maconachy was disloyal for participating in the
record falsification? ................................................................................18

**Question #15**: How did Maconachy testify concerning the work-related uses of the
home computer that he threw away after the start of the lawsuit?............18

**Point II**

    **PLAINTIFFS' DAMAGES**......................................................................................20

A. Plaintiffs are Entitled to Damages for Maconachy's Breach of Contract...................20

    1. Plaintiffs Are Entitled to Damages from January 7, 2000 ...............................20

    2. Plaintiffs Are Entitled to Damages from,
       at the Very Latest, November 17, 2000 ..........................................................23

B. Plaintiffs are Entitled to Disgorgement of Maconachy's Compensation.....................25

    1. Plaintiffs are Entitled to Disgorgement of All Salary, Fringe
       Benefits and Incentive Compensation from November 17, 2000...................25

    2. Plaintiffs are Entitled to Disgorgement of All Salary,
       Fringe Benefits and Incentive Compensation from,
       at the Very Latest, September 26, 2003 ..........................................................27

    3. Plaintiffs are Entitled to Disgorgement of All
       Quarterly Payments from November 17, 2000,
       or, at the Very Latest, September 26, 2003....................................................27

**CONCLUSION** ...............................................................................................................30

## TABLE OF AUTHORITIES

**Page**

### FEDERAL

*Babaev v. Grossman*,
   2008 WL 4185703 (E.D.N.Y. Sept. 8, 2008) ...............................................................19

*Gutman v. Klein*,
   2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008)................................................................19

*LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*,
   173 F.3d 454 (2d Cir. 1999)........................................................................................20

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*,
   2005 WL 832050 (S.D.N.Y. Apr. 12, 2005) ................................................................20

*Phansalkar v. Anderson Weinroth & Co.*,
   344 F.3d 184 (2d Cir. 2003)..................................................................................25, 28

*Sanders v. Madison Square Garden, L.P.*,
   2007 WL 1933933 (S.D.N.Y. July 2, 2007) ................................................................25

*Whitney v. JetBlue Airways Corp.*,
   2008 WL 2156324 (E.D.N.Y. Apr. 29, 2008) ..............................................................19

### STATE

*Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*,
   10 N.Y.3d 187 (2008) ...............................................................................................  20

*Feiger v. Iral Jewelry, Ltd.*,
   41 N.Y.2d 928 (1977)……………………………………………………….......…  25

*Lamdin v. Broadway Surface Advertising Corp.*,
   272 N.Y. 133 (1936) ...................................................................................................28

*Murray v. Beard*,
   102 N.Y. 505 (1886) ...................................................................................................25

*Turner v. Kondwenhoven*,
   100 N.Y. 115 (1885) ...................................................................................................25

### MISCELLANEOUS

RESTATEMENT 2d AGENCY § 469................................................................................25

Plaintiffs CARCO Group, Inc. ("CARCO") and PONJEB V, L.L.C. ("PONJEB", together with CARCO, "Plaintiffs") respectfully submit this Post-Trial Memorandum.

Plaintiffs delivered upon their promise that they would prove a continuum of wrongful conduct by defendant Drew Maconachy ("Maconachy"), progressing from failure to perform, to insubordination, to deception. After the closing of Plaintiffs' acquisition of the assets of Murphy & Maconachy, Inc. ("MMI") on January 7, 2000, the West Coast division of MMI ("MMI West"), which was managed by Maconachy, immediately incurred huge losses. These mounting losses were due to Maconachy's mismanagement of MMI West and his failure to meaningfully market its services. These losses continued through 2002 and ultimately totaled $1,949,053.

Maconachy's blatant insubordination first surfaced in November 2000. Around October and November 2000, the enormity of the MMI West's losses became obvious to Plaintiffs' lender, Chase Manhattan Bank ("Chase"). At Chase's urging, Plaintiffs' owner, Peter O'Neill ("O'Neill"), was forced to intervene in MMI West's previously largely-autonomous business affairs to impose marketing duties on Maconachy to attempt to generate desperately needed revenues. Then, to everyone's surprise, during the critical meeting on November 17, 2000, called to address MMI West's huge losses, Maconachy abruptly left without any prior warning. O'Neill testified that when Maconachy walked out, he was "amazed" and "shocked" and felt like he had been "kicked in the stomach." As it turns out, Maconachy played golf at his club the following two days, which explains his abrupt departure. This act was the beginning of a five-year-long pattern of open insubordination.

During this time, Maconachy repeatedly and intentionally refused to comply with countless duties that were assigned to him:

> ➢ He openly refused to make required sales calls and market CARCO's services, including to specific target prospects identified by him, after being repeatedly assigned such duties.

> ➢ He diverted background investigation business to CARCO's direct competitors when directed not to do so.

> ➢ He employed his wife, son and brother-in-law in spite of numerous CARCO directives concerning their employment.

> ➢ He failed to obtain required retainers from CARCO's clients which resulted in write-offs of significant fees.

> ➢ He refused to market CARCO's services while on business trips after being told countless times to do so.

> ➢ He refused to travel alone on business trips.

> ➢ He refused to make multiple sales calls when driving significant distances from CARCO's offices.

> ➢ He put CARCO at risk by violating federal and state law by employing his son "off the books" and his wife for an excessive number of hours for a part-time employee after being ordered not to do so.

> ➢ He failed to obtain a nondisclosure agreement when sharing proprietary business information with a CARCO competitor, which may have enabled the competitor to ultimately acquire MMI West's largest and most valuable account, the Sears vendor screening program.

These wrongful acts were constant, widespread and, collectively, so disruptive that CARCO's senior management — who devoted substantial time and energy towards Maconachy — was left simply incapable of working effectively with Maconachy.

Maconachy's deception began, as best we can tell, on September 26, 2003. On that date, he participated in a conspiracy with other MMI employees to falsify Weekly Time Analysis reports that he knew were routinely submitted to O'Neill. The intent of falsifying the Weekly Time Analysis reports was to hide MMI's employment of Maconachy's brother-in-law, Brendan Kertin ("Kertin"), from O'Neill. Maconachy participated in this scheme because he had been

ordered to stop using Kertin to perform services for MMI, but did not want to fire his relative. This falsification of business records continued, on a weekly basis, from September 2003 through Maconachy's termination on December 28, 2005. Maconachy candidly testified that the record falsification was a "deception" — a deception of O'Neill. This deception, freely admitted by Maconachy, lasted uninterrupted from September 2003 through the date of Maconachy's termination. Disloyal employee? The answer is self-evident.

In fact, Maconachy's deception continued even after his termination. First, well after the commencement of this lawsuit, Maconachy threw away his home computer, containing evidence for this case. Second, he used the name "Murphy & Maconachy" for his own benefit in a lawsuit, without CARCO's knowledge or permission, in direct violation of the Asset Purchase Agreement ("APA").

For these breaches, Plaintiffs seek two distinct categories of damages: contract damages and disgorgement of compensation. First, Plaintiffs seek recovery of $1,949,053 in breach-of-contract damages due to the cumulative losses incurred by MMI West in calendar years 2000 through 2002. Maconachy directly and proximately caused these losses by failing to perform sales and marketing duties that were assigned to him in accordance with the standards in the industry, in breach of his Employment Agreement ("EA"). Pursuant to Section 9.1 of the APA, Maconachy's breach of the EA also entitles Plaintiffs to recover interest and their attorneys' fees in this action.[1]

Second, pursuant to the faithless servant doctrine, Plaintiffs seek disgorgement of all salary, fringe benefits and incentive compensation paid to Maconachy from November 17, 2000, the date when Maconachy's faithlessness to Plaintiffs became obvious, through his termination

---

[1] Therefore, if Plaintiffs prevail on one or more of their breach of contract claims, the Court should hold an inquest concerning Plaintiffs' attorneys' fees.

3

on December 28, 2005. These amounts total $1,051,451.[2] In addition, Plaintiffs seek forfeiture of all quarterly payments paid to Maconachy, pursuant to the APA, subsequent to November 17, 2000. These payments total $1,368,468. As explained below, Plaintiffs are entitled to disgorgement of these quarterly payments because they were a form of compensation for Maconachy's continued faithful performance of his duties under the EA. Throughout the trial, Plaintiffs demonstrated that Maconachy's devoted services were the very heart of the APA. In other words, Maconachy's faithful performance of his duties under the EA was the most valuable asset that Plaintiffs purchased under the APA. Maconachy destroyed the value of that asset by faithlessly refusing to perform his duties.

In sum, Plaintiffs seek recovery of $1,949,053 in damages for breach of contract and $2,419,919 in forfeiture of compensation, including salary, fringe benefits, incentive compensation and quarterly payments, for a total of $4,368,972, as well as prejudgment interest and attorneys' fees, pursuant to Section 9.1 of the APA.

In Plaintiffs' Pre-Trial Memorandum (ECF Docket No. 42), Plaintiffs set forth the legal grounds for their claims as well as the reasons why Maconachy's counterclaims are baseless. Rather than repeat each of those claims and counterclaims, we incorporate that Memorandum by reference. Here, Plaintiffs address, in question and answer format, key questions that were posed by the Court at summation on August 15, 2008. *See* Point I. Next, Plaintiffs set forth in greater detail the legal grounds for, and calculation of, their damages. *See* Point II.

---

[2] As further explained in Point II.B.1, below, this amount excludes salary and fringe benefits paid to Maconachy from November 17, 2000 to December 31, 2002. These amounts are already included as expenses in calculating MMI West's cumulative losses. Plaintiffs seek recovery of these amounts under their separate claim for breach of contract. *See* Point II.A, below. However, as further explained in Point II.B.1, below, in the event that Plaintiffs do not recover some or all of their damages for breach of contract, Plaintiffs' disgorgement figure will need to be upwardly adjusted to include all salary and fringe benefits paid to Maconachy from November 17, 2000 to December 31, 2002.

4

## ARGUMENT

### Point I

### PLAINTIFFS' RESPONSES TO QUESTIONS OF THE COURT

Set forth below are paraphrased versions of questions raised by the Court during summation, followed by Plaintiffs' responses:

**Question #1:** *How did the termination of MMI West employees impact MMI West's financial performance?* Tr. 1903:10-1903:19.[3]

**Answer**: MMI West would not have shown any profit during Maconachy's six years with CARCO without the termination of MMI West employees beginning in 2002. Simply stated, MMI West was overstaffed. CARCO's former President, Michael Slattery ("Slattery"), testified that when he became President of CARCO in October 2001, he analyzed MMI West's financial condition and determined that MMI West needed to "align the cost with its revenues." Tr. 1296:18-1296:23; 1299:20-1300:07. Slattery thereafter directed that MMI West eliminate, according to Maconachy's testimony, approximately fourteen employees. Tr. 1649:08-1650:09.

MMI West's cost of doing business significantly declined after the staff cuts, with a directly proportionate increase in MMI West's profits. Tr. 1651:19-1653:15. Schedule "I" of CARCO's audited annual financial statements indicate that MMI West's total annual salaries decreased from $1,058,765 in fiscal year 2001 (the year before the staff cuts) to $976,074 in fiscal year 2002; to $636,390 in fiscal year 2003; to $810,170 in fiscal year 2004; to $804,242 in fiscal year 2005. P338[4]; P396; P339; P340; P341. Assuming that without the staff cuts MMI

---

[3] The trial transcript is referred to herein as "Tr.___:___".
[4] Plaintiffs' trial exhibits are referred to herein as "P___". Defendant's trial exhibits are referred to herein as "D___".

5

West's total annual salaries would have remained constant at $1,058,000 for each of years 2002 through 2005, the staff cuts resulted in a total payroll savings of $1,005,124.[5]

CARCO's Vice President of Finance, Glen Tannenbaum ("Tannenbaum"), testified that MMI West's cumulative profit from years 2000 through 2005 was only $288,513. Tr.1799:07-1799:13; *see also* P441; P5. Therefore, without the discharge of MMI West employees and the resulting payroll savings, MMI West would have sustained a cumulative loss of approximately $716,551 in the nearly six years that Maconachy was employed by CARCO.

**Question #2:** *Why would O'Neill fire Maconachy if O'Neill was "obsessed" with profitability and Maconachy was purportedly so successful at increasing MMI West's profitability?* Tr. 1906:11-1906:14.

**Answer**: O'Neill based his decision to fire Maconachy on two factors: a) whether Maconachy's "conduct r[ose] to the level of a breach of contract" and b) the financial "ramifications" that would result from terminating Maconachy. Tr. 800:03-800:18; 852:10-853:13. Prior to O'Neill's discovery of the falsification of the Weekly Time Analysis reports, O'Neill believed it was not financially prudent to terminate Maconachy until a qualified replacement was found. *Id.* However, when O'Neill learned, in or around November 2005, that Maconachy participated in the falsification of the Weekly Time Analysis reports, he concluded, based on the advice of counsel, that he had no choice but to fire Maconachy "regardless of the business consequences." Tr. 852:03-854:13.

Maconachy's counsel's suggestion that Maconachy's termination was instead based on O'Neill's "personal animus" towards Maconachy, or was specifically timed to avoid the running of the statute of limitations, *see* Tr. 1906:17-1907:03, is entirely unsupported by the record.

---

[5] This amount excludes additional savings in payroll taxes, medical and liability insurance and 401k matching contributions. While there is no evidence in the record concerning these additional amounts, a general rule of thumb is that FICA, FUI, SUI and GLI costs equal approximately 30% of an employee's annual salary.

**Question #3**: *Did John Murphy ("Murphy") have an interest in participating in the falsification of the Weekly Time Analysis reports?* Tr. 1908:16-1908:18.

**Answer**:        Yes.  Murphy and Maconachy were business partners and close friends for decades.  Maconachy testified at trial that he and Murphy were at MMI for "15 years together when we sold the business to Mr. O'Neill."  Tr. 1566:13-1566:21.  Moreover, even before Maconachy joined Murphy's business in 1985, Murphy bought Maconachy's home in Orange County, California, in approximately 1980 or 1981, and very soon thereafter formed a friendship with Maconachy.  Tr. 1566:22-1567:14.  They even lived, in Maconachy's words, "literally across the street."  Tr. 1567:09-1567:12.  Murphy remained close friends with and was loyal to Maconachy throughout his employment with CARCO.  As a close friend of Maconachy, Murphy naturally sought to help Maconachy's brother-in-law.

Murphy's purported reason for falsifying the business records is not credible.  Murphy testified in his videotaped deposition that Slattery called and directed him to falsify the Weekly Time Analysis reports.  7/3/07 Tr. 285:09-286:18[6]; 8/9/07 Tr. 533:04-534:15.  However, Slattery flatly denied Murphy's allegation at trial.  Tr. 1297:23-1298:13.  Counsel asked Slattery, "[D]id you ever instruct Mr. Murphy to falsify a business record?"  His unambiguous response: "*No*." Tr. 1297:23-1297:25 (emphasis added).  Counsel then asked, "Did you ever ask or instruct Mr. Murphy to change a weekly time analysis report to hide it from Mr. O'Neill?"  Slattery's response:   "No."   Tr. 1298:01-1298:04.   Slattery denied he even *knew* about the record falsification until he appeared as a witness at trial.  Tr. 1298:04-1298:07.

Second, Slattery instructed Murphy in an email dated June 17, 2002, that "going forward," Murphy was required to "communicate with MMI West in writing and provide me with a copy."  P236.  In direct violation of this directive, Murphy failed to copy Slattery on his

---

[6] Deposition transcripts are referred to herein as "__/__/07 Tr. ___:___".

September 26, 2003 email to MMI West directing the record falsification.   P360; P367.

Moreover, Murphy testified that he never *once* sent Slattery written confirmation of the removal

of Kertin's name from the Weekly Time Analysis reports.  8/9/07 Tr. 541:22-543:22.

**Question #4**: *Should the Court infer from O'Neill's criticism of Slattery in 2003 about MMI West's use of Kertin that O'Neill directed Slattery to terminate Kertin?* Tr. 1910:12-1910:14; 1910:17-1910:21.

**Answer**:        Yes.  Even under Murphy and Maconachy's version of events, one must

conclude that O'Neill directed Slattery to have Kertin terminated.  Otherwise, Slattery would

have had no motive to allegedly order the falsification of the reports.

Moreover, O'Neill testified at trial that he did, in fact, direct Slattery to terminate Kertin

in or around September 2003.  Tr. 847:19-847:22; 850:25-851:16.  The documentary record

supports O'Neill's testimony.    O'Neill sent increasingly concerned messages to Slattery

throughout 2003.  On May 5, 2003, O'Neill sent Slattery a note on a Weekly Time Analysis

report stating, "Watch this carefully or he [i.e., Kertin] will slip back on payroll."  P54; Tr.

847:23-848:20.  Then, on August 18, 2003, O'Neill sent Slattery another note on a Weekly Time

Analysis report stating, "Brendan [is] going to get us in trouble by paying him with a 1099 when,

in fact, he is a full time CARCO employee and denied benefits.  You need to address this!"  P44;

Tr. 848:21-850:24.

Finally, on September 16, 2003, O'Neill sent Slattery a note stating:

I am <u>directing</u> you to bring this to a halt.  Brendan is working as a P/T employee
without benefits in violation of Calif. law!!   Drew is giving <u>CARCO's</u> $ to
Brendan.  Why did we need Brendan to work 29 hrs this week with only 103 <u>total</u>
hrs for the branch.  Please advise."  (P55; Tr. 851:14-851:21).

O'Neill testified that the September 16, 2003 note was, in his view, a directive that Slattery

terminate Kertin.  Tr. 850:25-851:16; 1027:05-1027:08.  A mere ten days later, to alleviate this

8

pressure from O'Neill and Slattery, Murphy and Maconachy devised the plan to falsify the Weekly Time Analysis reports. P360; P367.

**Question #5**: *Even assuming that Maconachy did not actively participate in the falsification of the Weekly Time Analysis reports, was Maconachy disloyal by failing to inquire whether the records were falsified and by failing to notify O'Neill of the record falsification?* Tr. 1911:21-1912:02; 1912:07-1912:16.

**Answer**:       Yes.   According to Maconachy's testimony, he never followed up to determine whether the record falsification had, in fact, been implemented. Tr. 1448:10-1449:19. The most reasonable conclusion is that Maconachy knew or assumed that the record falsification had been implemented, because Kertin was still being paid by CARCO, but Maconachy sought to shield himself from culpability by consciously avoiding the truth.

Maconachy had a number of legitimate alternatives.   He could have complied with O'Neill's directives and terminated Kertin.  He could have instructed his subordinates to not cooperate with Murphy's request on September 26, 2003.  He could have informed O'Neill of the falsification. Instead, Maconachy admitted that he failed to take any affirmative steps to stop the falsification. Tr. 1445:13-1445:22. Indeed, by his own admission, Maconachy told Pauline Smith ("Smith") "you can do the research" to determine how the record falsification could be accomplished.  Tr.1436:07-1436:09.  As an officer of CARCO, Maconachy had affirmative duties to protect the interests of his employer.  Yet, by choosing to comply with the record falsification, Maconachy made clear that his loyalties lay anywhere but with O'Neill and CARCO.

Maconachy's testimony that he "very emphatically" objected to his staff participating in the plan to falsify the Weekly Time Analysis reports is directly contradicted by the testimony of

9

Murphy and Smith.  Tr. 1435:08-1436:09.  Murphy testified that Maconachy told him, *"[D]o what we got to do."*  8/9/07 Tr. 556:03-556:07 (emphasis added).

In addition, Maconachy's counsel asked Smith at her deposition, "Did Mr. Maconachy ever instruct you to falsify a record so that Mr. Kertin's employment would be hidden from Mr. O'Neill?"  She responded, *"Yes."*  6/4/07 Tr. 17:24-18:02 (emphasis added).  Counsel then asked, "Asked by whom?"  Smith responded, "Drew and John."  *Id.* 18:12-18:13.  Later, counsel asked Smith, "Did, at any time during those discussions, Mr. Maconachy tell you not to remove his name?"  Smith replied, "Not that I recall."  6/4/07 Tr. 267:01-267:03.

Finally, Maconachy testified that his counsel, Thomas Girardi, advised him as early as 2001, to "build a paper trail" concerning CARCO.  Tr. 1528:21-1529:17.  Complying, Maconachy personally printed and retained (and ultimately produced in discovery) a copy of Murphy's September 26, 2003 email proposing the record falsification.  *See* P360.  Maconachy unquestionably would have put his "emphatic" opposition to the record falsification in writing to protect himself in the event the falsification was discovered.  Maconachy's testimony that he opposed the plan to falsify the Weekly Time Analysis reports is incredible, at best.

**Question #6**: *If O'Neill knew that Kertin was performing work for MMI would there have been any reason to falsify the Weekly Time Analysis reports?*  Tr. 1921:13-1921:18.

**Answer**:      No.  The Weekly Time Analysis reports were falsified solely to hide Kertin's employment from O'Neill.  Murphy expressly testified there was no other purpose. 8/9/07 Tr. 537:11-537:17.  If Maconachy and Murphy truly believed that O'Neill was aware of Kertin's employment, based on O'Neill's occasional receipt of documents containing Kertin's name, they very likely would have ceased falsifying the Weekly Time Analysis reports.  Instead, Murphy and Maconachy knew that O'Neill stopped criticizing them about Kertin once the record

10

falsification began. Believing O'Neill's silence was due to the record falsification, they chose to continue to falsify the records through the date of Maconachy's termination.

Finally, Maconachy's testimony that he "[a]bsolutely [did] not" know that O'Neill wanted Kertin terminated belies all credibility. Tr. 1437:14-1438:17. Murphy testified at his deposition that Maconachy knew the intent of the falsification was to hide Kertin's employment from O'Neill. 8/9/07 Tr. 557:19-559:07. Obviously, but for O'Neill's desire to have Kertin terminated, there would have been no motive to hide Kertin's employment from O'Neill.

**Question #7**: *Can O'Neill be charged with actual knowledge that Kertin performed work for MMI during the period of the record falsification based on his receipt of sporadic documents containing references to Kertin?* Tr. 1925:15-1926:02.

**Answer**:      No. There is no doubt that O'Neill could have learned at some point during the falsification that Kertin was performing work for MMI. However, it cannot be assumed that O'Neill, CARCO's chairman, read every document in its entirety that he received containing a reference to Kertin, or, even if he read such a document, noticed a reference to Kertin buried therein. Tr. 1271:10-1272:21. Moreover, O'Neill's knowledge of whether Kertin was working for MMI is simply irrelevant to the central issue for Maconachy's disloyalty, i.e., his *intent* to deceive O'Neill for his own personal benefit.

**Question #8**: *When did O'Neill first inform Maconachy that he was prohibited from using CARCO's competitors for background screening services?* Tr. 1940:11-1940:13.

**Answer**:      Maconachy admitted at trial that O'Neill informed him before the acquisition that MMI was not to use CARCO's competitors to perform services that CARCO currently performed.    Tr. 1743:06-1744:10.      In addition, O'Neill testified that it was "understood" before the acquisition that MMI's use of CARCO to provide background screening

11

services "went to the heart of what our relationship was to be." Tr. 824:12-824:14. O'Neill testified that the "heart of that relationship" was, as stated in the Merrill Lynch valuation of MMI, to capitalize on "synergisms" through cross-selling the services of MMI and CARCO. Tr. 719:06-720:04; P2. MMI's use of CARCO for background checks was one of the synergisms the acquisition was designed to exploit. O'Neill testified that he, Maconachy and their staff discussed these cross-selling opportunities, including use of CARCO for background checks, prior to the acquisition. Tr. 722:06-722:20; 734:04-734:07; 1215:11-1216:25.

Despite the clear rule that MMI was not to use CARCO's competitors to perform services that CARCO currently performed, Maconachy's noncompliance forced O'Neill to specifically prohibit MMI West from using CARCO's competitors, first, for *criminal background checks*, then later, for *civil litigation searches*, and then finally, for *education and employment checks*. CARCO provided all of these services. Maconachy knew that he was required to process all of these background checks through CARCO rather than CARCO's competitors.

When O'Neill first learned that MMI was using CARCO's competitors for *criminal background checks*, O'Neill instructed Maconachy in a memorandum dated July 20, 2001, that "effective immediately, all of MMI's criminal history records checks are to be processed through our APU Division." P199; Tr. 822:10-824:14; 833:01-835:17; 1746:11-1746:17. O'Neill testified that this was not the first time he directed Maconachy not to use CARCO's competitors. Tr. 834:05-835:17.

Thereafter, when O'Neill learned that MMI was not using CARCO for *civil litigation searches*, O'Neill informed Maconachy in a memorandum dated October 10, 2001, that "I am directing that MMI (all offices) utilize the CARCO Research Division's APU services for all of the following searches:

12

- Criminal history checks (state and federal);
- Civil litigation searches (state and federal; individual and business entities);
- Motor vehicle records;
- Credit Bureau records;
- Social Security number traces (*i.e.*, verification of identity)" (P186).

Finally, Maconachy's own "2001 Business Plan of MMI" required MMI to use CARCO to perform *education and employment checks*. P216 at 47; Tr. 403:01-404:01; Tr. 415:18-416:05. However, despite all of the prior communications prohibiting MMI West from using CARCO's competitors for background checks, MMI West continued to use CARCO's competitors to perform education and employment checks through, at least, November 2004. P412; Tr. 78:09-82:03; 413:21-416:05. Maconachy gave CARCO's money to its competitors.

**Question #9**: *Why is it important to Plaintiffs that Maconachy used the name "Murphy & Maconachy" without Plaintiffs' permission in a lawsuit Maconachy commenced?* Tr. 1941:23.

**Answer**: Plaintiffs bought from Maconachy the exclusive right to use the name "Murphy & Maconachy." *See* P252, §1 ("The Purchased Assets shall consist of all . . . trade names . . . ."). Maconachy admitted at trial that he transferred to CARCO the right to use the name "Murphy & Maconachy." Tr. 1532:23-1533:04.

Plaintiffs are unable to prove monetary damages as a result of Maconachy's misappropriation of the name "Murphy & Maconachy." Tr. 1942:08-1942:11. However, two issues arise from this misuse. First, Maconachy's use of the name "Murphy & Maconachy" without Plaintiffs' permission is yet another example of Maconachy's deception and his propensity to further his own personal interests, regardless of whether it violates the law or his duties to Plaintiffs. In fact, Maconachy, a former FBI agent specializing in white collar crime, *committed perjury* by executing a Verification in the above-described lawsuit, in which he

13

swore, falsely, under penalty of perjury, that he was an officer of the then-dissolved Delaware entity known as "Murphy & Maconachy," and was authorized to execute the Verification on its behalf. P7; P8; Tr. 1532:23-1543:22. He was neither, and knew he was neither.

Second, Plaintiffs have requested injunctive relief barring Maconachy from future use of the name "Murphy & Maconachy" in violation of the APA. *See* Second Amend. Compl.[7] ¶¶406-413. Maconachy stipulated to this relief at trial. Tr. 1976:09-1976:21. However, if Plaintiffs ultimately incur damages as the result of Maconachy's use of the name "Murphy & Maconachy," such as a judgment against them as a counterclaim-defendant in the above-described lawsuit, then Plaintiffs are entitled to indemnification for such damages under the APA. *See* P252, §9.1.

**Question #10**: *Didn't MMI West's revenues increase significantly after the acquisition?* Tr. 1944:15-1944:18.

**Answer**:        They surely did.  MMI West's revenues increased from $1,204,720 in 2000 to $3,555,289 in 2005.  P5.  However, this revenue increase was largely due to MMI's fortuitous attainment of two large recurring-revenue projects: Reality TV and the Sears vendor screening program (which O'Neill first conceived and presented to Sears). Tr. 725:09-727:08; 801:22-802:08; 1267:11-1269:12; D1046.

The revenue increases were clearly not due to any increased sales efforts by Maconachy. Slattery testified that Maconachy steadfastly refused to comply with marketing directives and his own sales and marketing plans, perhaps because Maconachy, according to Murphy, "did not like going out and making sales pitches." Tr. 1305:12-1338:25; P246; P286; P41; P224; P418; P363; P237; P313; P364; P232; P438; P240; P225; P364; P330; P439; P236; P37; P40; P357.

Amazingly, Maconachy's own "best estimate" was that he failed to make even a *single* face-to-face sales call for 30 to 40 weeks in each of 2002 through 2005. Tr. 1502:25-1505:24.

---

[7] The Second Amended Complaint is referred to herein as "Second Amend. Compl. ¶____".

14

Maconachy met with only 33 out of 381 (or, 8.66%) of the target prospects in the greater Los Angeles area that he personally identified in the January 2002 Business Plan of MMI.   Tr. 1508:15-1514:25; P440.   Maconachy candidly admitted that he graded himself an "F" for meeting with so few target prospects.  Tr. 1514:22-1514:25; 1716:21-1707:02.

**Question #11**: *Was there a delay between the time that O'Neill directed Maconachy not to use CARCO's competitors for background screening services and the time that CARCO was able to perform those services at the same level as CARCO's competitors?*  Tr. 1956:17-1956:20.

**Answer**:          Yes.  O'Neill drafted a memorandum demanding that MMI use CARCO's Research Division for all civil and criminal checks background checks on October 1, 2001. P168.  Maconachy testified at trial that it took approximately eighteen (18) months from the time O'Neill issued this directive for CARCO's Automated Products Unit ("APU") to be able to service clients at the same level as CARCO's competitors.  Tr. 1747:25-1749:07.  According to Maconachy's testimony, MMI did not switch to CARCO's APU for background searches for Reality TV until approximately May 2003.  *Id*.; *see also* Tr. 73:12-74:25.

However, Maconachy's testimony fails to disclose two key facts.  First, MMI's issue with CARCO's background check services related to difficulties integrating CARCO's APU with MMI's esoteric Case Management System ("CMS").  Tr. 73:12-74:25.  In other words, the issue was an information technology issue, rather than an issue with CARCO's criminal search capabilities.  In particular, MMI's concern was that a lack of integration of APU and CMS might delay the turnaround time for background checks.  However, CARCO was able to perform every type of background check that MMI's customers required.  The integration of CMS and APU simply made it easier to perform what could already be done.  Tr. 97:02-97:11.

15

Second, Maconachy and MMI West did not meaningfully disclose to CARCO their problems with CARCO's APU or background screening services. Indeed, the record fails to contain even a single document between October 2001 and May 2003 in which MMI personnel notified CARCO of problems with CARCO's APU or its background check capabilities. Maconachy and MMI West unilaterally chose to use CARCO's competitors without conferring in good faith with CARCO concerning whether CARCO could service MMI West's needs.

In any event, there is no dispute that Maconachy continued to use CARCO's competitor long after the CMS-APU interface was completed in or around June 2003, including using Reference Pro for education and employment screening up to at least November 2004.   Tr. 75:13-78:21; P412.  These lost revenues directly harmed CARCO's bottom line.

**Question #12**: *Was O'Neill's objection to Maconachy's employment of Kertin based on the fact that Kertin was Maconachy's brother-in-law?*  Tr. 1963:16-1963:20.

**Answer**:        No. There were several reasons why O'Neill objected to Maconachy's use of Kertin. First, Kertin billed CARCO for his services as an independent contractor at an hourly rate. Salaried CARCO employees with time to work more billable hours were fully capable of providing those same services at no additional cost to CARCO. O'Neill was concerned that Kertin billed CARCO for work that could have been performed by salaried CARCO employees at no additional cost to CARCO.  Tr. 849:02-850:05; 1261:11-1261:25; P44; P54.

Second, private investigators in California performing services as independent contractors are required to have their own private investigators' license. Kertin did not have his own private investigators' license.   O'Neill was concerned that Maconachy's use of an independent contractor to perform investigative services without a private investigators' license exposed CARCO to liability.  Tr. 850:03-850:05; 1004:23-1005:20.

Third, O'Neill believed that Kertin's performance of services for CARCO at hours that were equivalent to full-time employment entitled Kertin to receive benefits that CARCO did not provide to him, possibly in violation of federal and California law.  P44; P55; Tr. 1004:11-1005:20.  Again, Maconachy's conduct put CARCO in legal jeopardy.

Finally, Maconachy's use of Kertin violated CARCO's policy against a relative reporting directly to another relative.  Tr. 1262:01-1262:08.  Maconachy acknowledged in an email to Murphy dated June 15, 2004, that "[i]f I review the Hiring of Relatives policy in the strictest sense, Brendan should not be employed in any capacity as he works for me."  P359.  Less than two weeks later, however, Maconachy sent an email to Kertin dated June 28, 2004, in which he stated:

> CARCO has an employment policy that states in effect that relatives cannot report to another relative.  As such, your direct report will now be to Pauline Smith. Needless to say, you and I will continue working extremely close together on all white-collar crime projects.  *Just a formality*."  P343 (emphasis added).

Despite CARCO's legitimate concerns about the direct reporting issue, Maconachy found the prohibition on relatives reporting to one another to be nothing more than a nuisance.  His insubordination continued.

**Question #13:** *How and by whom were the Weekly Time Analysis reports generated and circulated to O'Neill prior to implementation of the plan to remove Kertin's name from the report?*  Tr. 1968:19-1969:1; 1969:07-1969:12.

**Answer:**       In Murphy's September 26, 2003 email setting forth the plan to falsify the Weekly Time Analysis reports, there is no suggestion that the participants were to change any aspect of the procedure for generating and transmitting the reports to O'Neill, other than manually removing Kertin's name from the report.  P360; P367.  Therefore, with the exception

of Kertin's removal from the report, the procedure likely remained unchanged both before and after the falsification. Once the falsification commenced, on a weekly basis, Murphy's assistant, Debbie Lynn ("Lynn"), generated a Weekly Time Analysis report from CMS, MMI's time-keeping record. Tr. 1443:20-1443:21; 1444:02-1445:03. Then, she manually removed Kertin's name from the report. Tr. 146:05-146:13; 1443:25-1444:12; P360; P367. Then, Lynn electronically transmitted the report to O'Neill's assistant, Doreen Koronios ("Koronios"). Tr. 145:25-146:04; 775:08-775:11. Koronios then faxed or FedExed a copy of the report to O'Neill at his home in Florida. *Id.* O'Neill then handwrote comments on the report and faxed them back to Koronios, who then transmitted them to the addressee. Tr. 780:23-780:25.

**Question #14**: *Is O'Neill's awareness that Kertin may have been working for MMI during the period of the falsification of the Weekly Time Analysis reports relevant to the issue of whether Maconachy acted disloyally by participating in the record falsification?* Tr. 1972:10-1972:16.

**Answer**:      No. Even if O'Neill may or should have known that Kertin worked for MMI during the record falsification, the only relevant facts are that Maconachy: a) knew about the record falsification; b) believed O'Neill would be deceived by the record falsification; and c) acquiesced in, or at the very least, did nothing to prevent or disassociate himself from, the record falsification. Maconachy's disloyalty is proven by his wrongful intent (or, *mens rea*) to cause O'Neill to be deceived for his brother-in-law's benefit. As an officer of CARCO, Maconachy had an affirmative duty of loyalty to inform O'Neill that he was being deceived about a matter of great importance to CARCO. Instead, Maconachy furthered the deception.

**Question #15**: *How did Maconachy testify concerning the work-related uses of the home computer that he threw away after the start of the lawsuit?* Tr. 1974:12-1974:16.

**Answer**:          Maconachy's testimony concerning the destruction of his home computer should give rise to an adverse inference that the data on the computer would have harmed his case.  To be entitled to an adverse inference charge for spoliation of evidence, a party must show: a) an "obligation to preserve" evidence; b) a "culpable state of mind" such as recklessness or negligence; and c) evidence that the destroyed evidence was "relevant" to the moving party's claim.  *Gutman v. Klein*, 2008 WL 4682208, *6-*7 (E.D.N.Y. Oct. 15, 2008); *Babaev v. Grossman*, 2008 WL 4185703, *2-*3 (E.D.N.Y. Sept. 8, 2008) (same); *Whitney v. JetBlue Airways Corp.*, 2008 WL 2156324, *3-*6 (E.D.N.Y. Apr. 29, 2008) (same).

Here, Maconachy admitted at trial that he knew he had been sued at the time he threw away his computer.  Tr. 1531:01-1531:14; 1531:18-1531:20.  Second, Maconachy admitted at trial that he knew his computer contained business records at the time he threw it away.  Tr. 1532:04-1532:07.  Worse yet, Maconachy testified that he was a certified fraud examiner who provided litigation support services to law firms to recover just the type of evidence that he spoliated.  Tr. 1531:21-1532:07.  Finally, Maconachy admitted that the computer contained documents concerning CMS, as well as letters and memos concerning his employment with Plaintiffs.  Tr. 1529:21-1530:15.  He even testified that he "spent the better part of, you know, 100 hours" after the commencement of the suit preparing documents to help defend himself in the suit.  Tr. 1751:10-1752:20.  These documents are unquestionably "relevant" to Plaintiffs' claims for Maconachy's breach of the EA, APA and his fiduciary duties to Plaintiffs.  Therefore, Plaintiffs are entitled to an adverse inference that the home computer contained evidence that Maconachy breached the EA, APA and his fiduciary duties.

## Point II

## <u>PLAINTIFFS' DAMAGES</u>

Plaintiffs seek two distinct categories of damages: a) damages for breach of the EA and APA, and b) disgorgement under the faithless servant doctrine of all compensation paid to Maconachy after his first disloyal act. Each category is discussed below.

### A.      <u>Plaintiffs are Entitled to Damages for Maconachy's Breach of Contract</u>

Under New York law, "in breach of contract actions the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192 (2008). In other words, as the Court correctly observed, *see* Tr. 1947:20-1947:23, proximate causation is an essential element of damages for breach of contract. *See, e.g., LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 464-65 (2d Cir. 1999) ("Ordinarily, causation is required to recover damages for breach of contract."); *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 2005 WL 832050, *4 (S.D.N.Y. Apr. 12, 2005) ("In both tort and contract law, causation is an essential element of damages and a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages.").

Maconachy's breaches began at the outset of the acquisition, on January 7, 2000. These breaches directly and proximately caused Plaintiffs' losses. However, in the event the Court determines that Maconachy's breaches began at a later date, the Court should conclude that the date they began is, at the very latest, November 17, 2000.

### 1.      <u>Plaintiffs Are Entitled to Damages from January 7, 2000</u>

Pursuant to the EA, Maconachy was required to "perform such duties as the Members of [PONJEB] may assign, in accordance with the standards of professionalism and competence as

20

are customary in the industry of which the Company is a part." P254, §1.1.  According to Plaintiffs' attorney for the acquisition, Lawrence Reich ("Reich"), the parties understood this provision to be of the "highest order of materiality." Tr. 318:13-319:05.  However, from the very outset of the acquisition on January 7, 2000, Maconachy did not perform sales and marketing duties that O'Neill and his agents assigned to him in accordance with the standards of professionalism and competence in the industry.

Maconachy was informed prior to the acquisition that his primary duty was to increase MMI's revenues by approximately $2 million in the first year after the acquisition. P245. Yet, MMI's revenues declined from $3,761,000 in 1999 to $3,649,000 in 2000.   P272; P5. Maconachy's failure to perform his required marketing duties directly and proximately caused MMI's failure to increase revenues, which he testified was his responsibility.  Tr. 1477:07-1477:20.  Indeed, Maconachy admitted at trial that, as the manager of MMI West, he was personally responsible for MMI West's revenue generation. Tr. 1477:21-1477:23.

Maconachy's failure to perform his required marketing duties included, among other things, failing to attempt to make sales calls or to follow up on sales leads provided by CARCO. As Michael Giordano ("Giordano") stated in his memorandum of the minutes of the November 17, 2000 meeting, "[m]ore than 100 sales leads have been provided to MMI by CARCO. However, MMI has not conducted appropriate follow-up with these leads.  This has been particularly troublesome with respect to the sales leads assigned to Mr. Maconachy." P279.

Regarding the amount of Plaintiffs' damages, Maconachy's breach of the EA, commencing on January 7, 2000, proximately caused MMI West to incur losses through December 2002 of $1,949,053. P441; P5; Tr. 1795:06-1800:08.

21

As the Court observed, Maconachy did not begin to receive written marketing directives until October 12, 2000, when O'Neill authored his memorandum to Murphy and Maconachy imposing, for the first time, specific marketing duties. Tr. 1949:08-1949:09; P245; Tr. 739:21-742:15.  The Court questioned the causal connection between Maconachy's breach of contract and MMI West's losses prior to October or November 2000. Tr. 1948:25-1950:20.  The Court noted, "November of 2000 is when things start to go bad." Tr. 1932:21-1932:23.

Plaintiffs submit that they have indeed demonstrated a causal connection between Maconachy's failure to market MMI West's services from January 7, 2000 to November 17, 2000 and MMI West's losses during that period.  Regarding the lack of specific marketing directives, O'Neill testified that he did not impose specific marketing directives on Maconachy and Murphy prior to October 12, 2000 because "I believed in them. . . .  So I pretty much stayed away from my great directives, controls, that sort of thing." Tr. 734:17-735:01.

The Court should not conclude from the lack of specific marketing directives prior to October 2000 (or from the lack of written criticism of Maconachy during this period) that Maconachy was fulfilling his marketing duties in accordance with the EA.  Instead, O'Neill believed that Maconachy would effectively manage MMI West, as he had done in the past, without direct control from CARCO.  Moreover, as Senior Vice President of CARCO and head of MMI's California division, Maconachy should not have required written instructions to market MMI's services; he was fully aware of his marketing duties from the date that the acquisition closed in January 2000.

However, the very fact that memoranda commenced in October and November 2000 imposing sales and marketing duties upon Maconachy inherently shows that Maconachy failed to adequately sell and market prior to that period.  P245; P203; P279.  If Maconachy had

22

meaningfully marketed MMI's services prior to October and November 2000, there would have been no need to impose sales and marketing duties upon him.

### 2. Plaintiffs Are Entitled to Damages from, at the Very Latest, November 17, 2000

At the very latest, Maconachy's breach of the EA began on November 17, 2000. The events leading up to that critical date are clearly set forth in the record. O'Neill testified that for the first "eight to ten months" after the acquisition, he had a hands-off approach to MMI, "hoping that the problems would take care of themselves." Tr. 735:24-736:13. Then, O'Neill drafted a memorandum to Murphy on August 8, 2000, addressing his concerns with MMI's losses. P30; Tr. 737:16-740:08. On October 12, 2000, O'Neill drafted a memorandum to Murphy and Maconachy requiring them to implement a "focused sales program," including requiring them to make 20 sales calls per office per week. P245; Tr. 739:17-742:15.

On November 7, 2000, Chase sent O'Neill a letter expressing its dire concern with MMI's recent financial performance. P317; Tr. 742:16-746:04. O'Neill testified that the Chase letter prompted the November 17 meeting. Tr. 748:17-749:07. O'Neill testified that the purpose of the November 17 meeting was to "bring in the two principals of MMI" to "have a dialogue to examine what we are doing right, examine what we are doing wrong" and "as a team work together" to improve MMI's financial performance. Tr. 755:06-755:24.

As a harbinger of Maconachy's attitude at the November 17 meeting, Maconachy drafted a memorandum to O'Neill dated November 13, 2000, in which he insinuated that the parties might consider "unwind[ing] this purchase agreement." P272; Tr. 746:06-748:02. O'Neill testified that he was "shocked" when Maconachy articulated what O'Neill perceived to be a proposal to abandon the acquisition. Tr. 748:03-748:13.

Finally, on November 17, 2000, at a meeting that Maconachy knew at the time was an "important meeting" called to address what Maconachy admitted in his November 13, 2000 memorandum was a "crisis," *see* Tr. 1483:09-1483:17; P272, Maconachy prematurely walked out of the meeting before it had concluded and all matters had been discussed. P279; Tr. 380:10-382:13; 756:19-757:10. O'Neill testified that he was stunned:

> A:        Well, after losing $1.3 million I was – I felt like I was kicked in the stomach.
> I have to tell you that I was definitely at a loss for words. I was amazed, shocked, and I felt like it was incredible. Here we are in the middle of this meeting, and it wasn't all love and kisses because we were talking about different approaches, cultures, this and that, whatever.
> And all of a sudden this star bails out. (Tr. 757:11-757:20).

CARCO senior management subsequently learned that Maconachy was scheduled to play in a golf tournament at his golf club November 18 and 19, 2000, which was the likely reason for Maconachy's premature departure from the November 17 meeting.   Tr. 1486:23-1489:11; 4/17/07 Tr. 403:05-403:11; 4/17/07 419:18-420:25; P433 at 23.

From that date, Maconachy's breaches of his duties continued unabated.   The record shows that, from November 2000 to December 2005, Maconachy consistently disobeyed myriad duties and instructions from CARCO senior management, including sales and marketing directives.   Indeed, Giordano testified that at the November 17, 2000 meeting, Maconachy's "initial reaction" to the 20-sales-call requirement "was one of reluctance to one of why are we doing that many sales calls?" Tr. 383:02-383:08.

In the event the Court determines that Maconachy's breach caused only those losses incurred by MMI West after November 17, 2000, attached hereto as Exhibit "A" is a chart containing a statement of MMI West's losses from November 17, 2000 through December 31, 2002. This chart was derived entirely from Plaintiffs' Trial Exhibits 5 and 441. *See* Ex. "A";

24

P5; P441.  According to the chart, MMI West incurred a net loss from November 17, 2000 to December 31, 2002 of $901,645.  Ex. "A".  Therefore, at the very least, the Court should award Plaintiffs no less than $901,645 for Maconachy's breach of the EA.

### B.      Plaintiffs are Entitled to Disgorgement of Maconachy's Compensation

Under the faithless servant doctrine, an employee who is "faithless in the performance of his services" is required to "forfeit all compensation received after his first disloyal act." *Phansalkar v. Anderson Weinroth & Co.*, 344 F.3d 184, 188, 200 (2d Cir. 2003); *see also Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 929 (1977); RESTATEMENT 2d AGENCY § 469. Disgorgement is warranted whenever an employee "substantially violates the contract of service" or "acts adversely to his employer in any part of the transaction."  *Phansalkar v. Anderson Weinroth & Co.*, 344 F.3d at 201-02 (*quoting Turner v. Kondwenhoven*, 100 N.Y. 115, 120 (1885); *Murray v. Beard*, 102 N.Y. 505, 508 (1886)).  Critically, under the faithless servant doctrine, an employer is "not required to show that it 'suffered . . . provable damage as a result of the breach of fidelity by the agent.'"  *Sanders v. Madison Square Garden, L.P.*, 2007 WL 1933933, at *4 (S.D.N.Y. July 2, 2007) (*quoting Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d at 929).

Plaintiffs are entitled to disgorgement of two separate categories of compensation for Maconachy's services: 1) salary, fringe benefits and incentive compensation under the EA, and 2) quarterly payments under the APA.  Each is addressed separately.

### 1.      Plaintiffs are Entitled to Disgorgement of All Salary, Fringe Benefits and Incentive Compensation from November 17, 2000

Plaintiffs have shown that November 17, 2000, at the latest is the clear date of commencement of Maconachy's disloyalty.  Therefore, the Court should conclude that Plaintiffs are entitled to forfeiture of all compensation, including salary, fringe benefits and incentive compensation, from November 17, 2000 to Maconachy's termination on December 28, 2005.  At

trial, Plaintiffs proved that the amount of Maconachy's salary, fringe benefits and incentive compensation from *January 1, 2003* to December 28, 2005 was $1,051,451, consisting of $643,005 in salary, $75,240 in fringe benefits and $333,206 in incentive compensation. *See* P441; P389; D450; P394.

Critically, Tannenbaum testified at trial that this disgorgement amount *does not include* salary and fringe benefits paid to Maconachy from November 17, 2000 through December 31, 2002, because those amounts were already included as expenses in calculating MMI West's cumulative losses from 2000 through 2002. Tr. 1800:10-1803:01. As explained above in Point II.A, Plaintiffs seek recovery of MMI West's cumulative losses from 2000 to 2002 under their breach of contract theory. Tr. 1802:16-1803:01.

Therefore, in the event that Plaintiffs do not recover breach-of-contract damages for MMI West's losses from November 17, 2000 to December 31, 2002, then the disgorgement amount must be upwardly adjusted to include all salary and fringe benefits from November 17, 2000 to December 31, 2002.[8] To assist the Court, annexed hereto as Exhibit "B" is a chart containing a statement of all compensation paid to Maconachy from November 17, 2000 to the date of his termination on December 28, 2005. This chart was calculated based entirely on Plaintiffs' Trial Exhibit 389. Tr. 1800:25-1805:14. Assuming that the Court determines that Plaintiffs are not entitled to breach-of-contract damages, but that Maconachy must forfeit all compensation from November 17, 2000, then Maconachy must forfeit $1,508,976, consisting of $1,059,970 in salary, $115,800 in fringe benefits and $333,206 in incentive compensation. Ex. "B."

---

[8] Maconachy received no incentive compensation in 2000, 2001 or 2002 because MMI incurred net losses in those years. Tr. 1803:18-1803:22. Therefore, no adjustment must be made for incentive compensation.

2.      **Plaintiffs are Entitled to Disgorgement of All Salary,
         Fringe Benefits and Incentive Compensation from,
         at the Very Latest, September 26, 2003**

Maconachy was unquestionably disloyal from September 26, 2003.  On that date,
Maconachy became a participant in a conspiracy by MMI employees to falsify Weekly Time
Analysis reports on a weekly basis to hide the employment of Maconachy's subordinate and
brother-in-law, Kertin, from O'Neill, the owner of the company.  P360; P367; P435A; P60A.
Maconachy admitted that he was fully aware of the record falsification, *see* Tr. 1431:10-1432:10,
and according to Murphy, said, "[D]o what we got to do."  8/9/07 Tr. 556:03-556:07.

There is no question that Maconachy was disloyal to O'Neill when he consented to the
record falsification: he chose to purposefully deceive the company's owner for the sole purpose
of continuing to employ his brother-in-law in violation of the owner's directives that he be
terminated; that "deception" lasted from September 26, 2003 until the date of his termination in
December 2005.  Tr. 1452:07-1452:19.

To assist the Court, annexed hereto as Exhibit "C" is a chart containing a statement of all
compensation paid to Maconachy from September 26, 2003 to the date of his termination on
December 28, 2005.  This chart was calculated based solely on Plaintiffs' Trial Exhibit 389.  Tr.
1800:25-1805:14.  If the Court determines that Maconachy must forfeit all compensation from
September 26, 2003, but not earlier, then Maconachy must forfeit $889,711, consisting of
$496,156 in salary, $60,349 in fringe benefits and $333,206 in incentive compensation.  Ex. "C."

3.      **Plaintiffs are Entitled to Disgorgement of All Quarterly Payments
         from November 17, 2000, or, at the Very Latest, September 26, 2003**

The second category of compensation that Maconachy must disgorge is all quarterly
payments paid to him under the APA and Nonnegotiable Promissory Note (the "Note") after his

disloyalty began on November 17, 2000 through December 2005, which equals $1,368,468. *See*. *See* P252, § 2.3; P441;D450; P394.

Alternatively, if the Court determines that Maconachy's disloyalty began on September 26, 2003, annexed hereto as Exhibit "D" is a chart setting forth all quarterly payments made to Maconachy from the date of the acquisition through Maconachy's termination on December 28, 2005.[9]   According to the chart, Maconachy received $615,789 in quarterly payments from September 26, 2003 to December 28, 2005, which must be forfeited. Ex. "D".

As the Court correctly noted at summation, the faithless servant doctrine limits forfeiture to a faithless employee's "compensation for services." Tr. 1930:01-1930:05; *see, e.g.*, *Phansalkar v. Anderson Weinroth & Co. L.P.*, 344 F.2d at 203 (quoting *Lamdin v. Broadway Surface Advertising Corp.*, 272 N.Y. 133, 138 (1936). Accordingly, the Court correctly raised the question of whether Plaintiffs would be entitled to disgorgement of quarterly payments made to Maconachy under the APA. *Id.* The answer is "yes."

The faithless servant doctrine ordinarily would not require disgorgement of payments to an employee solely for his or her sale of a business's assets pursuant to an asset purchase agreement.   However, under the particular facts of this case, Plaintiffs submit that, for two reasons, Maconachy's receipt of quarterly payments under the APA must be regarded as a form of compensation for services, rather than as payments purely for the purchase of MMI's assets.

First, the evidence shows that the APA and EA were integrated, mutually dependent agreements arising from a single, integrated transaction. The APA provides that one of the conditions precedent to Plaintiffs' obligation to purchase MMI was that "Buyer shall have entered into Employment Agreements with each of" Murphy and Maconachy. P252, § 6.9; *see*

---

[9] This chart was created based on the quarterly payment schedule in the Note and Maconachy's cancelled quarterly payment checks. D450; P394; Tr. 1804:02-1806:18.

*also* Tr. 304:02-304:06.   Moreover, the EA provides in the "WHEREAS" provisions that Maconachy "has executed and delivered this Employment Agreement as an inducement to [Plaintiffs] to purchase the assets and business of MMI." P254; *see also* Tr. 304:18-305:07.

Plaintiffs' attorney for the acquisition, Reich, testified that Maconachy's execution of the EA "was an integral part of the entire transaction." Tr. 304:23-305:07.  Indeed, Reich noted that the duration of Maconachy's employment agreement matched the duration of Plaintiffs' quarterly payments under the Note. Tr. 305:11-305:13; P254, §2; D450.  The parties structured the acquisition this way because Plaintiffs would have been unable to make quarterly payment to Maconachy without his continued services to Plaintiffs.  *See* Tr. 731:15-731:16.   Clearly, Plaintiffs would have never executed the APA without Maconachy's agreement to faithfully perform the services set forth in the EA for the entire term set forth in the EA.

Second, Maconachy's faithful performance of his duties under the EA was the very asset that Plaintiffs purchased in the APA.  As O'Neill testified at trial, "when you purchase a company in the service industry, the only real assets are the people." Tr. 717:06-717:12; *see also* Tr. 745:18-745:21.  O'Neill further testified, "These guys, Mr. Murphy and Mr. Maconachy, are the franchise.  They are the New York Giants with Eli Manning.  Without Manning, the Giants have a different value." Tr. 717:16-717:19.  O'Neill testified that to secure the assets for the acquisition, Plaintiffs entered into an eight-year employment agreement with each of Murphy and Maconachy, which O'Neill testified was "a very lengthy period of time relative to what other personal service contracts come in the services industry." Tr. 730:17-731:16.  O'Neill testified that CARCO rarely entered into employment agreements, and *never* has it entered into an employment agreement that exceeded three years' duration. Tr. 731:17-733:04.

Therefore, looking at the entire transaction as a whole, Plaintiffs' quarterly payments to Maconachy under the APA should properly be regarded as a form of compensation for his services, rather than as payment for the assets of MMI. Maconachy's failure to perform his services in accordance with the EA and his fiduciary duties tainted and interfered with the entire transaction and destroyed the value of the assets Plaintiffs purchased under the APA. Maconachy must be required to disgorge all payments to him under the APA after he breached his duties; otherwise, Maconachy will be permitted to retain payments for assets whose value he personally destroyed.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court award Plaintiffs a money judgment in the amount of $4,368,972, as well as prejudgment interest from January 7, 2000 and attorneys' fees in an amount to be determined after an inquest.

Dated: November 4, 2008

Respectfully submitted,

By: _____
James M. Wicks
Franklin C. McRoberts
FARRELL FRITZ, P.C.
1320 RexCorp Plaza
Uniondale, New York 11556
(516) 227-0700
– and –
Edward F. Cunningham
62 Cambridge Avenue
Garden City, New York 11530
*Co-Counsel for Plaintiffs*

30