UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

CARCO GROUP, INC. and PONJEB V, L.L.C.,

                                    Plaintiffs,                    **Docket # 05 CV 6038**

                 -against-

DREW MACONACHY,

                                    Defendant.

------------------------------------------------------------------X

**DEFENDANT DREW MACONACHY'S**
**POST-TRIAL STATEMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................i

TABLE AUTHORITIES...............................................................................ii

PRELIMINARY STATEMENT ...................................................................1

POINT I

CARCO HAS FAILED TO SATISFY ITS BURDEN OF PROOF ON THE ISSUE OF
WHETHER DREW MACONACHY ACTED, AT ANY POINT IN HIS EMPLOYMENT
WITH CARCO, AS A FAITHLESS SERVANT .................................................2

    A. The Faithless Service Doctrine......................................................4

    B. The Faithless Servant Doctrine Has Never Been Stretched To Cover The Misconduct
       Complained Of By CARCO ........................................................7

    C. CARCO Has Not Proven That Any Of The Alleged Acts Of Disloyalty Permeated Mr.
       Maconachy's Service In Its Most Material And Substantial Part ...................13

POINT II

TO THE EXTENT THIS COURT VIEWS MR. MACONACHY'S FAILURE TO
DISCLOSE, TO MR. O'NEILL, CARCO'S PRESIDENT'S DIRECTION TO MR.
MURPHY CONCERNING REMOVING MR. KERTIN'S NAME FROM THE WTA, ONLY
MR. MACONACHY'S BASE SALARY WOULD BE SUBJECT TO FORFEITURE, ANY
FORFEITURE SHOULD BE FOR NO MORE THAN A MATTER OF MONTHS, AND
PUNITIVE DAMAGES ARE NOT WARRANTED ..............................................20

    A. Mr. Maconachy's Purported Disloyalty Ended No Later Than May 31, 2004.............20

    B. Mr. Maconachy Should Not Be Required To Forfeit Any Of His Incentive
       Compensation ...................................................................22

    C. Punitive Damages Are Not Warranted .............................................23

    D. There Is No Doctrinal Support To Support CARCO's Demand For Mr. Maconachy To
       Forfeit The APA Payments Received If He Is Found To Be A Faithless Servant........24

POINT III

THE DOCTRINE OF ELECTION ESTOPS CARCO FROM RELYING ON THE CLAIMED
BREACHES OF CONTRACT AS A BASIS TO TERMINATE MR. MACONACHY .........24

POINT IV

CARCO HAD NO CAUSE TO TERMINATE MR. MACONACHY AND, THUS,
BREACHED HIS EMPLOYMENT AGREEMENT BY FAILING TO PAY HIM FOR THE
FINAL TWO YEARS OF HIS CONTRACT .....................................................26

CONCLUSION ......................................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Apex Pool Equipment Corp. v. Lee, 419 F.2d 556 (2d Cir. 1969)* ...................................25

*Bigda v. Fischback Corp.,*
    *849 F. Supp. 895 (S.D.N.Y. 1994), aff'd, 101 F.3d 108 (2d Cir. 1996)* ................24, 25

*Design Strategy, Inc. v. Davis,*
    *469 F.3d 284 (2d Cir. 2006) aff'd, 384 F.Supp. 2d 649 (S.D.N.Y. 2005)*.............*passim*

*ESPN, Inc. v. Office Of The Commissioner Of Baseball,*
    *76 F. Supp. 2d 383 (S.D.N.Y., 1999)* .......................................................................25

*Phansalkar v. Anderson Weinroth & Co., L.P.,*
    *344 F.3d 184 (2d Cir. 2003)* ...............................................................................*passim*

*Sanders v. Madison Square Garden, L.P., 2007 U.S. Dist. LEXIS 48126*
    *(S.D.N.Y., July 2, 2007)* ...................................................................................*passim*

*Septembertide Publishing, B. v. Stein & Day, Inc.,*
    *884 F.2d 675 (2d Cir. 1989)* .....................................................................................26

*Seven Hanover Associates, LLC v. Jones Lang Lasalle Americas, Inc.,*
    *2008 U.S. Dist. LEXIS 12304 (S.D.N.Y., February 19, 2008)*.....................................19

*Sofi Classic S.A. De C.V. v. Hurowitz,*
    *444 F. Supp. 2d 231 (S.D.N.Y. 2006)* .......................................................................25

*Toussie and Chandler Property, Inc. v. County of Suffolk,*
    *2007 U.S. Dist. LEXIS (E.D.N.Y., Dec. 21, 2007)* .......................................................30

## STATE CASES

*Abramson v. Dry Goods Refolding Co.,*
    *166 N.Y.S. 771 (1st Dep't, 1917)*........................................................................7,8,9

*Bon Temporaries Agency, Ltd. v. Greenfield,*
    *212 A.D.2d 427, 622 N.Y.S.2d 709 (1st Dep't, 1995)* ..............................................5,6

*Callanan v. Powers, 199 N.Y. 268 (1910)* ........................................................................27

*G.K. Alan Associate, Inc. v. Lazzari, 2007 NY Slip Op 6019,*
    *840 N.Y.S.2d 378 (2d Dep't 2007), aff'd, 10 N.Y.2d 941, 862 N.Y.S.2d 855,*
    *2008 NY Slip Op 5959 (July 1, 2008)*........................................................................4,5

*Maritime Fish Products Inc. v. World-Wide Fish Products Inc.,*
   *100* A.D.2d *81, 474* N.Y.S.2d *281 (1st Dep't, 1984)* ................................................. 6,8

*Murray v. Beard,*
   *102* N.Y. *505 (1886)* ......................................................................................... 8

*Pictorial Films v. Salzburg,*
   *106* N.Y.S.2d *626 (Sup. Ct., New York, 1951)* ......................................................... 6,9

*Roden v. Dan Paper's, Inc.,*
   *2006* N.Y. Misc. LEXIS *3552 (2d Dep't, November 9, 2006)* ...................................... 7

*Schwartz v. Leonard,*
   *138* A.D.2d *692, 526* N.Y.S.2d *506 (2d Dep't, 1988)* .................................................. 5

*Sundland v. Korfund Co.,*
   *260* A.D. *80, 20* N.Y.S.2d *819 (1st Dep't, 1940)* ...................................................... 6,8

*Turner v. Kouwenhoven, 100 N.Y. 15 (1885)* .............................................................*passim*

*Walker v. Sheldon,*
   *10* N.Y.2d *401, 223* N.Y.S.2d *488 (1961)* .............................................................23,24

## PRELIMINARY STATEMENT

Defendant, Drew Maconachy, respectfully submits this Post-Trial Memorandum of Law concerning plaintiff CARCO's claims and Mr. Maconachy's counterclaims tried before your Honor between July 21, 2008 and August 15, 2006.  Based upon the testimony and documentary evidence that Mr. Maconachy introduced at trial,[1] Mr. Maconachy posits that Your Honor can arrive at but one conclusion:  CARCO's termination, without any prior warning and notice, of his employment on December 28, 2005, six years into his eight year Employment Agreement, ("EA"), and its decision to dishonor the remaining nine $68,421 payments due Mr. Maconachy pursuant to the December 15, 1999 Asset Purchase Agreement, ("APA"), reflecting CARCO's purchase of Murphy & Maconachy, Inc., ("MMI"), represents a willful breach by CARCO of these respective agreements.

Having commenced the construction of a litigation file against Mr. Maconachy in 2000, *see, Trans., at p. 1205, ln. 11 to p. 1207, ln. 14,* declaring in February 2002 that "we will be in litigation with MMI in the not too distant future," *see, Pl. Tr. Ex. 22,* believing Mr. Maconachy to be an "incompetent business manager" soon into their relationship, *see, e.g., Def. Tr. Ex. II,* and believing he had made a "very poor business decision" in purchasing MMI, *see, Def. Tr. Ex. II,* there was little doubt that Mr. O'Neill, the owner of CARCO, would terminate Mr. Maconachy's employment prior to the expiration of the EA and attempt to renegotiate his perceived "very poor business decision" through litigation.  However, confronted with the reality of, *inter alia,* three straight years of indisputable profit by Mr. Maconachy's MMI West office, *see, Pl. Tr. Ex. 5,* Mr. Maconachy's surpassing of financial projections identified in the 2002 Business Plan, *see, Pl. Tr. Ex.* 27 and Mr. Maconachy's development of, *inter alia,* the Reality

---

[1]     As agreed upon at trial, Mr. Maconachy also files for the completion of the record the deposition testimony designated by Mr. Maconachy in the Joint Pre Trial Order, (and accompanying documents), subject to CARCO's objections set forth therein.  To the extent referred to herein, Mr. Maconachy will attach said excerpts as exhibits to this Memorandum of Law.

TV line of business, (which CARCO continues to profit from), CARCO was forced to present to this Court primarily through the testimony of Mr. Owens, Mr. O'Neill, Mr. Slattery and Mr. Tannenbaum, each of whom were shown on cross-examination to have significant credibility issues, nothing but false and specious claims of disloyalty and contract breaches, all of <u>which were known</u> to CARCO's officers many years before Mr. Maconachy's termination.   Thus, based upon a fair reading of the evidence, it is clear that CARCO has failed to satisfy its respective burdens of proof on their claims against Mr. Maconachy and, accordingly, judgment should be awarded in his favor.

<b>POINT I</b>

<b>CARCO HAS FAILED TO SATISFY ITS BURDEN OF PROOF ON THE ISSUE<br/>OF WHETHER DREW MACONACHY ACTED, AT ANY POINT IN HIS<br/><u>EMPLOYMENT WITH CARCO, AS A FAITHLESS SERVANT</u></b>

CARCO, notwithstanding accepting the fruits of Mr. Maconachy's labor for almost six years, (and continuing to benefit from his labors subsequent to his termination), including a 152% increase in net profits before taxes, a 195% growth in sales, *see, Pl. Tr. Ex. 5,* and Mr. Maconachy's obliteration of the three-year financial net profit projections contained in the 2002 Business Plan, *see, Pl. Tr. Ex. 27,* unconscionably attempts to require Mr. Maconachy to forfeit over five years of his base salary, all of his earned Incentive Compensation, as well the APA payments made by CARCO for the same period of time, based upon the claim that Mr. Maconachy was a "faithless servant."  Notably, CARCO presented no evidence at trial, much less even attempted to show, that Mr. Maconachy stole money or property from CARCO, secreted and/or improperly removed proprietary or confidential information, surreptitiously competed or attempted to compete with CARCO, misappropriated any CARCO business opportunities for his own financial benefit or engaged in any conduct that state and federal courts

2

within the Second Circuit have traditionally relied upon to find a violation of the faithless servant doctrine.

Instead, CARCO posits singular, temporally sporadic and fundamentally unrelated acts of alleged disloyalty, most of which can only be described as trivial and insignificant, which not only occurred many years before Mr. Maconachy's termination, but, of critical importance, were either known to CARCO contemporaneously with the purported act or shortly thereafter, acquiesced to by CARCO, waived by CARCO or, as it pertains to the manual modification and delivery to Mr. O'Neill of the Weekly Time Analysis report, ("WTA"), by Mr. Maconachy's direct superior's assistant based upon the order of CARCO's President.    Specifically, the purported acts relied upon by CARCO in support of its faithless servant claim are: (1) Mr. Maconachy's leaving an "important" meeting "early," over no objection, on November 17, 2000 to catch a flight back to California; (2) Mr. Maconachy's payment to his son, Ryan, of a few dollars, "off the books," to deliver some documents in 2001; (3) the use of his son, "on the books," for a project lasting one day in 2003 after first seeking approval from his supervisor; (4) his wife working overtime at various times over the span of a few months in 2003; (5) the use of "unlicensed" investigators throughout the course of his employment; (6) failure to follow sales call directives since October, 2000;[2] (7) failure to follow directives concerning use of an outside vendor screening companies, and; (8) knowledge that his superior, Mr. Murphy, at the request of CARCO's President, Mr. Slattery, directed his [Mr. Murphy's] assistant in Virginia to manually remove Mr. Kertin's name from the hard-copy of the WTA that was mailed to Peter O'Neill, beginning in late September, 2003.

---

[2]     There is no evidence in the record supporting the proposition that Mr. Maconachy violated any state of federal law concerning the licensing of investigators. *See, also, p. 1459, ln. 8 to p. 1460, ln. 2.*

3

As the following analysis will convincingly demonstrate, application of the prevailing legal authority compels the conclusion that Mr. Maconachy did not act, at any point during his employment, as a faithless servant. Indeed, it is readily apparent that CARCO, knowing it could not demonstrate any damages from these purported "acts" and realizing that the evidence would, (and did), unequivocally show that CARCO elected to proceed with Mr. Maconachy's employment despite its knowledge of these "acts," *see, infra, at Point III*, attempts to convert what can only be considered classic breaches of contract, (although Maconachy disputes breaching any aspect of his respective agreements), into a disloyalty claim. In the over one-hundred year life of the "faithless servant" doctrine in New York State, *see, e.g., Turner v. Kouwenhoven, 100 N.Y. 115 (1885)*, this doctrine has never been stretched to cover the subject matter of CARCO's claims. Mr. Maconachy respectfully submits that neither law nor equity requires this Court to do so now.

**A.      The Faithless Service Doctrine**

"The faithless servant doctrine provides that an agent is obligated 'to be loyal to his employer and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *Sanders v. Madison Square Garden, L.P., 2007 U.S. Dist. LEXIS 48126, 9-10, (S.D.N.Y., July 2, 2007), (citations omitted).* "One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation ... [.]" *Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 394 N.Y.S.2d 626 (1977) (citing Restatement (Second) of Agency § 469 (1958)).*

Notably, however, knowledge and/or acquiescence on the part of the employer of the alleged disloyal act estops the employer from successfully asserting a claim based upon the faithless servant doctrine. *See e.g., G.K. Alan Assoc., Inc. v. Lazzari, 2007 NY Slip Op 6019, 840*

N.Y.S.2d 378, 383  (2d Dep't 2007) ("[a] principal who condones misconduct on the part of his

or her agent may not rely on that misconduct to deprive agents of compensation") *(citations*

*omitted)*, *aff'd, 10 N.Y.2d 941, 862 N.Y.S.2d 855, 2008 NY Slip Op 5959 (July 1, 2008)*.  Indeed,

in this regard, comment (a) to Restatement (Second) of Agency, § 469, cited by the Court of

Appeals in *Feigler*, specifically provides that "[a]n agent who, *without the acquiescence of his*

*principal*, acts for his own benefit . . . is not entitled to compensation which otherwise would be

due him because of the transaction." (Emphasis added).

Moreover, in discussing the doctrinal underpinnings of the faithless servant doctrine, it

has been emphasized that "[t]he existence of a fiduciary duty is dependent on the law of agency,

not on the terms of a contract." *Sanders, 2007 U.S. Dist. LEXIS 48126, at * 13*.  Therefore

"although the duty may be 'connected with' the contract, 'a simple breach of contract is not to be

considered a tort unless a duty independent of the contract itself has been violated [and] [t]his

legal duty must spring form circumstances extraneous to, and not constituting elements of, the

contract . . . [.]" *Id. (quoting, Ross v. FSG, 2004 U.S. Dist. LEXIS 16157 at * 24 (S.D.N.Y.,*

*August 17,2004)* (finding that a fiduciary duty claim "is barred as redundant" where it is "merely

a restatement, albeit in slightly different language," of the parties' contractual obligations)

*(citation and internal quotation marks omitted) (brackets added)*.

"Thus, even if [a party] violated the terms of [his] employment contract through her

alleged misconduct, such misconduct only violates the faithless servant doctrine if it also

'material[ly] and substantial[ly]' interfered with plaintiff's job performance. *Id. (quoting,*

*Phansalkar v. Anderson Weinroth & Co., L.P., 344 F.3d 184, 203 (2d Cir. 2003))*; *see also,*

*Feigler, 394 N.Y.S.2d at 929 (*"… no breach of fidelity so long as, …, plaintiff never lessened his

work on behalf of defendant . . .")*; Schwartz v. Leonard, 138 A.D.2d 692, 526 N.Y.S.2d 506, 508*

*(2d Dep't 1988)* (duty of loyalty not breached where employee did not "neglect[]" his work or

"further [] his own interest at the expense of" his employer);   *Bon Temps Agency, Ltd. v. Greenfield, 212 A.D.2d 427, 622 N.Y.S.2d 709, 710 (1st Dep't 1995)* (faithless servant doctrine violated if defendant's misconduct "lessened her work on behalf of plaintiff ...").

Accordingly, "in order to show a violation of the faithless servant doctrine," *id.,* the employer must show both (1) that the employee's disloyal activity was related to "the performance of his duties," *id. (quoting, Phansalkar, 344 F.3d at 203)* and (2) that the disloyalty "permeated the employee's service in its most material and substantial part." *Id. (quoting Phansalkar, id. (internal quotation omitted)); see also, Pictorial Films v. Salzburg, 106 N.Y.S.2d 626, 630-31 (Sup. Ct. New York, 1951)* ("dishonesty must be of such a character as would justify the conclusion that the contract of employment was violated 'in a most material and substantial part'") *(quoting, Turner, supra).*

In this regard, "New York courts have not specifically defined the 'material and substantial' standard, thereby leaving it to case-by-case determination whether the employee's conduct ***so far infringed on her job performance*** as to constitute a violation of the doctrine." *Sanders, id., at * 15 (citing, Phansalkar, 344 F.3d, at 202) (emphasis added)).*  Notably, the effect on an employee's job performance must be "substantial and concrete" rather than simply an "intangible, nebulous infringement." *Id. (citing, e.g., Phansalkar, 344 F.3d at 203* (duty of loyalty breached where employee "with[held]" from the employer "cash, stocks, and other interests that belonged to" the employer); *Maritime Fish Prods. Inc. v. World-Wide Fish Prods., Inc., 100 A.D.2d 81, 474 N.Y.S.2d 281, 285 (1st Dep't 1984)* (duty of loyalty breached where employee "surreptitiously organized a competing corporation, corrupted a fellow employee, and secretly pursued and profited from one or more opportunities properly belonging to his employer")); *see also, Sundland v. Korfund Co., 260 A.D. 80, 20 N.Y.S.2d 819, 821-22 (1st Dep't 1940)* (allegations that employee stole cork from employer at "frequent intervals throughout the

entire period of his service" are sufficient, if proven, as defense to employee's claim to share of profits due); *Abramson v. Dry Goods Refolding Co., 166 N.Y.S. 771, 773 (1ˢᵗ Dept., 1917); Pictorial Films, 106 N.Y.S.2d, at 629.*

Indeed, as instructed by the Second Circuit in *Phansalkar, supra,* "substantiality" has not been satisfied "where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior." *Phansalkar, 344 F.3d at 202 (citing e.g., Schwartz, 526 N.Y.S.2d, at 508* (single act of disloyalty was not "persistent pattern of disloyalty"); *see also, Bon Temps, 622 N.Y.S.2d, at 710 (1ˢᵗ Dep't 1995)* (employer must establish that two instances of secretly receiving commissions were not isolated); *Roden v. Dan Paper's, Inc., 2006 N.Y. Misc. LEXIS 3552, at * 5 (2d Dep't, November 9, 2006)* (plaintiff "waived" relied upon misconduct).

However, this Court need not even reach the question as to whether any of the claimed acts of disloyalty satisfies *Phansalkar's* "substantiality" requirement.  Succinctly, the historical application of the   faithless servant doctrine compels the conclusion, in Mr. Maconachy's most respectful opinion, that <u>none</u> of the acts relied upon by CARCO fall within the extreme behavior contemplated by this doctrine.

**B.     The Faithless Servant Doctrine Has Never Been Stretched To Cover The<br>Misconduct Complained Of By CARCO**

The first annunciated standard concerning what is now referred to as the faithless servant doctrine appeared in *Turner v. Kouwenhoven, supra.*  In *Turner,* the Court of Appeals, stated "in *dictum,*" *Phansalkar, 344 F.3d at 201,* the following:

> [c]ases may, no doubt, arise where the dishonesty of the servant is of such a character as would justify the conclusion that his contract had been violated in a most material and substantial part and to the extent which would bar any recovery whatever, but the act is such cases, to bar a recovery, must be misconduct and unfaithfulness which substantially violates the contract of service. [Citation omitted]. ***Flagrant acts of dishonesty or crime which seriously affects the master's interest, continued during the service,*** might well be regarded as a bar

7

> to the recovery of wages, although the amount received and fraudulently
> appropriated might be far less than the amount fixed by the contract.

*Id., at 120 (Emphasis added).* [3] Thus, it is clear from this very first pronouncement that the evidentiary hurdle on an employer to establish faithlessness is substantially high. This is not surprising given the "drastic," *Sanders, id., at * 19*, remedy of forfeiture upon a finding of faithlessness.

Indeed, simple acts of dishonesty or misconduct fall far short in the race to establish faithlessness and win forfeiture. Rather, conduct appropriately considered to be subject to the faithless servant doctrine is akin to criminality, *see, Turner, 100 N.Y. at 120*, fraud, *see, Murray, 102 N.Y. at 508*, covert competition, *see, Sanders, id.,* and financial self-dealing, *Phansalkar, 344 F.3d at 203 – 04.* Obviously, therefore, an insubstantial, nebulous or intangible impact on the employer resulting from the purported misconduct will fail to support application of forfeiture. *See, Sanders, id., at * 19-20.*

A review of a representative sampling of those judicial opinions where the faithless servant doctrine has been applied over the past one-hundred, twenty five years confirms the extremely difficult challenge confronting a party seeking forfeiture. *See, e.g., Murray, 102 N.Y. at 508* (covert competition by broker); *Phansalkar, 344 F.3d at 204* (secret retention of "cash, stocks and other interests that belonged to" employer); *Maritime Fish, 474 N.Y.S.2d at 285* (employee "surreptitiously organized a competing corporation, corrupted a fellow employee, and

---

[3]      In 1886, the Court of Appeals in *Murray v. Beard, 102 N.Y. 505, 508 (1886)* "enunciated a second standard for determining whether an employee's misbehavior warrants forfeiture," *Phansalkar, 344 F.3d at 202*, stating:

> [a]n agent is held to *uberrima fides* in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services.

*Murray, 102 N.Y., at 508.* The Second Circuit has noted that "New York courts have not reconciled any differences between them, or defined the circumstances, if any, in which one standard should apply rather than the other." *Phansalkar, id.*

secretly pursued and profited from one or more opportunities properly belonging to his employer"); *Sundland, 20 N.Y.S.2d at 821 – 22* (theft of cork); *Abramson, 166 N.Y.S.2d at 773* (solicitation of employees and competition); *Pictorial Films, 106 N.Y.S.2d at 629* (fraudulent removal of files and secret misappropriation of royalty checks belonging to employer).  Against this judicial landscape, CARCO's claimed acts of misconduct on the part of Mr. Maconachy, <u>on their face</u>, disappear and, consequently, fundamentally fail to find a home within the New York's faithless servant doctrine as interpreted and applied since 1885.

Indeed, Mr. Maconachy is aware of no reported decision applying the faithless servant doctrine and imposing the drastic remedy of forfeiture of salary earned and received to an employee who left a meeting early.  Likewise, to Mr. Maconachy's knowledge, faithlessness has never been found upon and forfeiture has never resulted from an employee's failure to follow work-place directives attendant to the employee's contractual duties and responsibilities concerning the hiring of a relative for a day's work, allowing a relative to work overtime over a limited period of time, paying one's child a few dollars "off the books" to make one delivery, the use of an outside vendor to perform certain work, use of unlicensed investigators or sales calls. Indeed, Mr. Maconachy has failed to find one reported opinion in New York or in this Circuit where such conduct, or conduct even remotely similar in nature, was  addressed by a court in the context of a faithless servant analysis.

The absence of such judicial discussion is not at all surprising since, on their face, none of these purported acts of misconduct could reasonably and objectively be viewed as affirmative acts of "flagrant dishonesty," *Turner, 100 N.Y. at 120,* and "substantial disloyalty." *Phansalkar, 344 F.3d, at 203.*  Rather, notwithstanding the trivial nature of many of these purported acts of misconduct, they are all, with the most generous characterization, nothing more than simple breaches by Mr. Maconachy of his obligations under his EA.  Given that the evidence is

overwhelming that all of these alleged acts of misconduct <u>occurred</u> years before Mr. Maconachy's termination and <u>were known</u> to CARCO contemporaneously or shortly after their occurrence, CARCO has simply attempted to cast these contractual claims as a disloyalty claims to get out from under its knowing, purposeful and <u>profitable</u> decision to elect to continue with Mr. Maconachy's employment for many years after these events.

Thus, obviously concerned with both the speciousness of these purported acts of disloyalty and its continuation of Mr. Maconachy's employment for many years despite its awareness of these acts, CARCO seizes on Mr. Maconachy's knowledge in late September, 2003 that his direct superior, Mr. Murphy, followed the instructions of CARCO's President[4] and directed his [Mr. Murphy's] assistant, Debbie Lynn, to remove Mr. Kertin's name from the WTA report, *see, Pl. Tr. Ex. 360,* which was mailed from Mr. Murphy's Virginia office to Mr. O'Neill.

---

[4]        Mr. Maconachy submits that the record requires this Court to credit Mr. Murphy's video-deposition testimony concerning his conversation with Mr. Slattery on this issue, *see, Trans., at p 1290, ln. 13 – 20; (Murphy Depo. Trans., at p. 285, ln. 3 to p. 286, ln. 22),* as well as Mr. Maconachy's testimony concerning his conversation with Mr. Murphy regarding same. *See, Trans., at p. 1435, ln. 14 to p. 1436, ln. 13.*

*First,* both Mr. Slattery and Mr. O'Neill were well aware that Mr. Kertin was working for CARCO for many months proceeding September 26, 2003. *See, e.g., Def. Tr. Exs. III, JJJ, KKK, LLL; Pl. Tr. Ex. 53; Def. Tr. Ex. 340; Pl. Ex. 54; Def. Tr. Ex. NNN; Pl. Tr. Ex. 45.* Moreover, there is absolutely no evidence supporting the conclusion that either Mr. Slattery or Mr. O'Neill ordered either Mr. Murphy or Mr. Maconachy to fire Mr. Kertin in or around September 26, 2003. Further, Mr. Murphy had fired Mr. Kertin one year earlier at Mr. Slattery's direction, *see, Def. Tr. Ex 80,* and Mr. Maconachy had been forced to fire his wife twice, the second time in March, 2003. *See, Trans., at p. 1631, ln. 3 - 5.* As Mr. Maconachy testified, he would have had no issue firing Mr. Kertin if directed, *id., at ln. 17 – 21,* because "[m]y thought process is it doesn't get any worse than firing your wife." *Id., at ln. 24 – 25.* **Consequently, there would have been absolutely no reason for either Mr. Maconachy or Mr. Murphy to discuss, on September 26, 2003, modifying the WTA in order to conceal Mr. Kertin's status absent Mr. Slattery's provocation.**

*Second,* only by crediting Messrs. Murphy and Maconachy's testimony on this issue can Mr. Slattery's post-September 26, 2003 silence, when advised of Mr. Kertin's continued work on behalf of CARCO, be explained. *See., e.g., Def. Tr. Exs. 23 &, J.* Indeed, if Mr. Slattery did not make this request, then one would have reasonably expected some evidence to be introduced by CARCO showing Mr. Slattery, upon receipt of Mr. Maconachy's e-mail on June 15, 2004 wherein he "float[ed] the idea" to Mr. Murphy of converting Mr. Kertin from an Independent Contractor to a full-time employee, **screaming "bloody murder."** *See, Pl. Tr. Ex. 359.* Instead, according to Mr. Murphy's e-mail, Mr. Slattery merely advised Mr. Murphy that the "time is not right" but that MMI could still use Mr. Kertin as an Independent Contractor. *Id.* Likewise, unless Messrs. Murphy and Maconachy's testimony is credited, Mr. Slattery's silence in the face of receiving a memo from Mr. Tannenbaum one month later advising him that Mr. Kertin was presently an Independent Contractor, *see, Def. Tr. Ex. N; Trans., at p. 1840, ln. 15 – 24,* would be simply inexplicable.

Critically, there is no evidence showing that Mr. Maconachy initiated the conversation concerning removing Mr. Kertin's name from the WTA.[5] There is no evidence showing that Mr. Maconachy personally modified or in anyway altered the WTA or directed anyone to do so. There is no evidence showing that Mr. Maconachy ever mailed the modified WTA to Mr. O'Neill or directed anyone to do so. There is no evidence that Mr. Maconachy had the authority to countermand Mr. Murphy's direction to Ms. Lynn. There is no evidence that Mr. Maconachy ever discussed this issue with Mr. Murphy or any other MMI employee subsequent to September 26, 2003. There is no evidence that Mr. Maconachy undertook any affirmative action after September 26, 2003 to hide Mr. Kertin's status from Mr. O'Neill or anybody at CARCO.

Instead, a fair reading of the evidence merely shows that Mr. Maconachy briefly engaged in communications concerning Mr. Slattery's direction, was aware that two MMI West employees were investigating, at Mr. Murphy's direction, the feasibility of Mr. Slattery's request, *see, Trans., at p. 1435, ln. 14 – p. 1436, ln. 9*, and was aware that Mr. Murphy directed Ms. Lynn to manually remove Mr. Kertin's name from the WTA. *See, Pl. Tr. Ex. 360.* The evidence also clearly shows that the un-modified WTA remained in CARCO's computer system and that no errors to CARCO's internal or external financial or accounting practices occurred as a result of the manual modification. *See, Trans., at p. 284, ln. 11 - 21.*

Thus, the crux of CARCO's faithless servant claim is that Mr. Maconachy failed to act akin to a "whistleblower" and advise Mr. O'Neill of CARCO's President's direction and Mr. Maconachy's direct superior's acquiescence to same, to remove Mr. Kertin's name from the hard-copy of the WTA that Mr. O'Neill received. Indeed, what makes CARCO's application for forfeiture even more troubling is that Mr. O'Neill *was* aware that Mr. Kertin was working for

---

[5]  To the contrary, Mr. Maconachy's unchallenged and non-rebutted testimony was that he disagreed with Mr. Slattery's direction to Mr. Murphy to modify the WTA, *see, Trans., at p. 1432, ln. 21 to p. 1433, ln. 6,* and that he refused to permit anyone at MMI West to modify the WTA. *Id., at p. 1435, ln. 12 to p. 1436, ln. 1; p. 1630, ln. 25 to p. 1631, ln. 5.*

CARCO during the "so-called" period of disloyalty. [6] *See, e.g., Def. Tr. Exs. PPP, J, O, U, X, Y, Z, AA, W, TTT; Trans., at p. 1942, ln. 19 – 21* (MR. WICKS: "[t]here's no question that Mr. O'Neill received reports from time to time with Kertin's name on it"). In fact, there is absolutely no evidence introduced by CARCO explaining why, when Mr. O'Neill received Mr. Maconachy's Weekly Travel Schedule and Memo in May and June, 2004, *see, Def. Tr. Exs. PPP & J,* he did not question anybody as to how Mr. Kertin could be working for CARCO yet not appear on the WTA.

Moreover, Mr. Wick's characterization of Mr. Kertin significance to Mr. O'Neill as a "fly on the hind quarter of an elephant," *see, Trans., at 1960, ln. 18 – 19,* is simply inconsistent with any fair reading of the evidence. As Mr. O'Neill even testified to:

> [t]he issue has been going on and on and on, and every time we put him in as an independent contractor, it shows as a part time employee and then a full-time employee. The whole corporation is trying to keep Brendan Kertin away from the company.
> …
>
> … the response back would always be, he's working on some critical case. Can you give him one more month, and he'll be off. The next thing you know, he's back on again and off again. The frustration, the whole company involved, not making money for Carco, but trying to control the two.[7]

*See, Trans., at p. 1026, ln. 4 – 8; p. 1027, ln. 16 – 20.* [8] There is little doubt from the record that Mr. O'Neill, at all times relevant to CARCO's claim of disloyalty, was concerned with and knowledgeable of the employment of Mr. Maconachy's family members, especially Mr. Kertin.

---

[6]     Additionally, CARCO's counsel had to admit during closing argument that there was no reliance on the part of Mr. O'Neill, much less detrimental reliance, due to his receipt of the modified WTA. *See, Trans. at p. 1965, Ln. 12-19.*
[7]     Indeed, Mr. Kertin worked for CARCO many months after Mr. Maconachy's termination. *See, Giallo Dep., at p. 159, ln. 6-12, a copy of which is attached hereto as Exhibit "1."*
[8]     *See, also, e.g., Def. Tr. Ex. II* (Mr. O'Neill to Mr. Slattery on February 19, 2002 – "I urge you to work very hard at eliminating as much of Drew's family as possible from the business. Colleen and Brendan should be laid off as soon possible without damaging our ability to perform. [ ]. Drew and his family still have too much control over CARCO's business in California. I would like to see this situation completely eliminated"); *id.* (referring to Mr. Kertin as a "sacred cow"); *Def. Tr. Ex. VV* (Mr. Giordano commenting to Mr. O'Neill on March 27, 2002 – "[a]s an aside, it is my opinion, as I mentioned to you following our meeting with Slattery, that Slattery should be

Critically, there appears to be no reported decision within this Circuit that has compelled forfeiture pursuant to the faithless servant doctrine in any remotely similar context.   Mr. Maconachy, therefore, respectfully asks that this Court reject CARCO's invitation to make new law and stretch this century's old doctrine far further than it has ever previously gone.

## C.      CARCO Has Not Proven That Any Of The Alleged Acts Of Disloyalty Permeated Mr. Maconachy's Service In Its Most Material And Substantial Part

Assuming *arguendo* that this Court finds, as a matter of law, that some of the alleged misconduct could, if satisfactorily proven, represent affirmative acts of "flagrant dishonesty" or "substantial disloyalty" subjecting Mr. Maconachy  to the potential application of the faithless servant doctrine, CARCO nevertheless failed to introduce any evidence at trial establishing that any of the alleged acts of disloyalty relied upon by CARCO "permeated Mr. Maconachy's service [to CARCO] in its most material and substantial part." *Sanders, id., at * 15 (quoting, Phansalkar, id., at 200)*.  As previously noted, in order to meet the "material and substantial" standard, this Court must look at the employee's job performance in relation to the specific act of disloyalty and determine whether CARCO proved that the alleged act of disloyalty "so far infringed on [his] job performance," *id. (quoting Phansalkar, id. at 202)*, in a "substantial and concrete way." *Id. (quoting Phansalkar, id., at 203)*.

CARCO has failed to satisfy its heavy burden.  With regard to all of the non-WTA acts, each was either a "single act," *Phansalkar, id., at 202*, known to or tolerated by CARCO, *id.*, or both.  For instance, leaving the November 17, 2000 meeting, paying his son "off the books" to make a delivery and using his son one day on a project were all one-time events.  Additionally,

---

encouraged to terminate Kertin and Maconachy now – even it means a temporary loss of existing revenues.  We'll deal with consequences after – just get it done."); *id.* ("it is what you [O'Neill] want, and the faster he gets it done, the better it will be for all concerned"); *Def. Tr. Ex. NNN* (Mr. O'Neill to Mr. Slattery on August 21, 2003 – Brendan will get a lot of billable hours!"); *Def. Tr. Ex. Y* (Mr. O'Neill to Mr. Watson on July 11, 2005 – "Dale – this is Drew's brother-in-law (Brendan Kertin). AGAIN we need to address this issue sooner rather than later."); *Def. Tr. Ex. AA* (Mr. O'Neill to Mr. Watson on November 2, 2005 ("we: (1) must get rid of Brendan Kertin immediately.").

the evidence shows that CARCO knew of each of these acts contemporaneously with the respective events and/or tolerated them, the latter clearly established by the fact that Mr. Maconachy was not fired until years after these incidents. Further, to the extent that the outside vendor,[9] licensing, overtime and sales calls issues are not characterized by this Court as "single act[s]," the evidence clearly supports the conclusion that CARCO knew of each of them contemporaneously and tolerated and/or condoned them.

As for the manual modification of the WTA by Ms. Lynn, this must be viewed, as it relates to Mr. Maconachy, as a single act -- his failure to "whistleblow" to Mr. O'Neill about the instructions given his superior by the President of CARCO concerning removal of Mr. Kertin's name. Moreover, CARCO would be hard-pressed to argue, assuming this Court credits Mr. Murphy's testimony, that it did not know of the manual modification since it was at the instruction of CARCO's President.

Critically, as it relates to this specific act, CARCO has presented absolutely no evidence that Mr. Maconachy's failure to "whistleblow" on CARCO's President and/or his superior "so far infringed on [his] job performance," *Phansalkar, 344 F.3d at 200,* or represents a "persistent pattern of disloyalty," *Schwartz, 526 N.Y.S.2d, at 508*, as to satisfy the "material and substantial" standard required to justify forfeiture. *Id.* In fact, CARCO has not produced any evidence

---

[9]      For example, should, notwithstanding Mr. Owen's thoroughly discredited testimony on this issue, *see, Trans., at p. 83, ln.8 to – p. 95, ln. 20,* CARCO continue to rely on MMI's apparent use of Reference Pro for "education and employment leads for the reality TV work," *see, Pl. Tr. Ex. 412,* then it is not only undeniable that CARCO knew of this supposed transgression, *id.,* but CARCO, through Mr. O'Neill's direction, did nothing other than to place this information "in the **litigation file** on not using other vendors for B/I work," *see, Def. Tr. Ex. A, (emphasis added),* for evidence in the lawsuit that CARCO knew it would be ultimately filing against Mr. Maconachy.

Indeed, a fair reading of Ms. Koronios' December 20, 2004 e-mail also further supports the conclusion that CARCO's knew years before Mr. Maconachy's termination of what it believed to be his disregard of directives concerning use of other outside vendors for criminal history record checks. *See, e.g., Def. Tr. Ex. B.* In this regard, the record does not support any finding that Mr. Maconachy violated any directive concerning use of outside vendors for criminal history checks. Moreover, with regard to civil history background checks, Ms. Stacey Reno testified at her deposition that MMI West was still using, at the time of her deposition in May, 2007, DDI for civil searches because of system issues. *See, Reno Dep., at p. 58, ln. 5 to p. 60, ln. 8,* a copy of which is attached hereto as Exhibit "2."

showing any link between Mr. Maconachy's failure to disclose CARCO's President's instructions to Mr. Murphy and any purported diminishment in his job performance or adverse impact on his performance, much less any substantial infringement in same. To the contrary, CARCO's own documents convincingly demonstrate that Mr. Maconachy's West Coast office exceeded the financial projections for 2003, 2004 and 2005 and were extraordinarily profitable for those three years. *See, Pl. Tr. Exs. 5 & 346.*

The Second Circuit's analysis in *Phansalkar, supra,* is, Mr. Maconachy submits, supportive of his position that his failure to advise Mr. O'Neill on September 26, 2003 of Mr. Slattery's direction did not "permeate [his] service in its most material and substantial part." In *Phansalkar*, plaintiff, an investment banker, entered into an employment relationship in February 1998 with defendant ("AW"), a small merchant banking firm and its two partners. *Id., at 187.* Plaintiff was treated as a partner, attended meetings where policy was discussed, was privy to confidential information and offered opportunities to invest in certain transactions. *Id., at 190.* Plaintiff's relationship ended in June 2000 and during the last year and a half of his employment, plaintiff worked on four transactions, took advantage of three Investment Opportunities, and sat on the boards of three companies. *Id.* After plaintiff left, AW accused him of failing to disclose certain compensation and business opportunities gained while performing his services on specific transactions, compensation and opportunities that AW believed belonged to it. *Id.*

After analyzing the specific transactions upon which AW based its faithless servant claim, and comprehensively addressing the doctrinal underpinnings of the faithless servant doctrine, the Second Circuit determined that "Phansalkar's misconduct warrants forfeiture under the standard enunciated in *Turner,* because Phansalkar's misconduct was *not* limited to a single, isolated incident, but rather occurred repeatedly, in nearly every transaction on which he worked." *Id., at 202.* The misconduct which plaintiff repeatedly engaged in was his failure to

disclose to AW and his retention of forms of compensation, e.g., options, shares, fees, relating to certain transactions for which he was responsible, in violation of AW's policy in regard to Director's Compensation. *Id., at 191.*

Indeed, the Second Circuit, in supporting its determination, noted that plaintiff's "disloyalties lasted for many months, and persisted boldly through an opportunity to correct them in June, 2000, when Phansalkar and Anderson discussed the various interests accumulated during Phansalkar's tenure." *Id., at 202.* The Circuit Court's conclusion was also based in part on the fact that plaintiff was told he had to contribute to AW all compensation and business opportunities from sitting on Boards and, thus, he "breached a critical duty when he failed to disclose his receipt of this income and these opportunities, which belonged to AW." *Id.*

Here, in significant contrast, Mr. Maconachy is not being accused of failing to disclose to CARCO receipt by him of monies or income belonging to CARCO. At best, Mr. Maconachy simply failed to disclose to Mr. O'Neill that CARCO's President had instructed Mr. Murphy to remove Mr. Kertin's name from a particular internal time-keeping report that was mailed to Mr. O'Neil. Likewise, this failure to disclose was a one-time event, as there is no evidence to suggest that Mr. Maconachy was responsible for creating this report, manually modifying it, mailing it to Mr. O'Neill, or that he and Mr. O'Neill ever discussed the WTA after September 26, 2003.

Similarly, in contrast the plaintiff in *Phansalkar, supra,* Mr. Maconachy did not persist "boldly" in the claimed disloyalty or ignore an opportunity to correct it. As for the former, there is no evidence that Maconachy ever again discussed the modification of this report with Mr. Murphy, Mr. Slattery or anybody else throughout the remaining 2 ¼ years of his employment, or took any subsequent affirmative act in relation to the manual modification of the report.

As for the latter, regardless of how this Court views CARCO's President's intent in directing Mr. Murphy to remove Mr. Kertin's name from the WTA report that was ultimately mailed to Mr. O'Neill, Mr. Maconachy cannot dispute that the removal of his name would make it appear, at least from this report, that Mr. Kertin was not working for CARCO.  However, as for Mr. Maconachy's conduct after Mr. Murphy's direction to Ms. Lynn, the evidence clearly demonstrates that rather than engage in any affirmative concealment from CARCO and Mr. O'Neill of Mr. Kertin's employment relationship with CARCO,[10] Mr. Maconachy advised CARCO[11] and, critically, Mr. O'Neill, at every available opportunity on documents known to be reviewed by Mr. O'Neill, of Mr. Kertin's work on behalf of CARCO[12]:  For example:

- on his May 31, 2004 Weekly Travel Schedule, Mr. Maconachy advised Mr. O'Neill that he and Mr. Kertin would be meeting with Wilson, Elser in Chicago the following week; *(see, Def. Tr. Ex. PPP)*;

- in a June 7, 2004 memorandum, Mr. Maconachy advised Mr. O'Neill (and, *inter alia*, Mr. Slattery) that he and Mr. Kertin met with Wilson, Elser on June 3, 2004 *(see, Def. Tr. Ex. J)*;

---

[10]     For example, plaintiff introduced no evidence to suggest that Mr. Maconachy did anything to prevent or delay the submission of Mr. Kertin's Invoice to Mr. Tannenbaum's Finance Department on November 10, 2003, for work done between September 29, 2003 and October 31, 2003, *see, Def. Tr. Ex. G,* or any other Invoice relied upon by CARCO to make <u>twenty</u> additional payments to Mr. Kertin through the end of Mr. Mr. Maconachy's employment. *See, Def. Tr. Ex. I.*
          Notably, when CARCO initially filed its Complaint, CARCO's Comptroller, Glen Tannenbaum, was identified as part of the "New York Management" that had "attempted to manage Maconachy." <u>See</u>, *Complaint, at* ¶ *23.*  Obviously realizing after-the-fact that documentation concerning Mr. Tannenbaum, like the Invoices relied upon to pay Mr. Kertin, existed that seriously undermines its, *inter alia,* faithless servant claim, Mr. Tannenbaum was conveniently removed from the "New York Management team" in the two subsequently filed complaints.  Mr. O'Neill had no credible explanation for this particular change, other than to say he read the Complaint too fast. *See, Trans., at p. 869, ln. 24 to p. 870, ln. 6.*
[11]     Shortly after, but on the very same day as Mr. Murphy's e-mail direction to Debbie Lynn to manually remove Mr. Kertin's name, *see Pl. Tr. Ex. 360,* Mr. Maconachy, in response to Mr. Slattery's request for information, advised Mr. Murphy of his intent to continue to use Mr. Kertin as an Independent Contractor. *See, Def. Tr. Ex. 408.*  Moreover, on January 8, 2004, Mr. Maconachy advised Mr. Slattery of his intent to continue to use Mr. Kertin on MMI West projects. *See, Def. Tr. Ex. 231.*  Additionally, Mr. Kertin signed two additional Independent Contractor Agreements with CARCO after September 26, 2003, *Pl. Tr. Exs. 56 & 58,* the first one after CARCO's specific inquiry on October 12, 2004 with Mr. Smith as to whether his contract should be renewed[.] *See, Pl. Tr. Ex. 57.*
[12]     Mr. O'Neill would also have had to be aware that Mr. Kertin was working on behalf of CARCO by virtue of the fact that the Billing Efficiency Reports, ("BERs"), *see e.g., Def. Tr. Ex. 1050,* identified the number of hours worked by Mr. Kertin.  Mr. O'Neill at trial contradicted his deposition testimony wherein he admitted that he reviewed the BERs as part of his normal business practice. *See, Trans., at p. 886, ln. 3 to p. 889, ln. 1.*

- in his July End Of Month Report, ("EOM"), Mr. Maconachy advises Mr. O'Neill of Mr. Kertin's success in securing a $470,000 project from Verizon (*see, Def. Tr. Ex. O*).[13]

Thus, unlike the plaintiff in *Phansalkar*, if this Court views Mr. Maconachy as engaging in disloyalty by not initially disclosing to Mr. O'Neill CARCO's President's directions to Mr. Murphy, then he certainly did not thereafter act "boldly" or fail to take advantage of numerous opportunities to advise Mr. O'Neill and CARCO of Mr. Kertin's status.

Accordingly, given CARCO's claims as to Mr. Maconachy's "disloyalty" and the evidence it relies upon for each, it should not be difficult for this Court to conclude, as did the Southern District in *Sanders, supra,* that CARCO's "overly expansive interpretation of the doctrine would eviscerate the requirement that the misconduct must 'permeate [] the employee's service in its most material and substantial part.'" *Sanders, id., at * 15 (quoting Phansalkar, 344 F.3d at 203).* Indeed, the following concern expressed by the District Court in *Sanders* is particularly relevant to CARCO's request for forfeiture:

> [t]he unfairness of MSG's position makes evident why the faithless servant doctrine does not stretch so far. MSG does not seek damages for any breach of Browne Sanders's alleged contractual promises to pay her taxes and eschew outside business pursuits. Indeed, it conspicuously fails to identify any way in which it suffered any such damage. As noted, it does not identify any way in which her alleged derelictions affected Brown Sanders's performance of her duties. Nevertheless, having accepted the fruits of Browne Sanders's labor for five years, MSG argues that it is entitled to obtain those fruits for free by forcing the forfeiture of all Browne Sanders's pay for her entire period of employment. The remedies of the faithless servant doctrine are drastic, and appropriately so where the doctrine applies. An employee who works to undermine or covertly compete with her employer cannot be permitted to retain the benefits of an agency relationship she has betrayed. An employee who violates an incidental work rule, however, or who cheats the government out of taxes due, may have

---

[13]     Mr. Maconachy also prominently mentions Mr. Kertin in his August 2004 EOM, *see, Def. Tr. Ex. O*, and October 2004 EOM, *see, Def. Tr. Ex. U,* that he submitted to Mr. O'Neill.  Incredibly, Mr. Maconachy's July, 2005 EOM contained Mr. O'Neill's hand-written comment on the section expressly mentioning Mr. Kertin. *See, Def. Tr. Ex. Z.*

to respond in damages for breach of contract, but need not forfeit
her entire salary.

*Id.*

In similar vein, the Southern District's more recent opinion in *Seven Hanover Assocs.,*
*LLC v. Jones Lang Lasalle Americas, Inc., 2008 U.S. Dist. LEXIS 12304 (S.D.N.Y., February 19,*
*2008),* also bears consideration.  In *Seven Hanover,* plaintiffs, owners of large commercial real
estate buildings, hired defendant to manage and lease out plaintiff's properties over the span of
approximately six years.  *Id., at * 1.*  Upon a change in ownership, plaintiff terminated its
contract with defendant, *id., at * 4,* and filed suit one year later alleging, *inter alia,* that
defendant was a faithless servant by, *inter alia,* "hir[ing] employees, charg[ing] Seven Hanover
for the full cost of their employment and then dispatched them to work on other properties – not
belonging to Plaintiffs – that Defendant managed." *Id., at * 5 – 6.*

In granting defendant's motion for summary judgment on plaintiff's "faithless servant
claim," *id., * 13,* the District Court stated, in part, as follows:

> [p]utting aside the reality of both the law and the facts,
> presupposing the existence of an independent duty, and assuming
> for the moment that JJL did inappropriately overcharge Plaintiffs
> for additional staffing and resources … finding the faithless
> servant doctrine applicable here would result in a totally
> unjustifiable windfall for the Plaintiffs.  They would have
> experienced no direct fiscal harm and yet they would recover all
> amounts paid to JJL, not just for the purported overcharges.
> Essentially, Defendant would have provided six years of business
> service (each of which Plaintiffs met their business goals, and each
> year of which was profitable for Plaintiffs) for free.  Nothing in the
> allegations of the Complaint or in the applicable law could justify
> this result.

*Id.*

Similar to the District Court's determinations in *Sanders, supra*, and *Seven Hanover, supra*, this Court should reject CARCO's attempt to stretch the faithless servant doctrine beyond the breaking point in order to receive an unconscionable financial windfall.[14]

## POINT II

**TO THE EXTENT THIS COURT VIEWS MR. MACONACHY'S FAILURE TO DISCLOSE, TO MR. O'NEILL, CARCO'S PRESIDENT'S DIRECTION TO MR. MURPHY CONCERNING REMOVING MR. KERTIN'S NAME FROM THE WTA, ONLY MR. MACONACHY'S BASE SALARY WOULD BE SUBJECT TO FORFEITURE, ANY FORFEITURE SHOULD BE FOR NO MORE THAN A MATTER OF MONTHS, AND PUNITIVE DAMAGES ARE NOT WARRANTED**

A.    **Mr. Maconachy's Purported Disloyalty Ended No Later Than May 31, 2004**

The Second Circuit in *Phansalkar, supra*, comprehensively analyzed the state of New York law on the issue of forfeiture in the context of a faithless servant claim and determined that "New York lower courts have endorsed limiting forfeiture to compensation paid *during the time period* of disloyalty." *Phansalkar, 344 F.3d at 204; see also, Design Strategy, Inc. v. Davis, 469 F.3d 284, 291 (2d Cir. 2006)* (affirming District Court's reasoning).[15] Thus, if this Court views Mr. Maconachy's knowledge of the manual redaction of Mr. Kertin's name from the WTA as "permeat[ing] the employee's service on its most material and substantial part," *Sanders, id., at*

---

[14]    Mr. Maconachy respectfully submits that a finding of "substantiality" on this issue is fundamentally irreconcilable with the fact that Mr. Murphy, the individual who actually directed Ms. Lynn to modify the documents, was not terminated by CARCO for approximately eighteen months after Mr. Maconachy's termination. *See, Tr. at p.1060, ln.20- p. 1068, ln. 11.*

[15]    As noted by the District Court in *Design Strategy*:

> ...requiring a disloyal employee to forfeit all compensation from the date his disloyalty commenced until the end of his employment, whether or not disloyalty persisted to that point, could have inequitable results. Such a doctrine could require an employee who was disloyal for a short period of time, but who subsequently performed his services loyally and to the substantial benefit of the employer for a long period of time, to forfeit even compensation that was earned during the later period of loyalty beneficial to the employer.

*Design Strategy v. Davis, 384 F.Supp.2d 649, 667 (S.D.N.Y. 2005).*

*15 (quoting, *Phansalkar, 844 F. 3d at 203*), then it is for this Court to fix the period of time of disloyalty.

Here, any period of disloyalty commenced on September 26, 2003, when Mr. Maconachy learned, via e-mail, that based upon CARCO's President's direction, Mr. Murphy instructed his [Mr. Murphy's] assistant in Virginia, Debbie Lynn, to manually remove Mr. Kertin's name from the WTA report. *See, Pl. Tr. Ex. 360.* Notwithstanding Mr. Maconachy's knowledge of Mr. Murphy's direction, he certainly did not engage in any affirmative conduct, either on September 26, 2003, or thereafter, to conceal from CARCO, (and Mr. O'Neill), the fact that Mr. Kertin continued to work for CARCO after the removal of his name from the WTA.

As previously noted, *see, supra, Point I,* Mr. Maconachy did nothing to prevent CARCO's Comptroller, Glen Tannenbaum, from understanding that Mr. Kertin continued to work for CARCO immediately after September 26, 2003, given that Mr. Kertin's Invoice for payment for work done between September 29, 2003 through October 31, 2003 was received by Mr. Tannenbaum's department on November 11, 2003. *See, Def. Tr. Ex. G.*[16] Moreover, and of significant importance, Mr. Maconachy sent a memo to CARCO's President, dated January 8, 2004, in response to his request for MMI's "Business Development Plan ("Plan"), for the calendar year 2004," *see, Def. Tr. Ex. 231,* specifically advising Mr. Slattery that:[17]

> [p]art-time employees and contractors utilized by MMI on a weekly basis include Tia Willis, Brendan Kertin...[.]  These employees/contractors *are instrumental* in assisting MMI complete, on a timely basis most of the projects undertaken on the West Coast.

*Id. (Emphasis added).*

---

[16]    In fact CARCO issued three checks to Mr. Kertin between November 14, 2003 and December 8, 2003. *See, Def. Tr. Ex. I.*
[17]    If this Court does not credit Mr. Murphy's testimony concerning Mr. Slattery's direction to remove Mr. Kertin's name from the WTA, then there can be no doubt that Mr. Maconachy was affirmatively advising CARCO of Mr. Kertin's continued employment relation with CARCO, thus repudiating his allegedly disloyal act three months earlier.

Finally, with specific regard to Mr. O'Neill, Mr. Maconachy advised him on his May 31, 2003 Weekly Travel Schedule, that Mr. Kertin would be joining him in Chicago for a meeting with Wilson, Elser the following week, *see Def. Tr. Ex. PPP*, and immediately thereafter, on June 7, 2004, sent Mr. O'Neill, among <u>nine</u> other CARCO officers and employees, a memo specifically identifying Mr. Kertin in his report on the trip. *See, Def. Tr. Ex. J.* Thus, if this Court views the purpose of the disloyal act on September 26, 2003 as an attempt to conceal from Mr. O'Neill the fact that Mr. Kertin was working for CARCO, the period of disloyalty definitively ended no later than May 31, 2003.[18] *See, e.g., Design Strategy, Inc. 469 F.3d at 291* (affirming District Court's decision, which "fixed Davis's period of disloyalty from mid-November of 1999, when he first began to promote IT Web to Microsoft, to early December of 1999, when he ceased making contact with Microsoft").

**B.    Mr. Maconachy Should Not Be Required To Forfeit Any Of His Incentive Compensation**

In addition to Mr. Maconachy's base salary, CARCO seeks the forfeiture of all Incentive Compensation paid to Mr. Maconachy in 2003, 2004 and 2005 resulting from the profits generated by MMI during those years.  While this appears to be a issue not yet addressed within the Second Circuit, the Second Circuit's decisions in *Phansalkar, supra*, and *Design Strategy, supra*, strongly suggest that such "Incentive Compensation" would not be subject to forfeiture.

In *Phansalkar, supra*, the Second Circuit, addressing the issue of commissions, reaffirmed that, if certain criteria were met, "New York courts would relax the law on forfeiture even further, to allow an employee to keep compensation for the *tasks* he performed loyally, during the time period in which he was disloyal in other work." *Id., at 205*. In *Design Strategy,*

---

[18]     Given that the BERs, which Mr. O'Neill reviewed and relied upon, *see, Trans, at p. 888, ln. 14 – ln. 23*, continued to identify Mr. Kertin was working and there is no evidence to even remotely suggest that any other CARCO document was modified to conceal Mr. Kertin's relationship with CARCO, Mr. Maconachy submits that the period of disloyalty as it related to Mr. O'Neill should in reality "be no more than one month, when the monthly BER for October was generated.

*supra*, unlike in *Phansalkar*, the employee "received both general compensation (his salary) and commissions, or specific amounts paid for individual tasks completed…[.]" *Id., at 301*. The Second Circuit in *Design Strategy* affirmed the District Court's decision not to require forfeiture of commission, adopting the lower court's rationale:

> … he is not required to forfeit any commission because, unlike the defendant in connection with any Design transaction from which he was entitled under the terms of his employment agreement to receive a commission, nor did it 'taint[ ] or interfere [ ] with the completion' of any sales in relation to which he received a commission.

*Id., at 301 (citing Phansalkar, 344 F.3d at 205 (internal quotation omitted).*

Here, Mr. Maconachy was entitled to Incentive Compensation based upon a specific formula concerning MMI's profit in a particular calendar year. Given that it was undisputed at trial that Mr. Maconachy received Incentive Compensation in 2003, 2004 and 2005, it would be difficult to conclude, (and CARCO submitted no evidence to support such a conclusion), that Mr. Maconachy's knowledge of Mr. Murphy's direction to his assistant to take Mr. Kertin's name off of the WTA on September 26, 2003 "taint[ed] or interfere[d]," *id.*, with Mr. Maconachy's efforts to generate enough profit to warrant receipt of Incentive Compensation. Indeed, Mr. Maconachy respectfully posits that it would be incongruous to require forfeiture of compensation based solely upon profit because of disloyalty that merely consisted of not disclosing to Mr. O'Neill that Mr. Kertin's name was removed from the WTA.

## C.     Punitive Damages Are Not Warranted

As instructed by the New York Court of Appeals, punitive damages are reserved for those "cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future." *Walker v.*

*Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 491-92 (1961). Succinctly, there is "no evidence in the record to support a finding of the level of extreme moral culpability necessary for an award of punitive damages." *Design Strategy*, 469 F.3d at 292 (quoting and adopting District Court reasoning).

**D.  There Is No Doctrinal Support To Support CARCO's Demand For Mr. Maconachy To Forfeit The APA Payments Received If He Is Found To Be A Faithless Servant**

Forfeiture of compensation paid to an employee by an employee for work performed is the sole remedy under the faithless servant doctrine. *See, e.g. Feigler v. Tral Jewelry, Ltd.*, 41 N.Y.2d 928, 394 N.Y.S.2d 626 (1977) ("[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary") (citing Restatement, Agency 2d, §469). Notably, the Second Circuit has endorsed, under appropriate circumstances, the limitation of forfeiture to just salary and not commissions. *See, Phansalkar*, 344 F.3d at 205. Mr. Maconachy is aware of no authority in New York or within the Second Circuit which extends the "faithless servant" doctrine to include the forfeiture of payments made to an employee for the prior purchase of that employee's business. Nothing in the doctrinal underpinnings of the "faithless servant" doctrine, nor the record herein, Mr. Maconachy respectfully submits, supports even the contemplation by this Court to grant such relief to CARCO.

**POINT III**

**THE DOCTRINE OF ELECTION ESTOPS CARCO FROM RELYING ON THE CLAIMED BREACHES OF CONTRACT AS A BASIS TO TERMINATE MR. MACONACHY**

It is well settled that the power to terminate a contract following a breach is one of election, *see Bigda v. Fischback Corp.*, 849 F. Supp. 895, 901 (S.D.N.Y. 1994), *aff'd*, 101 F.3d 108 (2d Cir. 1996) (unpublished opinion) (citation omitted), "requiring a choice between two

inconsistent remedies available for the redress of a wrong." *Id. (citing, e.g., Apex Pool Equipment Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969)).* "When an executory contract is breached, the non-breaching party to the contract faces two options: he may either continue to perform under the contract or he may terminate the contract." *Id. (Citation omitted).* "If the non-breaching party elects to continue performance, he may not later choose to terminate the contract on account of the breach." *Id. (citation omitted).*

Moreover, CARCO cannot extricate itself from its <u>profitable</u> election by virtue of the "non-waiver" clause in Mr. Maconachy's EA. *See, Pl. Tr. Ex. 254.* As instructed by the Second Circuit in *Apex, supra,*

> [t]he right to terminate in the face of a breach is only an option to declare the contract at an end; if the contract is continued, the party doing so has not, strictly speaking, 'waived' his right but has executed it in favor of continued contractual relations.

*Apex, 419 F.2d, at * 562.* Indeed, relying on *Apex,* the District Court in *Bigda, supra,* rejected the argument advanced by plaintiff that a boilerplate "no waiver" clause "enabled him to continue to perform while reserving his right to sue for breach at some time later." *Bigda, 849 F. Supp., at 901, n.2. Bigda's* sound reasoning has been subsequently endorsed. *See, e.g., Sofi Classic S.A. De C.V. v. Hurowitz, 444 F.Supp.2d 231, 239 (S.D.N.Y. 2006); ESPN, Inc. v. Office Of The Commissioner Of Baseball, 76 F.Supp.2d 383, 389 – 90 (S.D.N.Y. 1999).*

Here, the record is replete with documentary and testimonial evidence that with regard to the conduct claimed by CARCO to constitute a breach of the EA, CARCO knew about it contemporaneously with the occurrence. Indeed, Mr. O'Neill admitted on cross-examination that despite this knowledge, it was in "CARCO's best business interests not to sue Maconachy in 2002, 2003 and 2004." *See, Trans., p. 1074, ln. 11-15.*

25

Should this Court conclude that the record does not support the application of the doctrine of election as a bar to CARCO's contractual claims, then this Court, Mr. Maconachy respectfully submits, should nonetheless conclude that the record does not support CARCO's claim that Mr. Maconachy materially breached his EA.

**POINT IV**

**CARCO HAD NO CAUSE TO TERMINATE MR. MACONACHY AND, THUS, BREACHED HIS EMPLOYMENT AGREEMENT BY FAILING TO PAY HIM FOR THE FINAL TWO YEARS OF HIS CONTRACT**

It is well settled New York law that a party may rescind a contract where the other party's breach is "material and willful, or, if not, willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Septembertide Publishing, B. v. Stein & Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989) (quoting, Callanan v. Powers, 199 N.Y. 268, 284 (1910)).* Here, the record does not support a finding by this Court that CARCO has met its burden in proving a material breach by Mr. Maconachy of his EA.

In this regard, § 4.3 of the Employment Agreement provides in pertinent part:

> Termination for Cause. If the Employee is convicted of any crime or offense, is guilty of gross misconduct or fraud, or materially breaches material affirmative or negative covenants or agreements hereunder, the Company may, at any time, by written notice to the Employee, terminate this Employment Agreement ...[.]

*See, Pl. Tr. Ex. 254.* Inasmuch as CARCO knew that there was no evidence of, (nor produced any at trial), of a "conviction of any crime or offense," "gross misconduct" or "fraud," CARCO singularly relies on the last clause of §4.3 to support its termination of Mr. Maconachy. Specifically, CARCO's justification orbit's exclusively around CARCO's assertion that, in accordance with § 1.1 of the Employment Agreement, Mr. Maconachy failed to "render exclusive and full-time services in such capacities and perform such duties as the Members of the Company may assign, in accordance with such standards of professionalism and competence

26

as are customary in the industry of which the Company is a part." *Id.* Notwithstanding the patent ambiguity of the last clause of § 1.1, and the abject failure of CARCO to produce any evidence "as to such standards of professionalism and competence …," the trial record nevertheless confirms that Mr. Maconachy performed his duties professional and competently under anyone's reasonable definition of those terms.

In support of its claim of mutual breach,[19] CARCO relies principally on what it contends is Mr. Maconachy's failure to satisfy certain sales calls directives, most notably the requirement to make seven face-to-face sales calls per week to targeted prospects identified in the 2002 Business Plan. *See, Pl. Tr. Ex. 27.* Notably, the face-to-face sales calls directive, (or any other directive pertaining to sales call), was not set forth in the Employment Agreement, nor is there any evidence in the record to even support the reasonable inference that CARCO addressed with Mr. Maconachy in pre-acquisition discussions the "sale call" requirements ultimately instituted.[20]

---

[19]     CARCO also seeks $1.9 million in damages allegedly accumulating in 2000, 2001 and 2002. *See Trans. at p. 1949, ln. 4 - 7.* Mr. Maconachy posits that the record supports the determination that not only did he not breach any aspect of his EA in these, (or any other) years, but that there were a multitude of reasons as why MMI, according to CARCO, MMI West was not profitable in these years. Moreover, there was no evidence introduced showing any face-to-face sales call requirement in 2000.

[20]     The record strongly supports the conclusion that CARCO's face-to-face sales call directives were, under the circumstances, unreasonable and unrealistic. For example, CARCO was well aware Mr. Maconachy's "strength" was not in sales and marketing. According to the 1998 MLBAS Report provided to CARCO:

> … during the past 2 to 3 years, each partner and other senior managers have had great success cultivating client relationships. ***This practice has resulted in less emphasis placed on Mr. Murphy and Mr. Maconachy to develop new clientele.***

*See, Pl. Tr. Ex. 2 (Emphasis added).* Indeed, Mr. Giordano specifically advised Mr. O'Neill in March, 1999 that with regard to the question of "how much time does John and Drew devote to the selling process," that "[a]ccording to Drew, John is the more active of the two in the selling process," as well as that:

> [b]oth John and Drew agree that, ***given the lack of direct selling emphasis*** in the company, there is a need to look for a strategic partner to take advantage of selling synergies through cross selling.

*See, Pl. Tr. Ex. 200 (Emphasis added).*

Additionally, this directive was unreasonable considering all of Mr. Maconachy's other responsibilities, *see, Trans. at p. 588, ln. 9 – ln. 22; p. 591, ln. 2 – ln. 25,* as well as the fact that CARCO, in 2002, forced the

Moreover, while Mr. Maconachy admittedly did not satisfy the seven face-to-face sales call directive, he absolutely and unequivocally succeeded, despite a bare-bones staff and the failure of CARCO to establish a significant New York City rainmaker, *see, Trans. at p. 528, ln. 14 – p. 529, ln. 23,* in delivering on the undeniable objective behind this directive, as well as the 2002 Business Plan,[21] which was increased sales revenues and profit.   In this regard, the evidence is overwhelming and incontrovertible.

Mr. Slattery testified at trial that upon his hire in October, 2001, *see, Trans., at p. 1344, ln. 20 - 23,* he was advised by Mr. O'Neill that MMI, (both East and West), "were losing substantial money," *id., at p. 1344, ln. 20 – 23,* and that his goal as President was to increase MMI's "revenue and profit." *Id., at p. 1345, ln. 7 – 9.*  Indeed, it was specifically emphasized to Mr. Slattery by Mr. Giordano shortly after his hire that "the MMI problem is the Number One priority – everything else comes second," and Mr. Slattery acknowledged that "[h]e knows he was hired to turn around MMI[.]"  *See, Def. Tr. Ex., VV.*[22]  Of seminal import, Mr. Slattery acknowledged that upon his departure in October, 2004, MMI West was a profitable entity. *See, Trans., at p. 1353, ln. 23 to p. 1354, ln. 4.*

However, Mr. Slattery's characterization does not come close to accurately reflecting the financial success of Mr. Maconachy's MMI West office in 2002,[23] 2003, 2004 and 2005.  In this regard, Mr. Slattery advised Mr. Maconachy's direct superior, Mr. Murphy, that he was

---

termination of many MMI West employees, leaving it, for the bulk of Mr. Maconachy's tenure, with only five (5) full time employees. *See, Trans. at p. 1636, ln. 16-20.*

[21]     Additionally, a prominent objective of the 2002 Business Plan was the targeting and development of business in the Entertainment field and, specifically, Reality TV. *See, Pl. Tr. Ex. 27.*  The trial record makes clear that Mr. Maconachy achieved great success in developing and building this line of business. *See, e.g. Trans., at p. 800, ln. 19 to p. 801, ln 14; p. 1109, ln. 17 to p. 1110, ln. 5.*

[22]     Mr. O'Neill specifically advised Mr. Slattery in February, 2002 that "but for the MMI debacle, we would be seeking a person with an entirely different background." *See, Def. Tr. Ex. II.*

[23]     For example, Mr. Maconachy increased revenue $921,676 between 2000 and 2001, *see, Pl. Tr. Ex. 5,* almost doubling the MMI West revenue from 2000, a "challenge" that Mr. O'Neill described as "daunting" in a November, 2000 meeting. *See, Trans., at p. 455, ln. 23 to p. 446, ln. 11.*  Mr. Maconachy also for 2002 substantially exceeded the projected net profit margin, i.e., net profit before tax, set forth in the 2002 Business Plan. *See, Pl. Tr. Exs. 27 & 5.*

28

expecting to see a 15 to 20% profit margin from MMI in 2003 and beyond. *See, Def. Tr. Ex. XXX.* Mr. Maconachy met and surpassed this expectation between 2003 and 2005. *See, Pl. Tr. Ex. 5.*

Notably, shortly after Mr. Slattery's communication, Mr. O'Neill, in a letter to Mr. Maconachy concerning Incentive Compensation, wrote that:

> I, personally, look forward to the day when CARCO can pay you incentive compensation. However, as we both know, it will require that ***you manage a profitable operation on a continuous basis.***

(Emphasis added). By virtue of earning Incentive Compensation in 2003, 2004 and 2005, which CARCO has conceded, Mr. Maconachy met Mr. O'Neill's requirement that he "manage a profitable operation on a continuous basis."[24] *See, Def. Tr. Ex. FFFF.*

Nevertheless, despite Mr. O'Neil's "stated" desire in December, 2000 for Mr. Maconachy's MMI West's office to "survive, recover and succeed," *see, Def. Tr. Ex. NNNN; Pl. Tr. Ex. 203*, the unfortunate reality for Mr. Maconachy was that no matter how successful and profitable he made the West Coast office, the die had been cast five years earlier: Mr. O'Neill was going to fire and sue him before the expiration of any statutory or contractual limitations period in an attempt to undo what he believed was a bad business deal. *See, Pl. Tr. Ex. 252, at § 8.1(a)* (six year statute of limitations measured by date of closing). The Closing took place on January 7, 2000. Not so coincidentally, Mr. Maconachy was fired, without warning, one week before the sixth anniversary of the closing.[25]

---

[24] Indeed, according to CARCO'S Comptroller, Glen Tannenbaum, despite the application of significant G&A and Acquisition Costs, MMI achieved a positive "Total Income to CARCO" in 2002 ($611,282), 2003 ($1,746,942), 2004 ($1,921,859) and 2005 ($1,051,787), totaling a "Total Income to CARCO" for those four years of $5,331,870. *See, Pl. Tr. Ex. 346.* Additionally, in three of the five years after 2000, *i.e.*, 2001 through 2005, Mr. Maconachy achieved in MMI's West Coast office no less than a $765,000 increase in sales revenue from the proceeding year, accomplishing this achievement back-to-back in 2003 and 2004. *See, Pl. Tr. Ex. 5.*

[25] During closing argument, CARCO's counsel, sought an adverse inference concerning Mr. Maconachy's home computer. CARCO wholly failed to satisfy its burden on this request. Succinctly, there was neither a

## CONCLUSION

Based upon the evidence in the trial record, the arguments raised in closing arguments and the analysis set forth herein, Mr. Maconachy respectfully submits that this Court should rule that CARCO failed to carry its respective burdens of proof, reject CARCO's attempt to extricate itself from its financial obligations to Mr. Maconachy and award Mr. Maconachy his base compensation and benefits for the last two years of his EA, the remaining nine MMI acquisition payments, the $55,798 Incentive Compensation payment due him for 2005, *see, Pl. Tr. Ex. 341 (Note 8),* the average of his last two years of Incentive Compensation for 2006 and 2007, all applicable statutory and/or contractual interest and attorneys' fees. *See, Def. Tr. Ex. KKK.*

Dated: Uniondale, New York
       November 4, 2008

                    Respectfully submitted,

                    RIVKIN RADLER LLP
                    Attorneys for Defendant
                    DREW MACONACHY

By:    /S/_____
         KENNETH A. NOVIKOFF (KAN - 0350)
         ADAM H. KOBLENZ (AHK – 5533)
         926 RexCorp Plaza
         Uniondale, New York 11556-0926
         (516) 357-3110

---

showing of a culpable state of mind, nor what document(s) were in fact discarded and how they would have been relevant to CARCO's claims or defenses. *See, Toussie and Chandler Property, Inc. v. County of Suffolk,* 2007 *U.S. Dist. LEXIS (E.D.N.Y., Dec. 21, 2007).*