BUNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CARCO GROUP, INC. and PONJEB V,
L.L.C.,

                              Plaintiffs,

                                                    **OPINION AND ORDER**
            -against-                               CV 05-6038 (ARL)

DREW MACONACHY,

                              Defendant.
-------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        Plaintiffs Carco Group, Inc. and its affiliate Ponjeb V, L.L.C. (collectively "Carco") filed

this action against their former employee Drew Maconachy ("Maconachy") alleging *inter alia*

breach of contract and breach of fiduciary duty.  The parties have consented to the undersigned's

jurisdiction pursuant to 28 U.S.C. § 636.  (*See* Docket Entries 37 & 40.)  Beginning on July 21,

2008, and continuing for four weeks thereafter, the undersigned presided over a bench trial.

Having considered all of the evidence and testimony presented, and for the reasons that follow,

the court finds in favor of plaintiff Carco and judgment shall be entered against defendant

Maconachy in the amount of $1,791,356.  The court also finds that Carco is entitled to attorneys'

fees, prejudgment interest and a declaratory judgment as described herein.

                              **FINDINGS OF FACT**

        "In an action tried on the facts without a jury . . ., the court must find the facts specifically

and state its conclusions of law separately."[1]  FED. R. CIV. P. 52(a).  The following findings of

fact are drawn from the evidence and testimony presented at trial.

-------------------------------------------------------

        [1] To the extent that any conclusions of law are included in the findings of fact, they are to
be treated as conclusions of law.  Conversely, any findings of fact included in the conclusions of
law are to be treated as findings of fact.

## A. Carco's Purchase of MMI

Maconachy and John Murphy[2] ("Murphy") are longtime friends who are both former FBI agents with investigative experience. Murphy and Maconachy co-founded Murphy & Maconachy, Inc. ("MMI"), a security consulting firm that offered investigation and litigation support services. MMI was in business for approximately fifteen years prior to its acquisition by Carco. MMI had offices in both California, known as "MMI West," and Virginia, known as "MMI East." Maconachy was in charge of the MMI West operation and served as MMI's President.

Peter O'Neill ("O'Neill") is also a former FBI agent and is Carco's majority owner and Chairman. Carco was in the business of providing research and background check services. Beginning in the late 1990s, O'Neill sought to expand Carco's business to include investigative services. (Tr. at 369-70.)[3] O'Neill focused on MMI because of his common background with Maconachy and Murphy as FBI agents, and because MMI could provide Carco a foothold into investigative services.

In late 1998, MMI engaged Merrill Lynch Business Advisory Services ("Merrill") to determine the fair market value of MMI for potential sale of the business. Merrill produced a report which among other things noted that MMI's revenue generation was heavily dependent

---

[2] Carco has brought a separate action against Murphy, which was recently reassigned to the undersigned and District Judge Thomas C. Platt. *See Carco Group, Inc. v. Murphy*, No. CV 07-3739 (TCP)(ARL).

[3] "Tr." refers to the transcript of the bench trial.

upon Maconachy and Murphy, who together owned 84% of the business. (Pl.'s Ex. 2.)[4] The report described that MMI's business was derived principally through relationships and word of mouth, and it projected increased annual revenues of approximately 5%.

In February 1999, a meeting took place between Maconachy, Murphy and Carco's representative Mike Giordano ("Giordano") to discuss Carco's possible acquisition of MMI. The issues which would eventually destroy the business relationship surfaced at that first meeting: Maconachy and Murphy expressed discomfort with the notion that Carco would exercise control over their conduct of MMI's business. At this meeting, Maconachy also expressed his belief that MMI's go-forward revenue would be higher than Merrill's projections. (Tr. at 367, 371; Pl.'s Exs. 2, 200.)

O'Neill's decision to acquire MMI depended on Maconachy and Murphy's continued association with MMI. Maconachy and Murphy were MMI's key assets as it owned no buildings or real estate. In fact, O'Neill considered them to be so essential to the purchase that he required Maconachy and Murphy to each sign unusually long employment agreements of eight years. The eight-year term coincided with Carco's time line to repay a Chase bank loan obtained to acquire MMI. (Tr. at 717, 720-22, 730-32; Pl.'s Ex. 370.)

Carco acquired the assets of MMI on January 7, 2000. The Asset Purchase Agreement ("APA") provided for a cash purchase price of $7.2 million, with $2 million paid up front and the remaining $5.2 million to be paid in thirty-two equal quarterly payments following the closing.

---

[4] "Pl.'s Ex." refers to exhibits submitted by plaintiff Carco, and "Def.'s Ex." refers to exhibits submitted by defendant Maconachy. Maconachy's exhibits were submitted to the court numbered numerically, yet at trial the exhibits were marked alphabetically. Accordingly, this opinion refers to Maconachy's exhibits in the way that they were presented to the court, marked both numerically and alphabetically.

(Pl.'s Ex. 252.)  Of this amount, Maconachy was to be paid $68,421 each quarter for eight years.

Maconachy was made Senior Vice President of Carco, reporting directly to Carco's president.

(Tr. at 40.)  It was agreed that Maconachy would continue to manage MMI West.  (*Id*. at 34.)

Murphy was made a senior corporate officer of Carco and general manager of MMI, with specific

responsibility for MMI East.  Consistent with Carco's accounting practices, MMI's acquisition

costs were expensed to MMI's balance sheet.  (*Id*. at 366.)

Murphy and Maconachy's employment agreements ("EA") were made a condition

precedent to the APA and were explicitly described to be an integral part of the APA.  (Pl.'s Ex.

252 §§ 5.7, 6.9.)  The EA provided that Maconachy would be paid an annual salary of $200,000

as well as incentive compensation that would be calculated semi-annually.  The EA provided that

Maconachy would "render exclusive and full-time services in such capacities and perform such

duties as the Members of the Company may assign, in accordance with such standards of

professionalism and competence as are customary in the industry of which the Company is a

part."  (*Id*. § 1.1.)  The EA further provided: "If the Employee is convicted of any crime or

offense, is guilty of gross misconduct or fraud, or materially breaches material affirmative or

negative covenants or agreements hereunder, the Company may, at any time, by written notice to

the Employee, terminate this Employment Agreement, and the Employee shall have no right to

receive any Annual Salary, Incentive Compensation, or other compensation or benefits under this

Employment Agreement on and after the effective date of such notice."  (*Id.* § 4.3.)

B.     **Financial Losses and Development of First Business Plan**

Within only a few months of Carco's acquisition of MMI, it began to show heavy losses.

In a letter addressed to O'Neill dated November 7, 2000, Chase Bank expressed concern over

4

MMI's declining revenues. (Pl.'s Ex. 317.) Specifically, Chase noted that MMI's revenues were far below Merrill's revenue projections and were trending downward. Chase pointed out that actual 1999 year-end revenue was $4 million, whereas Merrill's projection had been $7.5 million. Chase further noted that, as of October 31, 2000, MMI had already incurred a loss of $1.3 million for the year 2000. Concerned for its investment, Chase suggested that MMI develop a business plan for correcting the situation, and even went so far as to suggest renegotiation of the acquisition terms. Maconachy attributed MMI's losses to acquisition costs.

On November 17, 2000, a critical meeting was held at Carco's headquarters in New York. The meeting was attended by O'Neill, Maconachy, Murphy and Giordano. The purpose of the meeting was to formulate a response to the Chase letter and to discuss a business plan to deal with MMI's declining revenue. It was agreed that Maconachy and Murphy would develop a business plan to address MMI's losses. At this meeting, O'Neill made clear that reversing the revenue trend required that MMI implement a new approach to sales. In particular, O'Neill insisted that MMI focus on bringing in new clients to strengthen revenues and demanded that a concerted effort be made in this regard. O'Neill emphasized the importance of face-to-face meetings with new client prospects. Maconachy was instructed that he bore primary responsibility for improving the sales effort at MMI West and that he was expected to actively solicit new business in the manner outlined by O'Neill. (Tr. at 788; Pl.'s Ex. 279.)

This meeting revealed a deep divide between Maconachy and O'Neill's views on how to increase sales. (Pl.'s Ex. 245.) Maconachy expressed discomfort with O'Neill's sales approach, and indicated that he did not want to become what he perceived to be a full-time salesman. Maconachy also expressed his view that the best source for new business was existing clients.

Maconachy's sales approach was rejected. Instead, O'Neill instructed Maconachy and Murphy that each division of MMI had to meet a target of at least twenty face-to-face sales meetings per week with potential new clients. O'Neill also discussed the need to cut MMI's costs. Despite the importance of this meeting, Maconachy unexpectedly left early which caused some consternation with Carco's management. (Tr. at 380-82.)

On November 20, 2000, Maconachy prepared a sales plan for MMI West that was consistent with O'Neill's sales direction. The plan provided for MMI West employees to meet with at least four new client prospects daily. Maconachy personally committed to devoting at least "one or two" days each week to meeting prospective new clients. (*Id.* at 385-86; Pl.'s Ex. 244.) O'Neill's response to the plan was to stress the importance of a concentrated sales effort. He clarified that the requirement of twenty sales calls per week, set at the meeting in November, was a minimum effort and that this requirement could not be met by a simple phone call. O'Neill also made clear that Maconachy was expected to personally spend at least two days in the field selling MMI's services to new customers. To accomplish this, O'Neill instructed Maconachy to delegate case management to someone else so that he would be available to lead the sales effort. (Pl.'s Ex. 203.) Maconachy, however, never followed the sales plan and by year end MMI West's revenues were down by a total of $1.9 million.

In January 2001, another meeting was held between O'Neill, Maconachy and Murphy. O'Neill was highly distressed over MMI's financial picture, and particularly Maconachy's failure to follow through with the sales plan. O'Neill again emphasized the importance of making twenty face-to-face sales calls per week  At one point during the meeting, Maconachy stated his prescient concern that he might not be a good fit for the company. It was agreed that MMI West

should hire a full-time marketing person to assist Maconachy in meeting the goals set by the sales plan. Jim Prince was subsequently hired to fill this role. At this meeting, Maconachy and Murphy projected further losses for 2001. (Pl.'s Exs. 207, 356.)

In March 2001, a formal business plan was compiled for MMI. (Pl.'s Ex. 216.) The plan was prepared by Giordano with input from Maconachy and Murphy, and it was an action plan to reverse MMI's losses. The key features of the plan were that each division of MMI would undertake twenty face-to-face sales meetings per week. The plan provided for weekly reports to be sent to O'Neill outlining MMI's efforts in this regard. It also outlined a cost containment strategy which required that visits to existing clients be made by a single employee unless a major presentation was contemplated. All business travel was to be combined with sales calls and where air travel was involved an employee would be required to take extra days to make sales calls. Finally, the plan committed MMI to utilizing Carco's research division to conduct employment background checks. The mutual referral of business was something that O'Neill had insisted on from the outset. (Tr. at 49, 403-04.)

The weekly reports which were sent to O'Neill under the business plan consisted of a weekly time analysis and a travel schedule. The time analysis report listed each employee at MMI West and provided a breakdown of each employee's hours by labor category. The travel report described details concerning outside meetings. Both reports were key management tools for O'Neill and Carco's senior management. (*Id.* at 45.) The reports were faxed to O'Neill, as it was well-known that O'Neill did not use e-mail or the internet, although his secretary had access to both. (*Id.* at 54-55.) Maconachy was aware that O'Neill regularly reviewed the weekly reports to keep track of MMI's employees. Indeed, O'Neill had specifically requested that the weekly

reports be faxed to him promptly every Monday to facilitate his oversight of MMI. (Pl.'s Ex. 207)

## C.     The Losses Continue

The flash revenue reports for January and February of 2001 reflected continuing losses at MMI of approximately $270,000. In March 2001, O'Neill prepared a performance evaluation for MMI which concluded that MMI West's sales performance had been dismal. (Pl.'s Ex. 208.) O'Neill deduced from the weekly reports that MMI West had not made any significant effort to meet the target of twenty sales meetings per week as set by the business plan. The reports reflected that the few sales calls made were only to existing or former clients, which was contrary to O'Neill's express instruction. O'Neill further observed that Maconachy had ignored the cost containment provisions of the business plan that mirrored Carco's corporate guidelines. The evaluation cited instances in which Maconachy had failed to schedule sales meetings while on a business trip and had permitted multiple employees to attend the same client meeting.

O'Neill's confidence in Maconachy's management abilities further eroded when he discovered that Maconachy had hired his son to do work for MMI West and had paid him off the books. (Pl.'s Exs. 211, 212.) O'Neill demanded that Maconachy stop this practice and noted that this put Carco in legal jeopardy. (Pl.'s Exs. 315, 397.) Around this same time, O'Neill expressed his discomfort with the fact that MMI West employed several members of Maconachy's family, including his wife Colleen and brother-in-law, Brendan Kertin ("Kertin").

In August 2001, O'Neill sought Murphy's assistance, in his capacity as general manager of MMI, to secure Maconachy's compliance with the business plan. (Tr. at 806.) Despite their joint efforts, as of October 2001, MMI West had yet to come close to meeting the target of

twenty sales meetings per week.  Moreover, Maconachy continued to target only former or existing clients for sales meetings.  By this point, O'Neill believed that Maconachy might be in breach of his EA.

### D.    Mike Slattery's Monitoring of Maconachy

Carco hired Mike Slattery ("Slattery") in October 2001 as its President.  (Tr. at 681.)  One of the issues that O'Neill tasked Slattery to deal with was MMI West's lack of profitability and, more specifically, Maconachy's failure to implement the business plan.  (*Id.* at 635.)  In January 2002, Murphy and Maconachy submitted a second business plan for MMI.  (Pl.'s Ex. 27; Tr. at 414-18.)  This second business plan mirrored the first plan.  It reiterated MMI's commitment to make twenty face-to-face sales calls on new clients each week.  It also reiterated that Carco's research division would be used to conduct background checks and that business meetings and trips would be conducted with the same limitations described in the first plan.  A major substantive change was that the new plan specifically identified 381 new businesses that would be specifically targeted by MMI West for sales calls (the "target prospects").

By February 2002, O'Neill reported to Slattery that the weekly reports reflected that Maconachy and MMI West personnel were not pursuing sales meetings with the target prospects and that Maconachy persisted in meeting only with existing customers.  (Pl.'s Exs. 25, 47.)  Slattery was instructed to address this issue with Maconachy and to work towards removing Maconachy's wife and brother in law, Brendan Kertin, from the payroll as soon as possible.  (Pl's Ex. 292.)  By this time, O'Neill had become particularly concerned  that Maconachy's wife, a part-timer, was working more hours than the law allowed and that, despite directing Maconachy to limit her hours, she continued to work full time. (Pl.'s Exs. 22, 23, 24, 33; Def.'s Ex. II.)  The

prospect of terminating Maconachy was also discussed at this point. (Def.'s Ex. VV; Tr. at 632-34.)

As instructed, Slattery began to closely monitor MMI West's compliance with the business plan. In March 2002, after reviewing some of MMI West's weekly reports, which continued to reflect that the business plan was not being followed, Slattery demanded an explanation from Maconachy. Slattery informed Maconachy that his failure to increase sales revenue required cuts in MMI West's costs. (Pl.'s Ex. 418, 234.) Maconachy's response came in April 2002. (Pl.'s Ex. 363.) Essentially, Maconachy reported that his staff had been too busy to implement the business plan and added that he had therefore modified the plan by limiting the sales efforts to existing clients. Maconachy thus unilaterally decided to abandon the approved business plan in favor of a plan that had been specifically rejected by O'Neill.

When O'Neill learned of this development he instructed Slattery to meet with Murphy and Maconachy in person to address the sales problem. Slattery traveled to California and met with Maconachy and Murphy in mid-April 2002. At this meeting, Maconachy reiterated that he had abandoned the sales plan contending that it was unrealistic. Slattery reminded Maconachy that he had helped formulate the plan and made it clear that implementation of the sales plan was not optional. As a concession, Slattery agreed to reduce the required number of sales meetings from twenty to seven per week, but otherwise insisted that the plan be followed. Slattery outlined this new agreement in a memo to Maconachy noting the specific commitment to make seven face-to-face sales calls per week on target prospects. (Pl.'s Ex. 364.) In his memo, Slattery restated the guidelines for business trips, including the requirement that such trips be

coupled with sales calls.  The memo further directed that client meetings be handled by a single MMI employee and that any exceptions had to be cleared through Slattery.

Slattery reported back to O'Neill on his meeting with Maconcachy, and plans were made to further consolidate the operations of MMI to reduce expenses.  The focus continued to be the need to ramp up the sales effort at MMI West to curtail mounting losses.  (Pl.'s Ex. 240.)  By April 30, 2002, only two weeks after his meeting with Slattery,  Maconachy again complained about the sales program.  In a terse response, on May 2, 2002, Slattery issued an ultimatum directing Maconachy to *personally* conduct seven face-to-face sales calls each week from the target prospect list and demanding that Maconachy set sales targets for the balance of his staff. (Pl.'s Ex. 330.)

**E.      Maconachy's Continued Failures to Follow Carco's Directives**

In April and June 2002, Slattery demanded a report detailing what had been done to meet the sales program.  (Pl.'s Exs. 37, 363.)  Yet again, and notwithstanding the continuous direction otherwise, Maconachy reported that he had targeted existing clients based on his belief that this was the better way to go.  Maconachy repeated all of the same reasons he had in April for not implementing the sales program, acknowledging that he had not even met the reduced requirement of seven sales calls per week.  (Pl.'s Ex. 365.)

On June 17, 2002, Slattery sought a progress report from Murphy, who had also been asked to deal with Maconachy's lack of cooperation.  (Pl.'s Ex. 33.)  Murphy bluntly conceded that the sales plan was not being followed by MMI West.  (Pl.'s Ex. 236.)  Murphy reported that although he had cautioned Maconachy on a number of occasions to follow through with the sales plan, Maconachy was uncomfortable with sales and had chosen instead to reach out only to

existing clients.  Murphy further noted that although Maconachy complained about a lack of

support, Murphy had offered the assistance of MMI East personnel.  Further, Murphy reported

that Maconachy had failed to properly supervise Jim Prince, the full-time marketing person,

thereby reducing his effectiveness.  Murphy added that Maconachy was willing to discuss his

termination in recognition of the fact that his relationship with Carco had soured.

In July 2002, Slattery contacted Murphy and highlighted examples of MMI West's

continued failure to follow the sales plan.  (Pl.'s Ex. 246.)  For example, Slattery noted that for

the week beginning July 8, only three hours were spent marketing and sixty hours were charged

to undefined administrative tasks.  Slattery informed Murphy that this work pattern was

unacceptable, and reflected a total lack of good faith on Maconachy's part.  Slattery concluded

that Maconachy's continued lack of effort in this regard could only be viewed as open and

intentional disregard for corporate directives and policies.  In response, Murphy, who by this

point was also clearly exasperated with Maconachy, sent Slattery a memo describing that, despite

numerous discussions over many months, Maconachy had yet to comply with the sales plan.

Pl.'s Ex. 37.)  Murphy followed up by again reminding Maconachy of the need to follow the

plan.  (Pl.'s Ex. 38.)

In the end, despite the many directives he received, Maconachy never implemented the

sales plan and never met the reduced target of seven sales calls per week on target prospects.  By

mid-2002, O'Neill considered, but rejected,  the idea of terminating Carco's relationship with

Maconachy.  O'Neill concluded that terminating Maconachy would only leave him with a large

debt that he had personally guaranteed and with no one to oversee any existing MMI West

business.  (Tr. at 800.)

**F.  Maconachy's Continuing Employment of Family Members**

In May 2002, Slattery directed Maconachy to terminate the employment of his wife Colleen.  Slattery made it clear that Maconachy's failure to follow O'Neill's direction to reduce Colleen's hours had forced this result. Colleen was duly terminated but, by February 2003, Maconachy had arranged to have her rehired by citing work needs.  (Def.'s Ex. 329.)  To avoid Slattery's scrutiny, Maconachy submitted the request to rehire his wife only to Murphy.  At Murphy's direction, Carco's comptroller Glen Tennenbaum ("Tennenbaum") put Colleen back on the payroll.  (Pl.'s Ex. 197.)  Slattery was deliberately bypassed because both Maconachy and Murphy were well aware of his and O'Neill's previous instruction to remove Colleen from the payroll.  Maconachy and Murphy relied on their position as corporate officers to direct Tennebaum to restore Colleen to the payroll.  (Tr. at 954.)  In March 2003, when Slattery apparently realized that Colleen had been restored to the payroll, he directed Tennenbaum to issue a corporate directive that the hiring of relatives was not permitted.  The directive identified Colleen and Maconachy's son by name.  (Pl.'s Ex. 197.)

On August 30, 2002, in an effort to further cut costs at MMI West, Slattery gave the direction to terminate the employment of Maconachy's brother-in-law, Kertin.  Slattery informed Maconachy that Kertin's termination was caused by Maconachy's utter disregard of the sales plan and his continuous failure to adhere to company directives and policies.  (Pl.'s Ex. 232.)  In response, Maconachy repeated his long-held view that by focusing MMI West's sales effort on existing clients he was meeting the need to raise revenues.  (Pl.'s Ex. 218.)

On September 5, 2002, Murphy reported to Slattery that Kertin had been removed from the payroll.  Murphy, however, sought permission to continue to utilize Kertin on an ad hoc basis

as an independent contractor. Slattery agreed but was insistent that any use of Kertin would be

contingent upon Maconachy's compliance with the sales plan and guidelines. (Tr. 1299-1302,

Pl.'s Ex. 225.) Despite this, Maconachy continued to ignore the sales plan while employing

Kertin. (Pl.'s Ex. 48.)

## G. Maconachy's Continued Failure to Follow Directives

In September 2002, Slattery sent an e-mail expressing extreme frustration with Murphy

and Maconachy. Slattery pointed out that Murphy and Maconachy had shelved the sales plan and

consistently failed to adhere to corporate directives and policies. (Pl.'s Exs. 40, 41, 286.) In its

interrogatory responses, Carco identified thirty-eight business trips taken by Maconachy in which

he ignored the directive to schedule sales meetings. Carco also identified twenty-six examples of

Maconachy traveling with another MMI employee to meet clients. (Def.'s Ex. EE.) Moreover,

Maconachy virtually ignored the target prospects identified in the second MMI West sales plan.

(Tr. at 814.) Of the 381 target prospects identified in the sales plan, only thirty-three of these

were visited during the five years that Maconachy was employed with Carco. (*Id.* at 1513.)

On September 12, 2002, Slattery summarized the problem in a memo to Murphy stating

that he was tired of Maconachy's and Murphy's excuses for not meeting the sales plan. (Pl.'s Ex.

40.) Slattery described the circular problem in this fashion: Maconachy and Murphy never met

the sales plan which they had proposed, had no alternative plan to address the mounting losses,

thereby forcing management to cut personnel, which Maconachy and Murphy then used as an

excuse for not following the sales plan. (Pl.'s Ex. 41.) Slattery concluded that Maconachy had

not demonstrated good faith in complying with the sale plan. Significantly, this assessment was

based not merely on the fact that meetings with target prospects did not occur, but on the absence

of any effort to secure those meetings.  (Tr. at 1334-36.)  In November 2002, Slattery reported to

Murphy that Maconachy was not even making telephone sales calls of any significance.  (Pl.'s

Ex. 438.)  On December 30, 2002, Maconachy, acknowledging that MMI West continued to

experience losses, and outlined yet another sales plan which he submitted to Murphy.  (Pl.'s Ex.

217.)  In that plan, Maconachy stated that he and his staff would telephone no fewer than fifty-

five law firms and sixty major corporations within sixty days in an effort to develop business.

Slattery was unimpressed by this offer, noting that management had instructed Maconachy to "go

out and sell," and that having staff members make blind phone calls would not satisfy this

requirement.  Indeed, O'Neill, who was experienced in this area, had on a number of occasions

explained to Maconachy that cold telephone calls were ineffective and had advised Maconachy

on how to effectively approach new sales.  (Pl.'s Ex. 220.)

In January 2003, Slattery reported to Maconachy that MMI West's business was failing

from a lack of management and the absence of any good faith effort to follow corporate

directives.  (Pl.'s Exs. 220, 224.)  Slattery made it clear that Maconachy's refusal to market the

business was the chief cause of personnel cuts, which further diminished the business's overall

value.  Maconachy again suggested to Carco that they discuss his termination, acknowledging

that he had not been following corporate guidelines.  Maconachy also conceded that revenue

from some existing MMI West accounts was down, which was precisely O'Neill's initial

concern: that too much reliance was being placed on existing customers.

## H.    Maconachy's Involvement in Altering Documents and Unauthorized Outsourcing

By January 27, 2003, Maconachy rehired Kertin and was using him on a full-time basis.

(Pl.'s  Ex. 73.)  The personnel action form authorizing his return was signed by Murphy and

Maconachy.  It was very clear to Maconachy that Slattery and O'Neill wanted to be rid of Kertin.  Although they had agreed to allow Kertin to be brought back intermittently as an independent contractor, Slattery and O"Neill did not agree to his full-time employment.  By April 2003, O'Neill realized that, although Kertin was purportedly hired as an interim independent contractor, the weekly reports reflected that he was working more hours than the regular full-time staff.  (Pl.'s Ex. 54)  O'Neill, who was monitoring the weekly reports, concluded that Maconachy was simply using the independent contractor status as a ruse to bring Kertin back full-time.  (Pl's Ex 44.)  O'Neill directed a memorandum to Slattery in September 2003 demanding that Kertin's employment be ended.  (Pl.'s Ex. 55; Tr. at 847-51.)  This final ultimatum led to Maconachy and Murphy's altering the weekly reports.

On September 26, 2003, Murphy instructed his assistant to manually remove Kertin's name from the weekly reports that were faxed to O'Neill.  (Pl.'s Ex. 367; Tr. at 145-46.)  Murphy and Maconachy discussed altering the weekly report, and Maconachy's assistant supplied the "how to."  Maconachy conceded that he was aware of the alteration, but contended he was merely a bystander, and that this action was taken at Murphy and Slattery's behest.  (Tr. at 1431-48.)  However, it is clear that the alterations of the weekly reports were done with Maconachy's knowledge and approval and that Slattery had no knowledge of this misconduct.  (*Id*. at 1297-98.)  Maconachy served in the FBI and in particular served on squads that worked on fraud cases and corruption.  He could have had no doubt and does not deny that this was a deceptive practice.  (*Id.* at 1451-52.)  The reports were altered to conceal Kertin's continued employment from O'Neill, and they were continuously altered from September 2003 until Maconachy's termination in December 2005.  (*Id.* at 69-72, 118, 1452.)  Thus, despite O'Neill's and Slattery's objections

16

to Kertin's employment, by virtue of this deceptive act, Maconachy managed to keep his brother-in-law continuously employed from 2003 to 2005. (Tr. at 173-74; Pl.'s Exs. 218, 359.) This deception was not uncovered by Carco management until late 2005.

In 2004, O'Neill learned that, contrary to his express directive as well as express provisions in each of MMI 's business plan, MMI West had been using a Carco competitor, Reference Pro, to conduct background checks. This arrangement was discovered by chance when a Reference Pro representative happened to mention this arrangement to Giordano at a trade show. MMI West had been referring business to Reference Pro for approximately one year, and Carco's management directed an immediate stop to this practice. (Tr. at 78-82; Pl.'s Ex. 412.) This was the second time that this issue had come up with respect to MMI West. (Pl.'s Ex. 199.)

In late October 2005, Carco's management discovered a discrepancy in the MMI West weekly reports. This led to an investigation which revealed that the weekly time sheets sent by fax to O'Neill had been altered to delete any reference to Kertin. (Pl.'s Exs. 104, 435A; Tr. at 54, 64-65.) Kertin's name appeared in several monthly reports. (Def.'s Exs. O, Q, W, Z.) However, O'Neill only occasionally reviewed the monthly reports and it was his consistent practice to regularly monitor the weekly reports. (Tr. at 106-07, 111-118, 703-04.) It was well-known within the company that O'Neill did not use a computer and would not likely discover the alteration on his own. (*Id.* at 701-04.) It was also well-known to both Murphy and Maconachy that O'Neill relied heavily upon the weekly reports to track MMI's business progress and that any alteration of those documents would mislead O'Neill. (Pl.'s Ex. 206.)

## I. Maconachy's Termination

Maconachy was terminated on December 28, 2005 for insubordination, poor performance and falsification of business records. (Tr. at 45-46.) Maconachy's insubordination was described as his failure to follow corporate directives and his failure to follow company policy with respect to employment of family members. (*Id.* at 49-50.) By the time that Maconachy was terminated, MMI West had experienced some limited financial recovery. By 2005, MMI West for the first time posted a positive cumulative net income of a mere $288,513. (Pl.'s Ex. 441.)

### CONCLUSIONS OF LAW

The parties agree that subject matter jurisdiction exists under 28 U.S.C. § 1332(a)(1). The parties also agree that New York law applies to this action pursuant to the choice-of-law provisions contained in the EA and APA. *See Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) (citing *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)) (applying an express choice-of-law provision except where there has been a showing of fraud, violation of public policy or lack of sufficient contacts).

Carco alleges the following causes of action: (1) breach of fiduciary duty/faithless servant;[5] (2) breach of the APA; (3) breach of the EA; (4) breach of warranty; (5) declaratory judgment; and (6) indemnification. Carco has voluntarily withdrawn additional claims contained in its second amended complaint, and Maconachy has voluntarily withdrawn all counterclaims. As stated in its post-trial memorandum, Carco now seeks "two distinct categories of damages: a) damages for breach of the EA and APA; and b) disgorgement under the faithless servant doctrine

---

[5] Although Carco alleged two separate claims of breach of fiduciary duty/faithless servant, the court considers these two causes of action under the same analysis. This approach is consistent with the parties' papers.

of all compensation paid to Maconachy after his first disloyal act." (Docket Entry 58 at 20.)

## A. Breach of Contract

"Under New York law, a plaintiff must prove four elements to prevail on a breach of contract claim: '(1) the making of a contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the contract and (4) damages suffered by the plaintiff.'" *Eastman Kodak Co. v. STWB Inc.*, 232 F. Supp. 2d 74, 91 (S.D.N.Y. 2002) (quoting *Kreiss v. McCown DeLeeuw & Co.*, 37 F. Supp. 2d 294, 298 (S.D.N.Y. 1999), *aff'd*, 108 F.3d 1369 (2d Cir. 1997)). Although a plaintiff is entitled to damages in all instances where a defendant has breached a contract, the plaintiff is only entitled to suspend its own performance when the defendant's breach was material. *See* 23 WILLISTON ON CONTRACTS § 63:3 (4th ed. 2008) (herein "WILLISTON").

Maconachy does not dispute that he entered into the EA and APA with Carco, nor does he deny that Carco performed under these agreements. Any dispute thus centers on whether Maconachy breached the EA and APA, whether the breaches were material, and whether Carco suffered damages as a result.

### 1. Breach of the EA

Carco alleges that Maconachy breached the EA by failing to adequately perform his duties and failing to follow instructions from his supervisors. "In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (citation and internal quotation marks omitted). The EA gave Carco the right to terminate the agreement if Maconachy was in material breach, upon which Maconachy had no right to receive his "Annual Salary,

Incentive Compensation, or other compensation or benefits under this Employment Agreement on and after the effective date of such notice." (Pl.'s Ex. 254 § 4.3.) Carco claims that Maconachy materially breached the EA by failing to abide by Section 1.1 (the "Performance Clause"), which required Maconachy to "render exclusive and full-time services in such capacities and perform such duties as the Members of the Company may assign, in accordance with such standards of professionalism and competence as are customary in the industry of which the Company is a part." (*Id.* § 1.1.) Although the EA does not define the term "Members," it is undisputed that the plain meaning of this term includes O'Neill and Slattery, who were Carco's upper management and Maconachy's direct supervisors. Carco thus claims that, under the terms of the agreement, Maconachy's breach of the EA gave Carco the right to terminate the agreement and to seek damages.

Even if the EA had not contained the Performance Clause, implied in all employment agreements are the duties to adequately perform and to follow reasonable directions from supervisors. *See* 19 WILLISTON § 54:22 (noting that "there is implied in every contract for work or service a duty to perform it with reasonable skill, care, and diligence, and in a workmanlike manner") (citing *Fairmont Shipping Corp. v. Chevron Int'l Oil Co., Inc.*, 511 F.2d 1252 (2d Cir. 1975)) (other citations omitted); 19 WILLISTON § 54:23 (noting that "an employee is bound to obey the instructions and follow the rules of his or her employer, subject to the requirement that the instructions not be unreasonable") (citing *Reilly v. Polychrome Corp.*, 872 F. Supp. 1265 (S.D.N.Y. 1995), *aff'd*, 71 F.3d 405 (2d Cir. 1995)) (other citations omitted). The Performance Clause nonetheless explicitly defined and set forth Maconachy's obligations: (1) to perform in accordance with the standards of professionalism and competence that are customary in Carco's

industry; and (2) to comply with duties assigned by Carco's upper management. Carco alleges that Maconachy breached these duties "by willfully and repeatedly refusing to perform duties assigned to him and by routinely deviating from customary standards in the investigative industry." (Docket Entry 42 at 8.) Maconachy denies that he breached the EA, and alleges that "not only did he work exceedingly hard, but . . . he always tried his best to and acted in good faith to comply with any directive given." (Docket Entry 41 at 4.) Given the evidence and testimony presented at trial, the court disagrees with Maconachy's assessment.

Maconachy's argument that he worked "exceedingly hard" is belied by the evidence presented, which makes clear that Maconachy failed to perform with the customary level of professionalism and competence that is standard in virtually any industry. Carco purchased MMI almost exclusively due to Maconachy and Murphy's specialized skills and experience in the investigative field. Maconachy therefore had a heightened duty to utilize his skills and experience in performing his everyday duties. *See* 19 WILLISTON § 54:22 (noting that an employee has a duty to exercise any special skill that he or she possesses) (quoting RESTATEMENT (SECOND) OF AGENCY § 379(1) (1958)). Beginning in November 2000, when Chase discovered that MMI West's business was showing steep financial losses, and continuing throughout Maconachy's tenure at Carco, the need to take urgent action to turn around MMI West was clear and explicit. The evidence shows that Maconachy did not take this need seriously, beginning when he left early from a planning meeting on November 17, 2000. As MMI West continued to struggle to turn a profit, let alone to meet the expectations set forth in the Merrill report, Maconachy refused to implement multiple business plans, despite the fact that he participated in their drafting and represented that he would comply. Maconachy instead

unilaterally and consistently refused to pursue sales meetings with new clients. Sales and business expansion were not only well within Maconachy's scope of responsibility but Maconachy was particularly well-suited to conduct these meetings given his knowledge of MMI West's business. The only impediment to enacting the sales plans was Maconachy's persistent refusal to do so. Maconachy's sole rationale for not following the sales plan was that he felt more comfortable with his own sales approach. Maconachy was unwilling to accept that he no longer had the final say in such matters. As a result, O'Neill and Slattery were forced to constantly intervene and monitor Maconachy's activities because they justifiably could not rely upon Maconachy's business judgments. The court is thus swayed by O'Neill's testimony that squarely laid the blame for MMI West's financial losses upon Maconachy's incompetence. (*See* Def.'s Ex. II.)

Part and parcel with Maconachy's breach of his duty to perform was Maconachy's repeated and consistent failure to comply with the tasks assigned to him by O'Neill and Slattery. The record is rife with examples, again most notably Maconachy's repeated refusal to conduct face-to-face sales calls. O'Neill issued this direction to Maconachy as early as November 2000. O'Neill and Slattery then repeated these instructions throughout Maconachy's entire employment at Carco. Regardless of whether it was more prudent to merely service existing clients rather than to pursue new ones, Maconachy was bound under the terms of the Performance Clause to follow the directions of his supervisors. Instead, Maconachy paid mere lip service to Slattery and O'Neill's directions.

Those directions were not the only instructions that Maconachy openly disobeyed. Maconachy consistently refused to follow Carco's guidelines on reducing costs during business

travel, despite being reminded to do so on multiple occasions. Maconachy also refused to follow

instructions that MMI West utilize Carco's background check services rather than competitors'

services. In addition, Maconachy consistently refused to follow O'Neill and Slattery's

instructions regarding the employment of his family members. The consistent employment of

family members came despite O'Neill's repeated instructions otherwise. At every turn,

Maconachy failed to comply with the reasonable duties and directions given to him by his

superiors. Accordingly, due to the acts described above that show a wanton disregard of

reasonable instructions from supervisors, the court finds that Maconachy breached the

Performance Clause. This breach began on November 17, 2000, which was the first date that

Maconachy was instructed to conduct face-to-face sales calls, and continued until Maconachy's

termination in December 2005.

In addition, the court finds that Maconachy caused a separate breach of the Performance

Clause through his involvement in altering documents. Maconachy argues that his supervisors

were aware of Kertin's continued employment and thus had tacitly provided their approval.

Although Maconachy is correct that O'Neill and Slattery gave permission to hire Kertin for

limited projects through 2004 and 2005, O'Neill had also strenuously and repeatedly voiced his

objection over MMI West's retention of Kertin on a full-time basis. More importantly, the fact

that O'Neill was aware that MMI West continued to employ Kertin in some capacity has no

bearing on the submission of altered documents, which were intended to conceal from O'Neill

the full extent of Kertin's employment. The evidence also shows that Maconachy was well

aware that the weekly reports were the sole documents that O'Neill reviewed. The court is

unpersuaded by Maconachy's argument that he, at most, merely failed to "whistleblow" on

others' wrongful activities. Although the alteration of the weekly time reports occurred at the MMI East office, Maconachy bore managerial responsibility for their submission and was fully aware that the documents were being altered. Maconachy also bore direct managerial responsibility for Kertin's employment, and the modifications were intended solely to keep O'Neill and Slattery in the dark. Given that Maconachy was aware of the modification of the weekly reports, that he had direct management responsibility over the submission of the reports to O'Neill, and that the altered versions provided cover for his insubordination, the court finds that Maconachy was responsible for these acts. The submission of these documents was clearly effectuated in order to subvert O'Neill's express directions, and these acts fall well below the customary standard of professionalism and competence. Accordingly, Maconachy's involvement in altering documents, which began in September 2003 and continued through Maconachy's termination, constituted a separate breach of the Performance Clause.

The EA provided Carco with the right to terminate the agreement upon a material breach. Because the EA does not define what conduct would constitute a material breach, the court must interpret this term "in accord with the parties' intent." *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166 (N.Y. 2002) (citations and quotation marks omitted). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id*. (citations and quotation marks omitted). The court looks to New York law to define the term "material breach" pursuant to the "Governing Law" provision of the agreement. (*See* Pl.'s Ex. 254 § 10.7). Under New York law, "[a] 'material' breach has been defined as one which would justify the other party to suspend his own performance, or a breach which is so substantial as to defeat the purpose of the entire transaction." *Lipsky v. Commonwealth United Corp.*, 551 F.2d

887, 895 (2d Cir. 1976) (citing *Fink v. Friedman*, 78 Misc.2d 429, 358 N.Y.S.2d 250 (N.Y. Sup.

Ct. 1974); 12 WILLISTON ON CONTRACTS § 1469 (3rd ed. 1970)).  It is well-settled under New

York law that, "to find that there was a material breach, the departure from the terms of the

contract or defects of performance must have pervaded the whole of the contract or have been so

essential as substantially to defeat the object that the parties intended to accomplish."

*Cablevision Sys. Corp. v. Town of East Hampton*, 862 F. Supp. 875, 885 (E.D.N.Y. 1994) (citing

*Miller v. Benjamin*, 142 N.Y. 613, 617, 37 N.E. 631 (N.Y. 1894)).  Put another way, "for a

breach of a contract to be material, it must 'go to the root of the agreement between the parties.'"

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (quoting

*Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)).

It is clear that the parties intended for Maconachy's diligent and obedient service to be an

essential element of the EA.  The parties' intent is most clearly shown by the fact that the

Performance Clause is the very first term of the EA.  This point of emphasis is made even more

stark by the fact that the term was even included in the agreement when New York law implies

such duties.  The parties' intent is further reflected by the agreement's preamble, which describes

that Carco's purchase of MMI West was contingent upon Maconachy's execution of the EA, and

also refers to Maconachy's "experience in the management and operations of firms engaged in

activities similar to [Carco]."  (Pl.'s Ex. 254 at 1.)  Finally, the parties' intent is reflected in the

fact that Maconachy was obligated to render his services for a term of eight years.  This shows

the importance of Maconachy's performance under the EA, which did not provide for at-will

termination of the agreement by either party.  The EA thus reflects that the parties intended for

Maconachy's performance to be one of, if not *the* essential item that Carco had sought to receive

25

in exchange for providing salary and benefits.

As described above, Maconachy's breaches of the Performance Clause were neither trivial nor transitory, but rather they pervaded Maconachy's entire relationship with Carco. The court is particularly persuaded that Maconachy's refusal to follow directions from O'Neill and Slattery subverted the entire purpose of the EA. Even absent the express requirements contained in the Performance Clause, Maconachy's refusal to follow directions "strikes at the very heart" of his employment relationship with Carco. *See* 19 WILLISTON § 54:23 (citing *Reilly*, 872 F. Supp. 1265). By consistently failing to act with the requisite level of professionalism and by failing to follow the directions of his supervisors, Maconachy's conduct led to a fundamental breakdown of his employment relationship with Carco. It is even more apparent that Maconachy's involvement in modifying documents severely undermined his employment relationship, to the extent that Maconachy actively sought to undermine O'Neill's management. The evidence makes clear that Maconachy's breaches of the Performance Clause were so substantial as to defeat the entire purpose of the EA. *See Lipsky*, 551 F.2d at 895. Accordingly, under New York law, Maconachy materially breached the EA.

The court thus finds that Maconachy committed two material breaches of the EA: (1) through his general failure to perform and follow directions, which began on November 17, 2000, and continued until Maconachy's termination on December 28, 2005; and (2) through his involvement in altering documents that were submitted to O'Neill, which began in September 2003 and continued until Maconachy's termination on December 28, 2005.

## 2.     Breach of the APA

Carco next argues that Maconachy's breach of the EA also constituted a breach of the

APA.  To that end, Carco contends that "the EA and the APA were mutually dependent and must be treated as one."  (Docket Entry 42 at 8.)  Under New York law, "[w]hether the parties intended to treat both agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact."[6]  *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13, 280 N.E.2d 867, 873 (N.Y. 1972); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 204-05 (2d Cir. 1989) (collecting cases).  "In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances."  *Rudman*, 30 N.Y.2d at 13, 280 N.E.2d at 873 (citations omitted).  Although Maconachy does not appear to dispute that the EA and APA were mutually dependent, the court must determine whether the parties intended the APA to be integrated with the EA.  In other words, the issue is whether, as Carco argues, the parties intended for a material breach of the EA to also constitute a material breach of the APA.

The court again begins its analysis with the plain meaning of the APA.  *See LaSalle Bank Nat'l Ass'n*, 424 F.3d at 206.  On the one hand, the APA and the EA were separately executed agreements.  *See Rudman*, 30 N.Y.2d at 13, 280 N.E.2d at 873 (holding that it is influential but not conclusive that parties have entered into separate written agreements with separate assents) (citations omitted).  However, under the "Covenants and Agreements" section, the APA required Carco to simultaneously enter into the EA with Maconachy.  (*See* Pl.'s Ex. 254 § 5.7.)  The APA also states that execution of the EA was a precondition to Carco's obligations under the APA, and a copy of the EA was explicitly annexed to the APA as an exhibit.  (*See id*. § 6.9.)  In

---

[6] Although the court analyzes this issue under the conclusions of law section of this opinion, it nonetheless does so as an issue of fact rather than an issue of law.

accordance with these terms, the signature pages of the two agreements reveal that they were in fact executed simultaneously. The APA thus makes clear that the parties intended for the *execution* of the EA and the APA to be mutually dependent. However, the APA is silent regarding whether a material breach of the EA would also constitute a material breach of the APA. Because the APA is facially ambiguous, the court must consider extrinsic evidence to ascertain the correct and intended meaning of the agreement. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177-78 (2d Cir. 2004) (citation omitted).

Under New York law, "when a contract is ambiguous, the court may and should look to the prior negotiations of the parties to determine what was intended." *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC*, 467 F.3d 107, 125-26 (2d Cir. 2006) (quoting *Rudman*, 30 N.Y.2d at 11, 280 N.E.2d at 872) (quotation marks omitted). It is clear from the negotiations prior to the execution of the APA that O'Neill viewed Maconachy's and Murphy's services to be MMI's essential assets. This assessment is supported by the evidence that, at the time of its acquisition, MMI had very little tangible property. Instead, MMI's valuation was based almost entirely upon Maconachy and Murphy's business relations with existing clients and their ability to grow the company in line with the Merrill projections. O'Neill was drawn to MMI because Maconachy and Murphy had backgrounds as FBI agents, and because he believed that Maconachy and Murphy's services would allow Carco to expand into the investigative field. Further, Carco sought and Maconachy agreed to commit himself to an eight-year term of employment under the EA. This eight-year term directly tied Maconachy's employment to the term of loan repayments pursuant to the APA. The negotiations and extrinsic evidence thus show that the parties intended Carco's purchase of MMI to be made in exchange for Maconachy

and Murphy's loyal services to Carco. This overarching bargain encompassed the terms of both the EA and the APA.

The extrinsic evidence therefore shows that the parties assented to one promise as a whole, which was dependent upon Maconachy's compliance with the Performance Clause. The EA and APA are mutually dependant because they relate to the same subject matter, they were executed simultaneously, and there would have been no bargain whatsoever if the Performance Clause had been stricken from the EA. *See Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52-53 (2d Cir. 1993) (citations omitted). The court finds that the parties intended that the EA and the APA be mutually dependent agreements, in that Maconachy's performance under the EA was a necessary precondition to the parties' obligations under the APA. Because Maconachy materially breached the EA by failing to comply with the Performance Clause, Maconachy also materially breached the APA. Accordingly, Maconachy's failure to perform in accordance with the EA absolved Carco from its continuing obligations to Maconachy under the APA, most notably Carco's obligation to make continuing quarterly purchase payments.

### 3. Doctrine of Election

Having found that Maconachy breached the EA and APA, Maconachy argues that Carco is estopped from terminating the agreements under the doctrine of election. Maconachy does not dispute that, even if Carco is estopped from terminating the EA and APA, Carco is still entitled to an award of damages. Instead, Maconachy argues that the doctrine of election prevents Carco's termination of the EA and APA because the conduct constituting the breach of the agreements began before Maconachy's eventual termination in December 2005. The doctrine of election has been described as follows:

When one party commits a material breach of contract, the other party has a choice between two inconsistent rights—he or she can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach—but the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain.

13 WILLISTON § 39:32 (citing *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996); *ARP Films, Inc. v. Marvel Entm't Group, Inc.*, 952 F.2d 643 (2d Cir. 1991)); *see also Apex Pool Equip. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969). Thus, "if the non-breaching party chooses not to terminate the contract, it loses the right to terminate the contract on the basis of the earlier breach." *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003) (citation omitted). Although Carco continued to perform under the EA and APA after Maconachy's first material breach, the court does not agree with Maconachy that the doctrine of election estops Carco from terminating the agreements.

First, Carco was entitled to rely upon Maconachy's representations that he would change his conduct to comply with the Performance Clause. Under New York law, "a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future." *Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988) (citing *S.D. Hicks & Son Co. v. J.T. Baker Chem. Co.,* 307 F.2d 750 (2d Cir. 1962); *Canda v. Wick*, 100 N.Y. 127, 2 N.E. 381 (N.Y. 1885)). This right to rely upon representations of improved performance provides that:

[W]here the nondefaulting party brings his or her complaints to the defaulting party's attention, and continues the relationship only on the assurance of better future performance, he or she will not be barred from asserting rights under the contract; in such a case, the successive acceptances of performance do not justify

30

> the belief that performance of the character tendered was satisfactory, and a
> waiver of the right to the promised performance cannot be found.

13 WILLISTON § 39:32 (citations omitted). Further, under New York law, the waiver of a right

under a contract "will not be inferred unless the intent to waive is clear." *Seven-Up Bottling Co.*,

686 F. Supp. at 1023 (citing *Schubtex Inc. v. Allen Snyder, Inc.*, 49 N.Y.2d 1, 399 N.E.2d 1154

(N.Y. 1979) (Gabrielli, J., concurring)). Maconachy is correct that O'Neill considered that

Maconachy might be in default of the Performance Clause as early as February 2002, and that

O'Neill had considered terminating the EA and APA well before Maconachy's eventual

termination in December 2005. However, the court finds that Carco did not waive its right to

terminate the agreements due to its good faith, albeit mistaken, belief that its relationship with

Maconachy would improve. This belief was based upon O'Neill and Slattery's consistent

prompting that Maconachy adhere to the Performance Clause, and Maconachy's promises that he

would, in essence, try harder. Carco relied upon Maconachy's promises of improved

performance as reflected in the business and sales plans he submitted to Carco management.

Carco agreed to assist Maconachy and provide him a full-time marketing person as Maconachy

had requested in order to improve sales. When Maconachy complained about the demands of the

sales program, Carco lowered the number of required sales meetings. Carco also relied upon

Maconachy's representations that he would cease employing family members while at the same

time allowing him time to phase out his brother-in-law. Most crucially, at no point did Carco

clearly indicate that it intended to waive its right to terminate the EA and APA. Instead, Carco

continued to perform under the agreements solely in an effort to salvage whatever could be

salvaged. The court is persuaded that to hold Carco responsible for continuing obligations under

the APA despite Maconachy's material breach and his promises of improved performance would be a harsh result that would essentially reward Maconachy for his subterfuge and false promises.

Second, and more importantly, the discovery of Maconachy's involvement in altering documents constituted a separate material breach that allowed Carco to terminate the EA and APA. *Even if* Carco had initially waived its right to terminate, Carco retained "the option of terminating the contract based on other, subsequent, breaches." *See Bigda*, 898 F. Supp. at 1011-12 (citing *Apex Pool*, 419 F.2d at 563). The modification of the weekly reports was discovered just prior to and was cited by Carco as the cause of Maconachy's termination. Unlike the previous breaches, which centered around Maconachy's poor performance and his repeated refusal to follow directions, the altering of documents constituted an active step to undermine O'Neill's management. Carco had therefore not waived its right to terminate the EA and APA on the basis of this subsequent material breach because the conduct was of a different nature than the previous breaches. Accordingly, the court finds that Carco had not waived its right to terminate the EA and APA in December 2005 under the doctrine of elections. Carco was therefore justified in terminating the agreements due to Maconachy's material breach, and Carco has no further obligation to Maconachy under either the EA or the APA.

### 4. Damages

In addition to absolving Carco from its continuing obligations under the EA and APA, Maconachy's material breaches entitle Carco to monetary damages. It is well-settled under New York law that "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) (citation omitted). "[A] plaintiff who

proves a breach of contract may recover lost profits contract only by showing: (1) that the damages were caused by the defendant's breach; (2) that the lost-profit damages are 'capable of proof with reasonable certainty;' and (3) that such damages were 'fairly within the contemplation of the parties to the contract at the time it was made.'" *Spherenomics Global Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp. 2d 236, 251 (E.D.N.Y. 2006) (quoting *Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 261, 493 N.E.2d 234 (1986)). Under New York law, "in breach of contract actions the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192, 886 N.E.2d 127 (N.Y. 2008) (citations omitted). If a plaintiff meets these requirements, than "damages are calculated at the time of the breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 269 N.E.2d 21 (N.Y. 1971)).

As described above, Carco expected that MMI West would be a profitable business and that Maconachy's dutiful and obedient service would be a central tenant of that business's success. The evidence shows that this expectation derived from the Merrill report and Maconachy's own representations that MMI West would turn a substantial profit. Instead, MMI West was nowhere near the profitable business that Carco had expected, and this lack of profitability was due almost exclusively to Maconachy's breach of the Performance Clause. It is thus clear that Carco has suffered damages as a result of Maconachy's material breaches of the EA and APA, and that these damages where within the contemplation of the parties at the time that they executed the EA and APA. What remains to determine is the amount of Carco's

33

damages and whether those damages are capable of proof with reasonable certainty.  In

determining general damages with reasonable certainty, the Court of Appeals for the Second

Circuit has cautioned that:

> "Certainty," as it pertains to general damages, refers to the *fact* of damage, not the
> amount.  For when it is certain that damages have been caused by a breach of
> contract, and the only uncertainty is as to their amount, there can rarely be good
> reason for refusing, on account of such uncertainty, any damages whatever for the
> breach.  A person violating his contract should not be permitted entirely to escape
> liability because the amount of the damage which he has caused is uncertain.  The
> burden of uncertainty as to the amount of damage is upon the wrongdoer.   The
> plaintiff need only show a stable foundation for a reasonable estimate of the
> damage incurred as a result of the breach.  Such an estimate necessarily requires
> some improvisation, and the party who has caused the loss may not insist on
> theoretical perfection.

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 110-11 (2d Cir.

2007) (emphasis in original, citations and quotation marks omitted).  The Second Circuit thus

held that it was reversible error for a trial court to place the burden upon a plaintiff to prove its

general damages to a reasonable certainty.  *Id*. at 111-12.

Carco seeks to recover its losses for the years 2000 through 2002, when MMI West ran a

net deficit.  These damages are best characterized as general damages rather than consequential

damages, because Carco does not seek to recover the multiple millions of dollars of net profit

that it *expected* to receive under the Merrill projections but rather the monetary loss that Carco

actually suffered during this period.  Because Carco only seeks general damages, and because it

is impossible to calculate the exact amount that Carco lost as a result of Maconachy's material

breaches of the EA and APA, it is proper for the court to employ some degree of improvisation to

calculate Carco's damages to arrive at a reasonably certain sum.  As a starting point, the court

must calculate damages beginning on November 17, 2000, which is the first date that Maconachy

34

materially breached the agreements. Using this date as the basis of damages, Carco claims that it is entitled to the economic loss that it suffered from November 17, 2000, through December 2002, which totals $901,645.[7] This amount reflects MMI West's total net loss for this period, which includes expenditures such as acquisition costs under the APA as well as Maconachy's compensation. Further, this amount was derived from Maconachy's own accountant, and has not been contested by either party as inaccurate.

Although MMI West was profitable between 2003 through Maconachy's termination in December 2005, the court has found that this was due to other measures not attributable to Maconachy's actions. Beginning in 2003, O'Neill and Slattery instituted cost-saving measures above Maconachy's objections, which most notably included the termination of many MMI West employees. Thus, the court is unpersuaded by Maconachy's argument that MMI West was a profitable enterprise, and the court is certainly unpersuaded that MMI West was successful due to Maconachy's efforts. More importantly, any net profit that was made between 2003 and 2005 is completely offset by the fact that in the end MMI West proved to be a wholly failed venture, and that this failure was due to Maconachy's material breaches. Because of the unique nature of MMI's business which, as described in the Merrill report and in the record, is entirely dependent on the contacts and relationships built by its principals, Carco has no future benefit in this bargain. This offsets any slight profit that Carco derived during 2003 to 2005. In other words, the court is convinced that $901,645 does not fully put Carco in the position that it expected to be

---

[7] Carco argues in the alternative that it is entitled to damages beginning upon execution of the EA and APA in January 2000. However, the court has found that the breaches did not occur until November 17, 2000, and calculates damages accordingly.

in when it purchased MMI West, but it certainly does not overcompensate MMI West for its losses.

In sum, Carco's loss of $901,645 was directly attributable to Maconachy's actions, in that this amount represents the economic harm that Carco suffered as a result of Maconachy's breaches of the Performance Clause. The court finds that Carco bargained for a profitable business, and that Maconachy's performance and obedience was central to Carco's expectation of receiving a profitable business. Carco's economic loss between November 17, 2000 and December 2002, which totals $901,645, is therefore a reasonable estimate of Carco's general damages due to Maconachy's material breaches of the EA and APA.

**B.      Breach of Fiduciary Duty/Faithless Servant**

In addition to its breach of contract claims, Carco argues that it is entitled to damages caused by Maconachy's breach of his fiduciary duty. "New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (citing *Murray v. Beard*, 102 N.Y. 505, 7 N.E. 553 (N.Y. 1886)). To give rise to a breach of fiduciary duty claim under New York law, a plaintiff "must demonstrate: (1) that a fiduciary duty existed between plaintiff and defendant; and (2) that defendant breached that duty." *Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008) (citing *Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006)). "'One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary.'" *Phansalkar*, 344 F.3d at 200 (quoting *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928, 363

N.E.2d 350, 350 (N.Y. 1977)).  Maconachy does not dispute that, as a corporate officer, he owed

a fiduciary duty to Carco.  *See Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 165 (2d

Cir. 2003) (citing N.Y. Bus. Corp. Law § 715(h) (McKinney 1997)).

As an initial matter, Maconachy contends that Carco failed to adequately delineate

between its breach of contract and breach of fiduciary duty claims.  It is well-settled under New

York law that "[a] cause of action for breach of fiduciary duty which is merely duplicative of a

breach of contract claim cannot stand."  *William Kaufman Org., Ltd. v. Graham & James LLP*,

269 A.D.2d 171, 173, 703 N.Y.S.2d 439, 442 (N.Y. App. Div. 1st Dep't 2000) (citing *Perl v.*

*Smith Barney, Inc.*, 230 A.D.2d 664, 666, 646 N.Y.S.2d 678 (N.Y. App. Div. 1st Dep't 1996),

*leave denied*, 89 N.Y.2d 803, 675 N.E.2d 1234 (N.Y. 1996)).  "Where the plaintiff and defendant

are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff

must prove that the defendant breached a duty 'independent' of its duties under the contract."

*Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003) (citing *Clark-Fitzpatrick Inc. v. Long*

*Island R.R., Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190 (N.Y. 1987)).  The New York Court of

Appeals has explained that:

> A tort obligation is a duty imposed by law to avoid causing injury to others.  It is
> apart from and independent of promises made and therefore apart from the
> manifested intention of the parties to a contract.  Thus, [a] defendant may be liable
> in tort when it has breached a duty of reasonable care *distinct from* its contractual
> obligations, or when it has engaged in tortious conduct *separate and apart* from
> its failure to fulfill its contractual obligations. . . .  Conversely, where a party is
> merely seeking to enforce its bargain, a tort claim will not lie.

*New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316, 662 N.E.2d 763 (N.Y. 1995) (citations

and quotation marks omitted, emphasis added).  It is therefore well-settled that "a simple breach

of contract is not to be considered a tort unless a duty independent of the contract itself has been

violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract . . . ." *Clark-Fitzpatrick*, 70 N.Y.2d at 389, 16 N.E.2d at 193-94 (citations omitted).

Carco alleges that Maconachy breached his fiduciary duty for a plethora of reasons, including Maconachy's involvement in altering documents; refusal to make sales calls; outsourcing of background checks to Carco's competitors; employment of family members; and failure to follow Carco's guidelines on business travel.[8] (*See* Docket Entry 42 at 4-5.) Although much of this conduct falls solely within the ambit of the EA and APA, the alteration of documents constitutes a separate breach of Maconachy's fiduciary duty that is apart from Maconachy's contractual obligations under the Performance Clause. "It is fundamental that a fiduciary duty 'is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.'" *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 82 N.Y.2d 158, 172, 624 N.E.2d 129, 137 (N.Y. 1993)) (quoting RESTATEMENT (SECOND) OF TORTS § 874, comment b) (other citations omitted). As Carco's fiduciary, Maconachy owed "not simply the positive duty of reasonably skillful performance of the work" as embodied by the Performance Clause, "but the further duty to refrain from deception and entering into relations giving [him] an interest inconsistent with or antagonistic to that of [Carco]." *See* 19 WILLISTON § 54:26 (citing *Smith v. Bear*, 237 F.2d 79 (2d Cir. 1956)) (other citations omitted). Maconachy's contractual obligations under the Performance Clause were the duties of reasonable performance and to follow directions. In contrast, Maconachy's fiduciary

---

[8] Although Carco alleged that other conduct gives rise to this claim, the court has found otherwise as reflected in the findings of fact section, *supra*.

duty was to act on Carco's behalf and to avoid self-dealing. The court thus finds that Maconachy's involvement in falsifying business records is a quintessential breach-of-fiduciary claim and therefore separate from Carco's breach of contract claim. The falsification records represents not only a failure to perform adequately and the failure to follow directions, but also self-dealing and acts against Carco's interests. While the conduct may overlap both claims, the obligation to act on Carco's behalf is distinct from Maconachy's separate contractual obligations. The court thus finds that Maconachy's involvement in altering documents gives rise to a separate claim of breach of fiduciary duty that is distinct from Carco's breach of contract claims.

The next question is whether Maconachy in fact breached his fiduciary duty. In *Phansalkar*, the Court of Appeals for the Second Circuit noted that New York courts have articulated two distinct standards for determining whether a fiduciary duty has been breached by an employee. Under the first standard, which is more burdensome to employers, a breach of fiduciary duty occurs where the "misconduct and unfaithfulness . . . substantially violates the contract of service" or the misconduct "permeates the employee's service in its most material and substantial part." *Phansalkar*, 344 F.3d at 201 (quoting *Turner v. Konwenhoven*, 100 N.Y. 115, 120, 2 N.E. 637 (N.Y. 1885); *Abramson v. Dry Goods Refolding Co.*, 166 N.Y.S. 771, 773 (1st Dep't App. Term 1917)) (quotation marks omitted). Perhaps unsurprisingly, Maconachy urges the court to adopt this standard. Under the second standard, which is more favorable to employers:

> An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services.

39

*Phansalkar*, 344 F.3d at 202 (quoting *Murray*, 102 N.Y. at 508, 7 N.E. 553).  The Court of Appeals did not resolve this disparity in *Phansalkar* because the Court found that the conduct in that case warranted recovery under both standards.  *See* 344 F.3d at 202.  Here too the court need not resolve this disparity because Maconachy's conduct violated both of these standards.

Maconachy argues that no New York court, nor any court in this Circuit, has ever extended the faithless servant doctrine to include Maconachy's misconduct.  Leaving aside the questionable relevance of this assertion, the court disagrees with Maconachy's underlying argument that his misconduct was minor and transitory.  New York law has long held fiduciaries to a very high standard of conduct.  *See Gully*, 341 F.3d at 165 (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (N.Y. 1928) (Cardozo, C.J.)) ("New York courts have long held fiduciaries to a standard 'stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is . . . the standard of behavior.'").  In doing so, New York courts have consistently recognized that agents must act solely on behalf of their principals because "no man can serve two masters with equal fidelity when rival interests come into existence." *Elco Shoe Mfrs. v. Sisk*, 260 N.Y. 100, 103, 183 N.E. 191, 192 (N.Y. 1932).  Further, Maconachy owed an especially strong fiduciary duty to act on Carco's behalf because he was not merely an agent but a corporate officer.  *See Gully*, 341 F.3d at 165 (quoting *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 569, 473 N.E.2d 19 (1984)) ("A corporate officer's fiduciary duty includes discharging corporate responsibilities 'in good faith and with conscientious fairness, morality and honesty in purpose' and displaying 'good and prudent management of the corporation.'").

As described above, Maconachy was directly responsible for altering the weekly reports

that were submitted to O'Neill, and these acts were effectuated by Maconachy in order to subvert

Slattery and O'Neill's authority. The concealment of Kertin's employment represents an active

effort by Maconachy to benefit both himself and his family members rather than to benefit

Carco. It is a fundamental principle of agency law that such "blatant self-dealing" is a violation

of one's fiduciary duty. *See Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 539 N.E.2d 574, 576,

541 (N.Y. 1989) (citation omitted). It also does not make any difference that Maconachy and

Kertin's services might have been ultimately beneficial to Carco. *See Feiger v. Iral Jewelry,*

*Ltd.*, 41 N.Y.2d 928, 928-29, 363 N.E.2d 350, 351 (N.Y. 1977) (citation omitted). The fact

remains that, by permitting and approving the submission of false records, Maconachy was acting

solely on his own behalf rather than on behalf of Carco. These acts were against Carco's interest

because they severely undermined O'Neill's management. Even if the court were to credit

Maconachy's assertion that he was merely an innocent bystander (which it does not),

Maconachy's failure to take any step to rectify or correct the weekly reports for over two years,

despite his admitted knowledge, constitutes a clear breach of his fiduciary duty. Under the more

stringent standard for determining a breach of fiduciary duty, these acts permeated Maconachy's

service at its most material and substantial part. *See Phansalkar*, 344 F.3d at 201. The court

therefore finds that Maconachy's active concealment of Kertin's employment breached his

fiduciary duty to Carco, especially because Maconachy's duty was heightened as a corporate

officer. The court finds that Maconachy's disloyalty began on September 26, 2003, which was

the date of the first alteration of the weekly reports.

Under New York law, an employee is required to forfeit all compensation, including

"commissions or salary," paid beginning with his first disloyal act. *Id*. at 200 (quoting *Feiger*, 41

N.Y.2d at 928, 363 N.E.2d at 351).  Carco has calculated that Maconachy's total compensation from September 2003 to Maconachy's termination on December 28, 2005 was $889,711.  (*See* Docket Entry 58, Ex. C.)  This amount includes Maconachy's base salary, fringe benefits and incentive compensation.  Further, forfeiture of this amount does not constitute double recovery of Carco's breach of contract claims because those damages derive from a separate period of time from November 2000 to December 2002.  (*See id*. at 26.)  The court is unaware of any authority under New York law limiting recovery under both a theory of breach of contract and beach of fiduciary duty, except where the two claims are duplicative as described above.  Therefore, Carco is entitled to an award of $889,711, which constitutes the compensation paid to Maconachy during his period of disloyalty from September 26, 2003 to December 28, 2005.

In addition, Carco creatively argues that it is entitled to disgorge the quarterly payments made to Maconachy under the APA as "compensation for services."  The court disagrees.  Although the Second Circuit has interpreted compensation to include investment opportunities and stock options, *Phansalkar*, 344 F.3d at 208-11, such payments are nonetheless made in exchange for the employee's services.  *See id.* at 204 (holding that a disloyal employee "forfeits his right to compensation *for services* rendered by him if he proves disloyal") (quoting *Lamdin v. Broadway Surface Adver. Corp.*, 272 N.Y. 133, 138, 5 N.E.2d 66 (N.Y. 1936)) (emphasis added).  Here, by the plain language of the EA and APA, Carco's quarterly payments to Maconachy were *not* made as compensation for his services, but rather in exchange for Maconachy's ownership interest in MMI.  Carco nonetheless argues that it is entitled to recover the quarterly payments because the EA and APA are mutually dependent agreements and Maconachy's performance was the key element of the bargain.  As described above, the court

42

agrees that the EA and APA are indeed mutually dependent agreements, but only in terms of whether a breach of the Performance Clause under the EA also constituted a breach of the APA. It is clear from the plain meaning of the agreements that the quarterly payments were not employment compensation, but were part of a separate bargain made in exchange for Maconachy's interest in MMI. Carco has otherwise cited no New York law that encompasses such a broad forfeiture right under the doctrine of faithless servant. Therefore, Carco is not entitled to a forfeiture award constituting past payments to Maconachy made pursuant to the APA.

**C.     Carco's Remaining Claims**

Finally, Carco seeks: (1) an award under its breach of warranty claim; (2) a declaratory judgment that Carco is entitled to indemnification, including attorneys' fees and prejudgment interest; and (3) a declaratory judgment that Maconachy is not entitled to any future payment under the APA or EA.

**1.     Breach of Warranty**

Carco has failed to show that it is entitled to any recovery under its breach of warranty claim that it would not otherwise receive under its breach of contract or breach of fiduciary duty claims. Indeed, Carco devotes a mere two paragraphs to this claim in its papers, the majority of which merely quotes the Performance Clause. (*See* Docket Entry 42 at 9.) Having failed to show why it is entitled to relief, Carco's breach of warranty claim is dismissed.

**2.     Indemnification**

Carco next claims that it is entitled to indemnification, including attorneys' fees and prejudgment interest. Section 9.1 of the APA provides that Maconachy shall "indemnify, defend,

and hold [Carco] harmless [against] any and all losses, liabilities, damages, deficiencies, costs, or expenses (including interest, penalties, and reasonably attorney's fees and disbursements) . . . based on, arising out of, or otherwise due to any inaccuracy in or breach of any representation, warranty, covenant or agreement . . . contained in this Agreement or in any document or other writing delivered pursuant hereto . . . ." (Pl.'s Ex. 254 § 9.1.) Maconachy does not dispute that the APA is a valid agreement, nor does he argue that Carco is disentitled to attorneys' fees and interest under the agreement. Instead, Maconachy generally claims that Carco is not the prevailing party in this action. The court has found otherwise and sees no reason why Section 9.1 of the APA should not be enforced.

Although the "American Rule" generally requires each party to bear its own attorneys' fees, "a federal court will enforce contractual rights to attorneys' fees if the contract is valid under applicable state law." *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1312-13 (2d Cir. 1993) (citations omitted). "Although a district court has broad discretion in awarding attorneys' fees, and an award of such fees may be set aside only for abuse of discretion, where a contract authorizes an award of attorneys' fees, such an award becomes the rule rather than the exception." *Id.* at 1313 (citations omitted). As the prevailing party in this action, Carco is entitled to an award of attorneys' fees under the terms of the APA. To determine the amount of such an award, Carco is required to submit its contemporaneous time records. *See N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147-48 (2d Cir. 1983). Accordingly, no later than May 5, 2009, Carco is directed to submit an affidavit(s) detailing its attorneys' fees. Maconachy may submit any objections no later than May 12, 2009, upon which the undersigned will amend the judgment to include the appropriate amount.

Even if the APA did not provide for an award of prejudgment interest, Carco is entitled to such an award under New York law. An award of prejudgment interest is mandatory for a breach of contract claim. *See New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) (quoting N.Y. C.P.L.R. § 5001(a) (McKinney 1992)). The Second Circuit has indicated that prejudgment interest is also mandatory for a breach of fiduciary duty claim. *See Lewis v. S.L. & E., Inc.*, 831 F.2d 37, 39-40 (2d Cir. 1987) (citing *Spector v. Mermelstein*, 485 F.2d 474, 481-82 & n. 8 (2d Cir. 1973); *United Bank Ltd. v. Cosmic Int'l, Inc.*, 542 F.2d 868, 877-79 (2d Cir. 1976)).[9] New York law applies a statutory interest rate of 9% per annum. *See* N.Y. C.P.L.R. § 5004. Interest is calculated using simple rather compound rates. *See Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998). Prejudgment interest is to "be computed from the earliest ascertainable date the cause of action existed . . . [but] where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. § 5001(b). Here, the court finds that it is appropriate to use the midpoint of periods for which Carco's claims accrued, which accounts for the fact that damages and compensation accrued over time. In other words, the court uses the midpoint of November 17, 2000 and December 31, 2002 on Carco's breach of contract claims, and the midpoint between September 26, 2003 to December 28, 2005 on Carco's breach of fiduciary duty claims. These dates are December 9, 2001 and November 11, 2004, respectively. Therefore, the court finds that Carco is

_____

[9] In equitable actions, New York law provides that prejudgment interest is awarded within the court's discretion. *See* N.Y. C.P.L.R. § 5001(a). To the extent that Carco's breach of fiduciary duty claim entitles Carco to discretionary rather than mandatory prejudgment interest, the court exercises its discretion and finds that such an award is appropriate under the facts of this case.

entitled to prejudgment interest at a simple rate of 9% per annum calculated: (1) on Carco's breach of contract claim, beginning on December 9, 2001; and (2) on Carco's breach of fiduciary duty claim, beginning on November 11, 2004.

### 3. Declaratory Judgment

Finally, Carco seeks a declaratory judgment that Maconachy is not entitled to any future monthly payments under the APA. Again, Maconachy's only argument against the entry of such a judgment is that he did not breach the APA. The court has found otherwise and has specifically found that Maconachy's material breaches of the APA permits Carco to suspend its obligations under the agreement. The court will therefore issue a declaratory judgment under 28 U.S.C. § 2201 stating that Maconachy is not entitled to any future monthly payments under the APA nor any future compensation pursuant to the EA.

## CONCLUSION

For the foregoing reasons, the court finds in favor of Carco and directs the Clerk of Court to enter judgment as follows:

(1) awarding $901,645 to Carco under its breach of contract claims, constituting Carco's economic loss between November 17, 2000 and December 31, 2002;

(2) awarding $889,711 to Carco under its breach of fiduciary duty claims, which constitutes forfeiture of the compensation paid to Maconachy during his period of disloyalty from September 26, 2003 to December 28, 2005;

(3) dismissing Carco's breach of warranty claim;

(4) awarding Carco attorneys' fees, in an amount to be determined;

(5) awarding Carco prejudgment interest at the simple rate of 9% per annum calculated

from: (a) December 9, 2001 on Carco's breach of contract claims; and (b) November 11, 2004 on Carco's breach of fiduciary duty claims; and

(6) awarding Carco a declaratory judgment under 28 U.S.C. § 2201 stating that Maconachy is not entitled to any future monthly payments under the Asset Purchase Agreement nor any future compensation pursuant to the Employment Agreement.

No later than May 5, 2009, Carco is directed to submit an affidavit(s) detailing its attorneys' fees. Maconachy may submit any objections to the calculation of attorneys' fees no later than May 12, 2009, upon which the undersigned will amend the judgment to include the appropriate amount.

Dated: Central Islip, New York
April 21, 2009

**SO ORDERED:**

_____/s/_____
ARLENE R. LINDSAY
United States Magistrate Judge