UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CARCO GROUP, INC. and PONJEB V, L.L.C.

                   Plaintiffs,           **MEMORANDUM**
                                              **AND ORDER**
          -against-                 CV 05-6038 (ARL)

DREW MACONACHY,

                   Defendant.
-------------------------------------------------------------X
**APPEARANCES:**

**JAMES M. WICKS, ESQ.**
**FARRELL FRITZ**
Attorneys for Plaintiffs
1320 RexCorp Plaza
Uniondale, New York 11556-1320

**EDWARD F. CUNNINGHAM, ESQ.**
Attorneys for Plaintiff
62 Cambridge Avenue
Garden City, NY 11530

**KENNETH A. NOVIKOFF**
**RIVKIN RADLER, L.L.P.**
Attorneys for Defendant
926 RexCorp Plaza
Uniondale, New York 11556-0926

**LINDSAY, Magistrate Judge:**

      This action, which arises out of the breach of an employment agreement and asset

purchase agreement between plaintiffs, Carco Group, Inc.("Carco") and  Ponjeb V, L.L.C

("Ponjeb") (collectively "Carco" or "plaintiffs") and defendant Drew Maconachy ("Maconachy")

concerning the plaintiffs' purchase of a private investigation firm of which Maconachy was a

principle, is before the Court on remand from the United States Court of Appeals for the Second

Circuit.  On April 29, 2009, following a bench trial, the undersigned found in favor of plaintiffs

on their breach of contract and faithless servant claims and entered judgment against Maconachy

in the amount of $1,791,356, plus attorneys' fees, prejudgment interest and a declaratory judgment. By decision dated July 6, 2010, the Second Circuit affirmed the judgment as to the breach of contract and faithless servant claims, but vacated the judgment as to the breach of contract damages award and remanded the case solely to recalculate damages awarded, if any, under Carco's breach of contract claims.

For the reasons set forth below, the court awards Carco damages in the amount of $571,506.85 under its breach of contract claims, plus prejudgment interest to be calculated by the Clerk of the Court.

## BACKGROUND

The factual background to this action is set forth in the undersigned's Opinion and Order, dated April 21, 2009, *Carco Group, Inc. v. Maconachy*, 644 F. Supp. 2d 218 (E.D.N.Y. 2009) and the Second Circuit's July 10, 2010 Amended Summary Order, *Carco Group, Inc. v. Maconachy*, 383 Fed. Appx. 73 (2d Cir. 2010), familiarity with which is assumed. The Circuit did not disturb the factual findings in the underlying Opinion and Order and accordingly the court incorporates them in the within decision. *See In re M/V DG Harmony*, No. 98 Civ. 8394 (DC), 2009 WL 3170301, at *1 (S.D.N.Y. Sept. 30, 2009). The following constitutes the court's additional findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), with relevant prior findings and conclusions repeated for context.

**(A)** **Factual Background**

**(1)** **Pre Acquisition**

Maconachy and John Murphy owned Murphy & Maconachy, Inc. ("MMI"), a security consulting firm that offered investigation and litigation support services, and had offices in both California, known as "MMI West," and Virginia, known as "MMI East". *Carco*, 644 F. Supp. 2d

at 223.  Maconachy was President of MMI West.  (*Id.*)  Carco was in the business of providing research and background check services.  *Id.*  Peter O'Neill ("O'Neill") was Carco's majority owner and Chairman, and in the late 1990s he sought to expand Carco's business to include investigative services.  *Id.*

In 1998, MMI commissioned Merrill Lynch Business Advisory Services ("Merrill") to prepare a valuation of the company and to determine the fair market value of MMI as of August 1, 1998 for a potential sale of the business (the "Merrill Valuation Report").  (*Id*; E-1-97.)[1]  Merrill's valuation in determining the fair market value for MMI and in projecting its post-acquisition revenues was based on an analysis of (i) MMI's financial history, including internal financial statements for years' ended December 31, 1993 through 1997 and interim financial statements for the period ended July 31, 1998; (ii) independent research, including Merrill's research analysis reports, Standard & Poor's Industry surveys, Dow Jones news reports, SEC filings, research reports on publicly traded companies, newspapers and trade magazines; (iii) management interviews with Murphy (Chairman) and Maconachy (President); (iv) sales prices for comparable companies; and (v) trends in the national investigative market.  (E-5-6; 42, 53-60.)

The Report stated that the business was a service business with few tangible assets, such as real estate, buildings, equipment or customer accounts receivables, its sales model was heavily dependent upon the development of personal relationships to generate revenue, and Murphy and Maconachy were its most valuable assets.  (*Carco*, 644 F. Supp. 2d at 241; E-17; T-64-65, 180,

_____

[1]References to the Second Circuit Appendix volume are referred herein as "A-"; references to the Second Circuit Exhibits volumes are referred herein as "E-"; references to the Second Circuit Trial Transcripts volume are referred herein as "T-"; references to the binders of exhibits that were admitted into evidence at trial but omitted from the Second Circuit Exhibits volumes are referred herein as "P-" or "D-"; and references to defendant's supplemental binder documents are referred herein as "DSB-".

277.) The Merrill Valuation Report determined that MMI had an enterprise value to a "generic buyer" or "non-strategic buyer" of between $7.7 and $8.5 million and between $10.2 and $12 million to a "synergistic buyer" or "strategic buyer."[2] (E-8, 68, 72.) The Report recognized that revenue generation was heavily dependent upon the direct sales approaches of its principals, particularly Murphy and Maconachy,[3] and noted that

> [t]he majority of business comes from reputation and word of mouth or from repeat business with previous clients. MMI's principals are frequently asked to participate as industry specialists in various forums, which is often a source of new clients and enhances MMI's national reputation. MMI also directs market specific clients and/or attorneys in those market sectors in which MMI specializes.

(E-17, 22.) The Report stated that MMI's revenues had grown at a compound annual rate of 16.5% from 1994 to 1997, and projected that under the strategic scenario, MMI's revenues could be expected to grow at an annual rate of 20% in the first two years after the acquisition and a rate of 15% per year thereafter. (E-26, 69.)

Maconachy and Murphy proffered the Merrill Valuation Report as an accurate and reliable measure of the fair market value of MMI. (E-5, 527.) At a meeting in February 1999 between Maconachy, Murphy and Carco's representative Mike Giordano to discuss Carco's possible acquisition of MMI, Maconachy represented to Carco his belief that MMI's future revenue would be even higher than Merrill's projections. *Carco*, 644 F. Supp. 2d at 223. Because Maconachy and Murphy were MMI's key assets, O'Neill's decision to acquire MMI depended on their

---

[2]Maconachy considered Carco a synergistic partner as contemplated by the Merrill Valuation Report. (*Id.* at E-285; T-94-94, 181; P-361.)

[3]O'Neill testified at trial that Merrill Lynch's assessment of Maconachy and Murphy's importance to the growth of MMI "had an impact" on him "because of my knowledge and experience of perhaps 20 years . . . in the service business . . . that when you purchase a company in the service industry, the only real assets are the people." (T-180.)

continued association with MMI. *Id.* To that end, Carco required that Maconachy and Murphy each sign a long term employment agreement ("EA") as a condition precedent to the asset purchase agreement ("APA"). *Id.* at 223-24.

### (2) The Acquisition

In considering the purchase of MMI, Carco relied on the Merrill Valuation Report to determine the purchase price for MMI and to project its potential revenues. (T-92-93, 124, 180.) Carco, through its subsidiary Ponjeb (collectively Carco), acquired the assets of MMI on January 7, 2000, for a total purchase price of $7.2 million, with $2 million paid up front and the remaining $5.2 million to be paid in thirty-two equal quarterly payments, following the closing. *Id.* Pursuant to the APA, Maconachy executed an EA[4] for a term of eight (8) years to "render exclusive and full-time services in such capacities and perform such duties as the Members of the Company may assign, in accordance with such standards of professionalism and competence as are customary in the industry of which the Company is a part." *Id.* Maconachy was made President of Ponjeb and Senior Vice President of Carco, reporting directly to Carco's president, and agreed to continue to manage MMI West. *Id.* at 224. The EA provided that Maconachy would be paid an annual salary of $200,000 plus incentive compensation that would be calculated semi-annually. *Id.* The EA further provided:

> If the Employee is convicted of any crime or offense, is guilty of gross misconduct or fraud, or materially breaches material affirmative or negative covenants or agreements hereunder, the Company may, at any time, by written notice to the Employee, terminate this Employment Agreement, and the Employee shall have no right to receive any Annual Salary, Incentive Compensation, or other compensation or benefits under this Employment Agreement on and after the effective date of such notice.

---

[4]Murphy and Maconachy's EAs were explicitly described to be an integral part of the APA. *Id.*

*Id.*

### (3)    Post Acquisition

Following Carco's acquisition, from January 2000 to October 31, 2000, MMI incurred a loss of $1.3 million. *Id.* In a letter addressed to O'Neill dated November 7, 2000, Chase Bank ("Chase"), Carco's lender for the acquisition of MMI, expressed concern over MMI's declining revenues. *Id.* In response to the Chase letter, Carco held a meeting on November 17, 2000 with Murphy, Maconachy, O'Neill, Carco's corporate planner, Michael Giordano ("Giordano") to discuss a business plan to deal with MMI's declining revenues. *Id.* At the meeting, O'Neill made clear that reversing the revenue trend required that MMI implement a new approach to sales with a focus on bringing in new clients to strengthen revenues. *Id.* O'Neill emphasized the importance of face-to-face meetings with new client prospects and instructed Maconachy that he bore primary responsibility for improving the sales effort at MMI West. *Id.* O'Neill instructed Maconachy and Murphy that each division of MMI had to meet a target of at least twenty face-to-face sales meetings per week with potential new clients in order to increase revenues. *Id.* at 225. Maconachy expressed disagreement with O'Neill's sales approach and left the meeting early. *Id.*

### (4)    Losses Incurred from November 17, 2000 to December 2002

On November 20, 2000, Maconachy prepared a sales plan for MMI West that was consistent with O'Neill's sales direction and provided for his staff to meet with at least four new client prospects daily and for him to devote one or two days per week to meeting prospective clients. *Id.* The plan acknowledged "the importance of 20 marketing/sales calls per week, and MMI West will work hard to accomplish that goal." (E-749-51.) In response, O'Neill stressed the importance of concentrated sales effort, clarified that the twenty sales calls' requirement was a minimum effort and could not be met by a simple phone call, made clear that Maconachy was

expected to personally spend at least two days in the field selling MMI's services to new customers, and instructed Maconachy to delegate case management to someone else so that he could lead the sales effort. *Id.* In a memo to O'Neill dated December 7, 2000 concerning his sales plan, Maconachy stated, "Everyone involved in sales at MMI West understands your instructions that we attempt to achieve a goal of twenty (20) street calls (defined by you, 'personal, face to face') per week . . . [W]e will put our best foot forward in attempting to . . . satisfy this goal." (E-695.) Maconachy never followed the sales plan and by year end MMI West's revenues were down by a total of $1.9 million. *Id.*

The flash revenue reports for January and February 2001 reflected continuing losses of MMI of approximately $270,000. *Id.* at 226. On March 2, 2001, Giordano, with input from Maconachy and Murphy, compiled a formal business plan for MMI to reverse MMI's losses, provided that each division of MMI would undertake twenty face-to-face sales meetings on new clients per week, provided for weekly reports to O'Neill outlining MMI's sales efforts, and outlined cost containment strategies. (*Id.* at 225; E-295-375.) The business plan recognized that one of the most important of the "[k]eys to success of MMI/CARCO" is "Marketing. We must focus our efforts on developing successful niche marketing. We need to find the quality-conscious client in the right channels, and we need to ensure that the potential client can find us." (E-301.) Pursuant to the business plan, Maconachy and Murphy "projected breakeven sales of $6 million" for 2001.[5] (E-296; 361-62.)

---

[5]In the preface to the 2001 Business Plan, O'Neill instructed Maconachy that, "The enclosed business plan provides you with the template you need to achieve th[is] objective[]. . . . I expect you to carry out the plan from this point forward. If any portion of the plan is unacceptable to you, it is incumbent upon you to submit, in writing, alternatives to breakeven for calendar year 2001." (E-296.) Maconachy neither objected to the business plan nor proposed written alternatives. At trial, O'Neill testified that the plan was intended as a road map" to the

O'Neill prepared a performance evaluation for MMI which concluded that MMI West's sales performance had been dismal, that MMI West had not made any significant effort to meet the target of twenty sales meetings per week, that the few sales calls made were only to existing or former clients, and that Maconachy had ignored the cost containment provisions of the business plan. *Carco*, 644 F. Supp. 2d at 226. In August 2001, O'Neill sought Murphy's assistance, in his capacity as general manager of MMI, to secure Maconachy's compliance with the business plan, however, as of October 2001, MMI West had yet to come close to meeting the target of twenty sales meetings per week. *Id.* Carco hired Michael Slattery in October 2001 as its President[6], and O'Neill gave Slattery the task of addressing MMI West's lack of profitability and, more specifically, Maconachy's failure to implement the business plan. *Id.*

In January 2002, Murphy and Maconachy submitted a second business plan for MMI[7] which reiterated MMI's commitment to make twenty face-to-face sales calls on new clients each week, outlined cost containment strategies and specifically identified 381 new businesses[8] that would be specifically targeted by MMI West for sales calls[9]. *Id.* at 226-27. By February 2002, O'Neill reported to Slattery that MMI West personnel were not pursuing sales meetings with the

[6]future success of MMI and set forth the "duties and responsibilities of each party that is participating in the plan." (T-192-93.) Maconachy testified "we adopted" the business plan. (T-380.)

[6]Slattery was Carco's president and chief operating officer from October 2001 through October 2004. (T-327.)

[7]In regard to the 2002 business plan, Maconachy testified, "it is our plan." (T-380.)

[8]Maconachy and his staff identified these entities as businesses within driving distance of MMI West's office, including large law firms and financial institutions, that were most likely to lead to new revenues. (E-176-187; T-381-83.)

[9]Of the 381 target prospects identified in the sales plan, Maconachy met with a total of 33 during the five years he was employed with Carco, which was only 8.6% of the total. *Id.* at 229.

target prospects and that Maconachy persisted in meeting only with existing customers.  *Id* at 227.

O'Neill directed Slattery to address this issue with Maconachy.  *Id.*  After reviewing MMI West's

weekly reports which continued to reflect Maconachy's failure to comply with the business plan[10],

in March 2002, Slattery demanded an explanation from Maconachy.  *Id.*  Slattery also informed

Maconachy that his failure to increase revenues would require cuts in MMI West's costs.  *Id.*

Maconachy responded in April 2002 that his staff had been too busy to implement the business

plan and so he had modified the plan to limit the sales efforts to existing clients; a plan which

O'Neill had specifically rejected.  *Id.*

 Upon learning of this development, O'Neill instructed Slattery to meet with Murphy and

Maconachy to address the sales problem.  *Id.*  At this meeting, although Maconachy reiterated that

he had abandoned the sales plan because it was unrealistic, Slattery reminded him that he had

helped formulate the plan[11] and made it clear that implementation of the sales plan was not

optional.  *Id.*  Slattery agreed to reduce the required number of sales meetings to seven per week

---

[10]In an e-mail to Maconachy dated March 26, 2002, Slattery stated:

> the failure to aggressively market will in the end impact revenue growth . . . I
> would rather cover our cost by growing revenues than cutting cost.  The only way
> we are capable of doing that is to have in the works of [the 2001 business plan] an
> 'aggressive marketing and sales system.'  The plan is an excellent plan.  The
> question is have we followed through.

(E-811-12.)

[11]In a memo to Maconachy dated April 8, 2002, Slattery stated:

> if you have a solution that would immediately erase the losses going forward, I am
> 'all ears.'  Short of a suggested solution . . . we need a herculean effort on the part
> of MMI's senior management to aggressively and efficiently sell services in
> accordance with [the 2001 business plan] developed and submitted by MMI.

(E-773-74.)

on target prospects, restated cost containment strategies and guidelines for business trips, and directed that client meetings be held by a single MMI employee. *Id.* In a follow-up memo dated April 25, 2002, Slattery told Maconachy and Murphy:

> After digesting our conversation and reading your respective responses to my inquiries about your sales plans, it is apparent to me that with few exceptions, the submitted sales plans have not been followed. Accordingly, I was extremely disappointed that I was not notified that you abandoned your sales plan in January 2002, which you originally submitted in November 2001, and resubmitted as part of MMI's business plan in February 2002. Moreover, you did not even prepare and submit a new plan. One has to question how MMI expects to generate new revenues and save the livelihood of our employees without designing and implementing a sales plan.
>
> I have stated from day one that the challenge faced by MMI is one of generating revenues and profit. If the revenues could not be increased, it would be necessary to align our cost structure with existing revenues in an effort to, at minimum, achieve breakeven status. With that as a backdrop, I have been disappointed with the marketing efforts.

(E-793.) Slattery reported back to O'Neill on the meeting and plans were made to further consolidate operations to reduce expenses and to ramp up the sales effort at MMI West to curtail mounting losses. *Carco*, 644 F. Supp. 2d at 227. By April 30, 2002, Maconachy again complained about the sales program, and Slattery issued an ultimatum directing him to personally conduct seven face-to-face sales calls each week from the target prospects list and demanding that Maconachy set sales targets for the balance of his staff. *Id.* at 227-28.

Notwithstanding the continuous direction by his superiors and Maconachy's agreement to sell new and existing services to new clients[12], throughout the balance of 2002, Maconachy failed

---

[12]In a memo to Murphy dated December 30, 2002 concerning MMI West's sales plan, Maconachy stated, "The objective of the Sales Plan continues to involve . . . selling new and existing services to new MMI clients . . . . With respect to making sales calls, Pauline, John Reardon and I will each be responsible for making sales calls. I will certainly make more calls than they do." (E-718, 721.)

to follow the sales plan, never met the reduced target of seven sales calls per week on target prospects, and did not comply with Carco's directives and policies.  *Id.* at 228-29.   In an effort to further cut costs, Carco reduced the staff at MMI.  *Id.*   MMI West's net loss for the period November 17, 2000 through December 2002 totaled $901,645.[13]  *Id.* at 240-41.

In January 2003, Slattery reported to Maconachy that MMI West's business was failing from a lack of management and absence of any good faith effort to follow corporate directives, and that Maconachy's refusal to market the business was the chief cause of personnel cuts, which further diminished the business's overall value.[14]  *Id.* at 230.  Maconachy suggested they discuss his termination and acknowledged that he had not been following corporate guidelines.[15]  *Id.*

### (5)   MMI West's Profitability After 2002

In the calendar years 2003, 2004 and 2005, MMI West became profitable.  (E-816; T-433.) MMI West's increased profitability was due in measures not attributable to Maconachy's actions, and was partly due to the reduction in MMI West's staff in 2002,[16] which reduced MMI West's salary expense by approximately $1 million.  *Carco*, 644 F. Supp. 2d at 241.

Although Maconachy repeatedly represented that he would actively participate in

---

[13]At trial, Maconachy conceded that he was responsible for generating revenues at MMI West and was responsible for MMI West's poor financial performance.  (T-373.)

[14]At trial, O'Neill testified that MMI West's failure to generate sufficient revenues to cover MMI's costs caused MMI West to incur cumulative net operating losses.  (T-188-189.)

[15]At trial, Maconachy testified that he would have graded himself an "F" for his "lack of meeting with as many people as they wanted me to every week."  (T-433.)

[16]MMI West's staff was reduced from 19 employees in 2000 to 5 full-time employees in late 2002.  (T-416.)

marketing MMI West's investigative services through making sales calls[17], at trial Maconachy testified that his best estimate was that in 2002, he went approximately 30 weeks without making a single face-to-face sales call; in 2003 he went approximately 30 to 40 weeks without making a single face-to-face sales call; in 2004 he went approximately 30 to 40 weeks without making a single face-to-face sales call; and in 2005 he went approximately 30 weeks without making a single face-to-face sales call.  (T-379-80.)  Between 2002 and 2005, Maconachy testified that he did not increase his sales efforts or sales calls but rather sought to drive the revenues by contacting "those prospects or existing clients by phone . . . and encouraging them to support [his] organization."  (T-380.)   In 2005, Maconachy sales efforts did not improve; he continued to resist compliance with MMI West's business plans, and Carco considered his termination.  (T-318.)

Weighing the profits from 2003 through 2005 against the losses from 2000 through 2002, MMI West had a total cumulative net profit for the six years of Maconachy's employment of $288,513.  (E-816.)   The net profit that was made between 2003 and 2005 was completely offset by the fact that MMI West ultimately proved to be a failed venture with no future benefit to Carco when Carco terminated Maconachy on December 28, 2005.  *Carco*, 644 F. Supp. 2d at 241.

**(B)      Procedural Background**

**(1)      The District Court's Decision After the Bench Trial**

By Opinion and Order dated April 29, 2009, the undersigned found, *inter alia*, that defendant breached both his employment agreement and the asset purchase agreement and was a faithless servant to Carco.  With respect to plaintiff's breach of contract claim, the court found

---

[17]For example, in his January 8, 2004 memo to Slattery regarding MMI West's sales plan, Maconachy stated that "[t]he MMI West Business Development Plan will actively involve participation by Drew Maconachy [and others].  Contacts and face-to-face meetings with new and existing clients will be made by each of us."  (E-377.)

two separate breaches of contract, to wit (1) Maconachy's failure to comply with the reasonable duties and directions given to him by his superiors, which first began on November 17, 2000 and continued until his termination in December 2005; and (2) Maconachy's involvement in the alteration of employment documents, which began in September 2003 and continued until his termination. The undersigned awarded judgment in favor of Carco and against Maconachy in the amount of $1,791,356. In addition, the court found that Carco was entitled to attorneys' fees, prejudgment interest and a declaratory judgment. Maconachy appealed to the United States Court of Appeals for the Second Circuit.

## (2)    The Second Circuit's Decision

By Amended Summary Order dated July 6, 2010, the Second Circuit affirmed the district court's findings that Maconachy breached his employment agreement and the asset purchase agreement and was a faithless servant. The Second Circuit found, however, that the district court erred "(1) in concluding that all net operating losses constituted general, as opposed to consequential damages, and (2) in failing to articulate the causal link between Maconachy's breaches and the damages awarded." *Carco*, 383 Fed. Appx. at 75. To this end, the Circuit observed:

> the district court failed to articulate any causal link between the breaches found and the damages awarded, stating only that MMI's lack of profitability was 'due almost exclusively to Maconachy's breach of the Performance Clause' because his 'performance and obedience was central to Carco's expectation of receiving a profitable business.' That Maconachy breached his employment contract does not necessarily mean the breach caused the company to be unprofitable. The district court should have first engaged in a proximate cause analysis to show that the breaches caused *some* loss. It should have then discussed potential intervening causes that might have broken the link between Maconachy's breach and any damages suffered.

*Id.* (emphasis in original). The Circuit explained that this court should have discussed evidence

13

suggesting potential intervening causes and other factors that may have caused the net losses other

than Maconachy's disobedience. *Id.* at 76.   The Circuit instructed that on remand, the district

court must determine:

> what damages, if any, were directly and proximately caused by Maconachy's
> breach.  These might include loss of salary paid to a disobedient employee, the
> value of lost opportunities, or any other damages the court concludes flowed from
> Maconachy's breaches.  The court must then determine which damages were
> general and which consequential.  It may only award consequential damages where
> the amount of loss can be ascertained with reasonable certainty.  To award general
> damages, the court need only be certain that *some* damage resulted from the
> breach; certainty as to the extent dollar amount is not required.

*Id.* (emphasis in original).  The Second Circuit vacated that portion of the final judgment that

awarded breach of contract damages to plaintiffs and remanded this case to the district court "to

recalculate damages, if any, in a manner consistent with this summary order." *Carco*, 383 Fed.

Appx. at 76.

### (3)    On Remand

At a conference held before the undersigned on September 1, 2010, the procedure for

resolving the limited remand on damages was established.  In particular, it was agreed that (i)

plaintiffs would submit proposed findings of fact in support an award of damages; (ii) defendant

would submit proposed findings noting any disputed facts; and (iii) plaintiffs may file a reply.

Each set of proposed findings was to include citations to the record.  A memorandum of law could

be submitted thereafter if the court requested one.  This procedure was agreed to by both parties.

By order dated December 22, 2010, the court (i) found the defendant's submissions failed

to comply with the aforementioned procedures; (ii) directed the defendant to submit its proposed

findings of fact in accordance with the outlined procedures; and (iii) directed that plaintiffs may

file a reply to defendant's submission.[18]  Defendant and plaintiffs timely filed their respective documents.

## DISCUSSION

The issue before the court on remand is narrow: to recalculate the breach of contract damages, if any, in a manner consistent with the Second Circuit's amended summary order.

### (A)    Legal Standard

Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988).  That principle "compels compliance [by the district court] on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *United States v Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001).  "To determine whether an issue may be reconsidered on remand, a district court should look to both the specific dictates of the remand order as well as the broader spirit of the mandate." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks and citation omitted); *see Meacham v. Knolls Atomic Power Laboratory*, 358 Fed. Appx. 233, 235 (2d Cir. 2009) (summary order) ("[W]e must always look to the opinion to interpret the mandate") (internal quotation marks and citation omitted).

The mandate here provides as follows:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of
the district court be AFFIRMED in part, VACATED in part, and REMANDED for

---

[18]By letter application dated February 22, 2011, Maconachy moved to strike Carco's reply proposed findings of fact as noncompliant with the procedure set forth by this court and/or Local Rule 56.1, or in the alternative, moved to file a sur-reply.  By order dated July 6, 2011, defendant's motion to strike the reply was denied, and defendant's motion in the alternative to file a sur-reply was granted.

> further proceedings. . . . We therefore VACATE the breach of contract damages award, and REMAND to the district court to recalculate damages, if any, in a manner consistent with this summary order. . . . Therefore, we AFFIRM the district court's judgment as to the faithless servant claim.

(Dkt. No. 143-1.) The Second Circuit's decision and mandate are identical. (Dkt. No 143.)

### (B)    Damages

In plaintiffs' proposed findings of fact, Carco offers three alternative measures of damages for Maconachy's breach of the EA and APA, namely (1) damages for its total lost capital investment in MMI West (or in the alternative damages for the loss of salary paid to a disobedient employee); (2) damages for the total loss of the value of the goodwill attributed to MMI West; and (3) damages for the loss of MMI West's business opportunities from 2000 through 2005. In considering these measures, the court employs the three-step analytical process set forth in the Circuit's Amended Summary Order, to wit (1) the court will first engage in a proximate cause analysis to show that Maconachy's breaches caused some loss; (2) the court will next consider potential intervening causes and/or other factors that might have broken the link between Maconachy's breach and the damages suffered; and (3) the court will then determine which damages are general and which are consequential.

### (1)    Proximate Cause Analysis

By failing to comply with the reasonable duties and directives of Carco, the undersigned found (and the Circuit affirmed) that Maconachy breached the employment agreement and asset purchase agreement; the first breach occurring on November 17, 2000. The trial record established that Maconachy's refusal to comply with Carco's directives to implement his sales programs proximately caused MMI West to incur losses. First, the evidence shows that (i) Maconachy proffered the Merrill Valuation Report ("Report") to Carco as an accurate valuation in

determining the purchase price for MMI and in projecting its post-acquisition revenues; (ii) Maconachy represented to Carco that the value of MMI may be even higher than the valuation in the Report; (iii) the Report stated that revenue generation was heavily dependent upon the principals, particularly Maconachy and Murphy; (iv) the Report noted that direct sales approaches to prospects were a fundamental part of MMI's approach to growing revenues; (v) the Report concluded that if Maconachy and Murphy continued to perform at the level prior to the acquisition, MMI's revenues could reasonably be projected to grow at annual rate of 20% in the first two years after the acquisition and at a rate of 15% thereafter; (vi) Carco relied on the projections and valuation in the Report to proceed with the purchase of MMI.

Moreover, the documentary and trial testimony establishes that (i) because Maconachy and Murphy were MMI's key assets, Carco required a long term employment agreement with Maconachy as a condition precedent to the purchase of MMI and explicitly described them to be an integral part of the asset purchase agreement; (ii) Carco reasonably expected and relied upon Maconachy and his staff to grow MMI West's revenues in accordance with the Report's projections; (iii) that in order to grow the business' revenues as expected, a business plan implementing a focused sales program, including new client prospects,[19] was required;[20] (iv)

---

[19]In a memo to all employees of MMI dated July 1, 2002, Murphy stated, "As we have discussed many times, the generation of new business is the key to our survival and growth." (E-653.)

[20]In addition, O'Neill testified at trial that based on his experience in the security industry, a security business could not make a profit except through sales and that in order to have sales, the business required a focused sales program. (T-176-79, 194, 202.) He further testified that Carco's management team "determined once and for all that [MMI's] loss] was a revenue generation issue, and we therefore had to put together a revenue generation, a/k/a sales plan, that everyone could participate in so we could successfully reach our financial goals." (T-192.)

17

Maconachy was repeatedly directed to implement his own sales plans[21]; (v) despite personally

agreeing to implement the plans, Maconachy disregarded them; and (vi) Maconachy's decision

not to implement his own sales business plans to increase revenues caused MMI to incur a loss of

sales for MMI West. Significantly, Maconachy conceded at trial that (i) it was his responsibility

to generate revenues at MMI West (T-373); (ii) he failed to accomplish/implement the business

sales plan requirements (T-379-80); and (iii) he bore responsibility for MMI West's poor financial

performance (T-373).

Finally, the record evidence makes clear that because the unique nature of MMI West's

business depended on sales to generate revenues[22], Maconachy's failure to implement his sales

plan and grow revenues through sales (i) in accordance with the parties' projections and

expectations and the Merrill Valuation Report and (ii) sufficient to cover costs[23], resulted in a

finding that at the time Maconachy was terminated in December 2005, MMI West was a failed

---

[21]Additionally, in a memo to Maconachy dated September 13, 2002, Slattery stated:

> Since I joined Carco 10 months ago I have attempted to assist you in moving the
> company business forward to achieve ongoing profitability. . . . I have explained
> that in order to achieve that goal it would be necessary to market those potential
> clients that could provide access to high end business that pay rates that are
> consistent with other national firms . . . I have been around the professional
> service business for a long time and the one thing I know is that you will never
> succeed unless you have a plan and more specifically a sales and operational plan.

(E-657.)

[22]In a memo to Maconachy dated July 1, 2002, Murphy stated, "We both agree that
revenue is the key factor for our success. We must generate additional revenues by increasing
our sales calls." (E-743.)

[23]O'Neill testified at trial that after Carco's acquisition of MMI, "The cause for the loss
was really, simply stated, the lack of sufficient revenues to cover [MMI's] fixed costs. . . .
"[T]he only way to [solve the loss] is to generate additional revenues. You have to look at your
revenue-generating machinery and say why is it not performing." (T-188.)

venture and a total loss to Carco. Accordingly, the undersigned concludes that Maconachy's breach of the agreements proximately caused MMI West to incur financial loss.

### (2) Intervening Causes and Other Factors

In his Proposed Findings of Fact, Maconachy identifies the following potential intervening causes for Carco's losses: (1) Carco's failure to provide introductions to prospective clients; (2) Carco's accounting decisions; and (3) market factors. The court will consider each potential cause in turn. In addition, potential factors such as the loss of William Bratton as President of Carco, Carco's due diligence and Carco's experience with high end investigations will also be considered.

### (a) Failure to Provide Introductions to Prospective Clients

Maconachy argues that Carco's failure to provide Maconachy and MMI West with the introductions to new prospects that were anticipated by the parties prior to the acquisition and as dictated by MMI's business plans was an intervening cause that inhibited MMI West's revenue performance. Contrary to Maconachy's argument, the trial evidence shows that O'Neill continually offered marketing assistance, encouraged Maconachy to use his connections but that on many occasions, Maconachy declined to coordinate with O'Neill or accept O'Neill's assistance.

A review of the record evidence reveals the following. The 2001 business plan of MMI provided that a main strategy for generating new business was to use the networking techniques of O'Neill to make contact with existing friends, business associates, colleagues, and clients to build a large network of potential clients. (E-337, 342.) The plan stated that while O'Neill would make the introductions to selected target customers, the staff of MMI bore the responsibility to close the sale. (*Id*.) At a January 15, 2001 meeting, O'Neill announced that he would devote 90% of his

time to marketing MMI.[24] (P-413.) O'Neill directed Maconachy to keep him in the loop with respect to all sales contacts and efforts by documentation. (*Id.*) The 2002 business plan reaffirmed the main strategy of the 2001 plan. (E-142, 147.) Despite this strategy, the record reflects that (i) Maconachy failed to take advantage of O'Neill's contacts and/or document his sales efforts;[25] (ii) O'Neill had provided MMI with opportunities to sell its services to Fortune 100 companies (E-705); (iii) O'Neill expected Maconachy to advise him and reach out to him about prospective clients so that he could assist with the contacts;[26] (iv) on the few occasions when Maconachy requested Carco's assistance with a prospective client, O'Neill and others at Carco

---

[24]Although Maconachy proffers O'Neill's testimony that in the six years of Maconachy's employment, other than the early Sears effort, O'Neill went on less than five sales calls with Maconachy (T-285), as discussed *infra,* his testimony is not inconsistent with Maconachy's failure to reach out to O'Neill for assistance accessing contacts at prospective clients and/or coordinating his sales efforts with O'Neill.

[25]For example, in a memo dated December 12, 2000, O'Neill encouraged Maconachy to advise him if he needed any assistance from Carco to assist in setting up marketing calls/contacts for his upcoming Chicago trip. (P-320.) In addition, in a memo dated February 14, 2001 from O'Neill to Murphy, O'Neill stated:

> An excellent example of our not taking advantage of the opportunity to sell to new clients can best be demonstrated using Drew's recent trip in February to Minneapolis. Drew spend part of two weeks in Minneapolis at a client's expense. I repeatedly urged him to make sales calls during his stay, even if it meant that he had to stay beyond the time required by the client. I set him up with Sandy Sandquist of Pillsbury and Fred Lafferty of Cargill . . . . To date, I have only seen one sales report from that trip (the 3M Company). I can only surmise by the lack of a written follow-up that this was the only sales call made during this trip. We have no idea when we will get the opportunity to visit this area of the country again. To not take advantage of these kinds of opportunities is terribly disturbing to me. I would hope that you share my feelings and will take appropriate action, if you have not already done so, to prevent a reoccurrence of this nature.

(E-705.)

[26]At trial, O'Neill testified that "if I saw they were going to XYZ business in San Francisco . . . I might know the chief security officer and say, don't do this, don't do that. The guy's hot buttons are time, service and so forth. Hey when you are out in the field, remind him of this, this and this. And I'm offering my wares in helping the sales process." (T-195.)

complied[27] (T-182, 202, 274, 285; P-320); (v) had Maconachy informed O'Neill of his sales prospects, he could have made an introduction to the prospective clients;[28] but (vi) instead of reaching out to O'Neill for assistance, Maconachy chose to make calls without a prior introduction (which O'Neill advised him was not an acceptable method) (T-274,431, 445). Accordingly, based on the record, it cannot be said that Carco's alleged failure to make introductions to prospects was an intervening cause for Carco's losses.

### (b)    Accounting Decisions

Maconachy avers that Carco's unilateral accounting decisions negatively impacted MMI West's profitability and were an intervening cause of its losses. Specifically, he argues that a substantial part of Carco's financial losses resulted from Carco's decisions to allocate to MMI costs of the MMI acquisition, interest, amortization of goodwill, intercompany interest and intercompany depreciation for other Carco corporate expenses and a percentage of Carco's

---

[27]Maconachy avers that when he requested Carco's help in May 2002 to identify Carco's contacts at the prospects identified in the business plan, O'Neill ridiculed him as putting the "monkey" on someone else's back and directed Slattery to reject his request. (E-611-13.) However, a review of the relevant documents shows that Maconachy's request was not a request for assistance in accessing O'Neill's contacts, but rather was in response to Slattery's request for him to identify the Fortune 1000 companies and begin marketing MMI's services. (Id.) O'Neill testified at trial that Maconachy and his administrative staff "were extremely capable of going on the internet and going to the Fortune 500 companies and pushing a button and saying, 500 largest financial, 500 largest industrial, insurance companies. That's not what we offered. What we offered was, if you tell me General Motors, General Mills, General Electric, can you get us into General Motors, General Mills, General Electric? Therein, we would use our contacts from the various sources I mentioned previously." (T-275-76.)

[28]For example, in a Weekly Travel Schedule dated February 25, 2002, Maconachy reported that he visited prospects in San Francisco that week, and on the face of the document, O'Neill wrote, "If Drew told me that he was going to San Francisco I would have helped him visit targets." (E-660.) And with respect to that trip, O'Neill testified that Maconachy "went to see Joseph [Russoniello] and Co[ol]ey God[ward] law firm. He and I went to law school together, friends for 50 years, and currently the U.S. Attorney in San Francisco. And I could have helped him with situations like that versus going in: My name is Drew Maconachy, and I'm from Carco." (T-205.)

general and administrative expenses, as well as taxes. Plaintiffs have represented, however, that to the extent that MMI West's reported profits were reduced by acquisition costs in the accounting statements, Carco has reversed those costs for the purposes of measuring damages. Accordingly, given that the allocation of acquisition costs have been removed and therefore have no effect on Carco's damages claims, Carco's accounting decisions are not an intervening cause.

### (c)    Market Factors

Maconachy contends that environmental market factors adversely affected MMI West's financial performance and were an intervening cause of MMI West's losses. The record evidence indicates that prior to the acquisition of MMI (i) the parties discussed the trends in the market for environmental investigations (E-286); (ii) MMI's environmental scientists actually told Carco that the environmental business was increasing, not decreasing (E-286); (iii) Maconachy told Giordano that while he did not dispute that the environmental business was on the decline, certain segments of the environmental market were increasing and might continue to do so for up to ten years because certain states, like California, enacted statutes broadening an insurer's duty to defend insureds sued for environmental contamination (*id.*); and (iv) when the Merrill Valuation Report's revenue projections for 1999 were shown to be optimistic, due to the declining environmental market the purchase price for MMI was downwardly adjusted to $7.2 million (which was below the $10.8-$12 million range in value to a synertistic buyer) (E-391, E-7-8). Because the decline in environmental market was already factored into Carco's acquisition costs and expectations, it was not an intervening cause of Carco's lost capital investment in MMI West.

That is not to say, however, that the declining environmental market trend did not have any impact on MMI West's loss of business opportunities. The record evidence indicates that (i) the 2001 business plan acknowledged that environmental market revenues declined from 75% of MMI revenues in 1997 to approximately 45% in 2000 to 33% in 2001 (E-108, 303); (ii) the 2001

business plan also reported that in the calendar year 2000, the four-year trend in declining

revenues from an ever-shrinking environmental support services market resulted in a loss of

approximately $1.8 million in the MMI operation, creating working capital shortfalls, and

necessitating cash infusions from the parent company and the company's bank (E-302);[29] (iii) the

2002 business plan stated that in the calendar year 2001, the five-year trend in declining revenues

from an ever-shrinking environmental support services market resulted in a loss of approximately

$1.7 million in the MMI operation, creating working capital shortfalls, and necessitating cash

infusions from the parent company and the company's bank (E-107);[30] (iv) and Slattery testified

that prior to his arrival at MMI, there were a variety of business reasons for MMI's losses, part of

which was a change in the environmental marketplace (T-328).  Although the court cannot

determine with precision the extent to which the declining environmental market trend had on

MMI West's loss of business opportunities and future profits[31], the court nonetheless concludes

that this factor was an intervening cause which broke the link between Maconachy's breaches and

such damages.

Conversely, the court observes that market factors (including the increasing market

revenues for investigative services commencing in the calendar year 2003) impacted, in part, on

the retention of MMI West's goodwill and on the return of Carco's capital investment.  While the

Merrill Valuation Report did not disclose a material decline in the environmental aspect of

---

[29]The 2001 business plan also stated that the plan was designed to provide the framework within which to reverse the heavy losses presently being incurred by the company because of the trend.  (*Id.*)

[30]The 2002 business plan also stated that although the rate of loss in fiscal year 2002 has decreased 34%, the focus of the company is to continue to reverse the heavy losses and this plan was designed to provide the framework within which to accomplish this objective.  (*Id*.)

[31]Notably, at trial counsel for Carco conceded that Carco was not seeking lost future profits as part of its damages' claim.  (T-492.)

MMM's business prior to Carco's acquisition, the 2001 and 2002 business reports for Carco/MMI acknowledged a four-year and five-year trend respectively, in declining revenues from an ever-shrinking environmental support services market which resulted in losses to the MMI business operations. Significantly, however, the record shows that MMI's market in the calendar years 2003, 2004 and 2005 began to turn and MMI became profitable, albeit not for any actions attributable to Maconachy and in part due to the reduction of staff in 2002. In addition, there is record evidence that after Maconachy's termination,[32] MMI West provided net positive earnings to Carco of $227,549 for the first quarter of 2007, over a year after Maconachy's termination. (DSB-109-135 Ex. 516) Although the court cannot determine with precision the extent to which the turn around in MMI's profitability had on the retention of MMI West's goodwill as well as on Carco's return on its capital investment in MMI West that were lost due to Maconachy's breaches, the court nonetheless concludes that this factor was an intervening cause which broke the link between Maconachy's breaches and such damages.

Accordingly, the court will not consider Carco's measure of damages for MMI West's loss of business opportunities, for MMI West's loss of goodwill, or for Carco's capital investment in MMI West (except to the extent that it included salary paid to a disobedient employee).

### (d) Loss of William Bratton

Although Maconachy made an argument on its appeal of the underlying decision that the

---

[32]By letter application dated February 22, 2011, Maconachy moves to withdraw certain testimony not contained in the trial record, viz. from the Reno deposition at page 122 line 16 through page 123 line 5. Maconachy's motion is granted. By letter response dated February 25, 2011, Carco avers that all documents or testimony (except for Exhibit 516) concerning the performance of MMI West subsequent to Maconachy's termination should be precluded based on the fact that the testimony and documents were outside of the trial record. The court agrees. The within decision is based on the record evidence at trial. Accordingly, documents and testimony that were not admitted into evidence will not be considered. Because Exhibit 516 was received into evidence pursuant to a stipulation of the parties on August 1, 2008, it will be considered by the court.

loss of William Bratton as President of Carco was an intervening cause for MMI's losses, he has not asserted this factor in his proposed findings of fact. The court will nevertheless address this potential factor. The record evidence indicates that in January 2000, shortly after Carco's acquisition of MMI, Bratton was terminated. (D-LL.) A memo from Giordano dated December 11, 2000 to the Carco/MMI Business File which documented the November 17, 2000 meeting states:

> Subsequent to Murphy and Maconachy's departure, Messrs. O'Neill, Carney and Giordano had a brief discussion concerning how much W. Bratton's departure may have hurt the sales effort as Maconachy maintained. It was pointed out that Maconachy made extensive calls with Bratton over a period of approximately five months (see attached) and that absolutely no business was obtained from such contacts. Therefore, to suggest that the termination of Bratton was a significant factor in MMI's lack of performance does not appear reasonable.

(*Id.*) (emphasis in original). As there is no record evidence that Maconachy followed up on Bratton's introductions[33] and closed new business deals for MMI, it cannot be said that Bratton's presence or lack thereof was an intervening cause for MMI West's losses.

### (e)  Carco's Alleged Inexperience with High End Investigations

Although Maconachy made an argument on its appeal of the underlying decision that Carco's alleged lack of experience was an intervening cause for MMI's losses, he has not asserted this factor in his proposed findings of fact. The court will nevertheless address this potential factor. The record evidence indicates that prior to Carco's purchase of MMI, the company had always had a presence in high end investigations, and O'Neill and other Carco personnel would, upon request from clients, perform such investigations. (T-8-9.) Notably, Carco was looking to expand that line of business. (*Id.*) Moreover, Carco's acquisition of MMI was an extension of its

---

[33]The only sales call with Bratton that led to a new revenues was Sears, however, it was O'Neill who introduced Bratton and Maconachy to Sears and cultivated the relationship. (T-202.)

existing investigative business. (*Id.*) Finally, after the acquisition, a large percentage of MMI West's revenues were derived from ordinary background investigations rather than high-end investigations. (T-201-02.) In short, there is no evidence that Carco's experience or lack thereof was a cause in MMI West's decline in revenues.

### (f)    Carco's Alleged Inadequate Due Diligence

Maconachy made an argument on its appeal of the underlying decision that Carco's alleged failure to conduct due diligence was an intervening cause for MMI's losses. At trial, however, Carco offered proof on the extent of its due diligence but Maconachy had objected to the admissibility of such proof. Inasmuch as this court sustained Maconachy's objection disallowing any evidence of Carco's due diligence, such a factor cannot now on remand be considered as an intervening cause for MMI West's losses.

### (3)    General Damages and Consequential Damages

Having employed the first two steps of the Second Circuit's analytical process for the recalculation of damages, if any, that were proximately caused by Maconachy's breach, there remains one measure of damages proffered by Carco for the court to consider, namely damages for the loss of salary paid to a disobedient employee.

In an action for breach of contract, a plaintiff may seek general damages or consequential damages. *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000). In the Amended Summary Order, the Second Circuit explained:

> General damages seek to compensate the plaintiff for the value of the very performance promised, often determined by the market value of the good or service to be provided. Consequential damages, by contrast, are those that result when the non-breaching party's ability to profit from related transactions is hindered by the breach. In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract. When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are lost. Thus, any damages resulting

from Carco's inability to secure new business were consequential. The distinction is important because, unlike general damages, consequential damages may be recovered only where the amount of loss is capable of proof with reasonable certainty.

*Carco Group, Inc.*, 383 Fed. Appx. at 75 (internal quotation marks and citations omitted).

Maconachy's disobedience and breach of his covenant to "perform such duties as the Members of the Company may assign" proximately caused Carco's loss because it rendered Maconachy's promised performance worthless to Carco and the compensation Carco paid to Maconachy was a total loss. Because awarding Carco the lost salary it paid Maconachy would compensate Carco for the value of the very performance promised by Maconachy but which Maconachy failed to deliver, such an award would constitute general damages. Carco's actual damages for Maconachy's breaches of the EA and APA is the salary Carco paid Maconachy and which Carco lost due to Maconachy's breach which the court found at trial to have commenced on November 17, 2000 until the date of his termination on December 28, 2005. However, as a form of disgorgement under its faithless servant claim, Carco already recovered Maconachy's salary from September 26, 2003 to December 28, 2005. Therefore, the court finds that Carco is entitled to an award of the salary it paid to Maconachy and which Carco lost due to Maconachy's breach from November 17, 2000 to September 25, 2003.

Pursuant to the employment agreement, Carco paid Maconachy a base salary of $200,000 per year. (E-433.) Based on Maconachy's annual salary of $200,000 per year, the total unrecovered salary that Carco paid Maconachy from November 17, 2000 through September 25, 2003 is calculated by dividing Maconachy's annual salary of $200,000 per year by the number of days in a year, and then multiplying Maconachy's average daily salary of $547.95 by the total number of days in each month as follows:

| Month | Year | Days | Salary |
|-------|------|------|--------|
| November | 2000 | 14 | $ 7,671.23 |
| December | 2000 | <u>31</u> | <u>16,986.30</u> |
| TOTAL | 2000 | 45 | $ 24,657.53 |
| | | | |
| TOTAL | 2001 | 365 | $ 200,000.00 |
| | | | |
| TOTAL | 2002 | 365 | $ 200,000.00 |
| | | | |
| January | 2003 | 31 | $ 16,986.30 |
| February | 2003 | 28 | $ 15, 342.47 |
| March | 2003 | 31 | $ 16,986.30 |
| April | 2003 | 30 | $ 16,438.36 |
| May | 2003 | 31 | $ 16,986.30 |
| June | 2003 | 30 | $ 16,438.36 |
| July | 2003 | 31 | $ 16,986.30 |
| August | 2003 | 31 | $ 16,986.30 |
| September | 2003 | <u>25</u> | <u>$ 13,698.63</u> |
| TOTAL | 2003 | 268 | <u>$ 146,849.32</u> |
| | | | |
| TOTAL SALARY: | | | $ 571,506.85 |

In sum, the total unrecovered salary that Carco paid Maconachy from November 17, 2000 through September 25, 2003 totaled $571,506.85. Accordingly, the court finds that Carco is entitled to damages in the amount of $571, 506.85 for Maconachy's breach of the agreements.

### (C)     Prejudgment Interest

"A plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right." *United States Naval Inst. v. Charter Comm., Inc.*, 936 F.2d 692, 698 (2d Cir. 1991). Section 5001(a) of the New York Civil Practice Law and Rules ("N.Y.C.P.L.R.") Provides, in part, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract."   N.Y.C.P.L.R § 5001(a).  Section 5001(b) further provides that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed." N.Y.C.P.L.R § 5001(b).  In New York, the statutory rate for pre-judgment interest in a breach of contract action is nine (9) percent annum. N.Y. C.P.L.R. § 5004; *see also Marfia v. T.C. Ziraat*

*Bankasi,* 147 F.3d 83, 90-91 (2d Cir. 1998)(citing *Patane v. Romeo,* 235 A.D.2d 649 (3d Dep't 1997)); *Kaufman v. LeCurt Constr. Co.,* 196 A.D.2d 577 (2d Dep't 1993)). Thus, the court finds that Carco is entitled to prejudgment interest at the simple rate of 9 percent per annum calculated from November 17, 2000, the date the first breach began.

## CONCLUSION

For the reasons set forth above, the undersigned awards Carco damages in the amount of $571,506.85 under its breach of contract claims, plus nine (9) percent prejudgment interest to be calculated by the Clerk of the Court from November 17, 2000 through the entry of judgment. The Clerk of the Court is directed to enter judgment consistent with this decision.

No later than August 3, 2011, Carco is directed to submit an affidavit(s) detailing its attorneys' fees. Maconachy may submit any objections to the calculation of attorney's fees no later than August 17, 2011 upon which the undersigned will amend the judgment to include the appropriate amount.


Dated: Central Islip, New York          **SO ORDERED:**
          July 19, 2011


                                        _____s/_____

                                        ARLENE R. LINDSAY
                                        United States Magistrate Judge